# EXHIBIT 1

Filing # 50613392 E-Filed 12/29/2016 03:54:01 PM

RECEIVED
DEC 30 2016
By

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 16-31568-CA-01

MARTINAIR HOLLAND N.V., a foreign corporation,

        Petitioner,

v.

BENIHANA, INC., a Delaware corporation,

        Defendant.

_____/

## AMENDED COMPLAINT FOR BREACH OF SUBLEASE

Plaintiff, MARTINAIR HOLLAND N.V., a foreign corporation, by and through its undersigned counsel, hereby sues Defendant, BENIHANA INC. , a Delaware corporation, and states as follows:

    1.    This is a cause of action for breach of commercial lease contract, for past and future rents, damages, and other relief, all in excess of $15,000 exclusive of interest, costs, and attorney's fees.

    2.    This action concerns real property located in Miami-Dade County.

    3.    Plaintiff, MARTINAIR HOLLAND, N.V. ("MARTINAIR") is a business entity existing under the laws of Holland registered and qualified to do business in the State of Florida and doing business in the State of Florida and Miami-Dade County.

4.     Defendant, BENIHANA INC. ("BENIHANA") is a Delaware corporation doing registered and qualified to do business in the State of Florida and doing business in the State of Florida and Miami-Dade County.

5.     Plaintiff, MARTINAIR, was the lessee of commercial office space at the Doral Corporate Center 1 located at 8750 NW 36th Street, Doral Florida pursuant to the Office Lease Agreement with Hines VAF II, Doral LP. The Office Lease Agreement ("Master Lease") is Exhibit A to the Sublease which is attached hereto as Exhibit A and incorporated by reference.

6.     Plaintiff, MARTINAIR, leased 14,569 square feet of office space on the Third Floor of the Doral Corporate Center 1 as more particularly described in the Master Lease ("Office Space")

7.     All occurrences herein complained of took place in Miami-Dade County.

8.     On December 16, 2011, Plaintiff, MARTINAIR subleased the Office Space to Defendant, BENIHANA. The parties entered into the Sublease with a commencement date of December 16, 2011 and a termination date of January 30, 2018.

9.     As part of the Sublease, Defendant, BENIHANA, was required to make lease payments to Plaintiff, MARTINAIR, for the duration of the sublease.

10.     Defendant, BENIHANA, agreed to pay Monthly Base Rent, plus Additional Rent as set forth in the Sublease in exchange for continued possession of the Office Space.

11.     On April 28, 2014, Defendant, BENIHANA, mailed its notice of termination to Plaintiff, MARTINAIR. A copy of Defendant, BENIHANA'S Notice of Termination is attached hereto as Exhibit B.

2

12.     Pursuant to the Sublease, the Notice of Termination was defective as Defendant, BENIHANA, failed to timely notify Plaintiff, MARTINAIR, that it was terminating the Sublease.

13.     Even though, it failed to provide timely notice of its termination of the Sublease, Defendant, BENIHANA, on or about December 28, 2014, vacated and abandoned the Office Space and stopped making the Base Rent and Additional Rent payments.

14.     Defendant, BENIHANA, breached the lease by failing to make the required Base Rent and Additional Rent payments as required by the Sublease.

15.     Defendant, BENIHANA, further breached the lease by seeking to terminate  the Sublease in violation of the  Sublease.

16.     As a result of Defendant's, BENIHANA, breach of and default under the Sublease, the Lease was terminated.

17.     Plaintiff, MARTINAIR, suffered damages, including but not limited to owing rent to landlord through January 2018, loss of its fixtures, furniture, equipment,  unamortized sums expended for improvements, furniture, fixtures and equipment, and costs (attorney's fees and costs)  as a result of the Lease being terminated.

18.     Pursuant to the Sublease, Defendant, BENIHANA, owes to Plaintiff, MARTINAIR, all damages suffered including but not limited to:

(a)     Rents owed through January 2018

(b)     Unamortized sums expended for improvements, fixtures, equipment and furniture;

(c)     Unamortized sums expended for attorney's fees and leasing commission;

(d)     Costs, including attorney's fees incurred in connection with the termination of the Lease;

3

(e)     Charges;

(f)     Additional Rent;

(g)     Costs for alteration or repair to the Office Space required for re-letting; and

(h)     All other damages incurred by Plaintiff.

19.     As a result of Defendant's, BENIHANA, breach of and default under the Sublease, Plaintiff, MARTINAIR, has suffered and continues to suffer and will continue to suffer monetary damages plus interest, court costs, and attorney's fees.

20.     As a result of Defendant's, BENIHANA, breach of and default under the Sublease, Plaintiff, MARTINAIR, was required to hire the undersigned law firm and to agree to pay said law firm a reasonable fee for services.

WHEREFORE, Plaintiff, MARTINAIR HOLLAND N.V., demands judgement against Defendant, BENIHANA INC., for damages as set forth above, prejudgment interest, post-judgment interest, attorney's fees, costs, and such other relief as the Court deems proper and just.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of December, 2016, I electronically filed the foregoing document with the Clerk of Court using the Florida Courts E-Filing Portal. I also certify that the foregoing document is being served this day on all counsel of record and/or interested parties in the below Service List, pursuant to rule 2.516, Florida Rules of Judicial Administration.

4

**GRAYROBINSON, P.A.**
*Counsel for Plaintiff,* Martinair Holland N.V.
333 S.E. 2nd Avenue
Suite 3200
Miami, Florida 33131
Telephone:  (305) 416-6880
Facsimile:  (305) 416-6887


  */s/ Bradley S. Gould*                              .
Bradley S. Gould, Esq.;
Florida Bar Number.: 966150
Primary email: bradley.gould@gray-robinson.com
Secondary email: dghernandez@gray-robinson.com

5

## SERVICE LIST

**By Federal Express Tracking No:  7780 6518 1927**
**Benihana, Inc.**
21500 Biscayne Boulevard
Aventura, FL 33180

SUBLEASE

1. **PARTIES.**
This Sublease, dated December 16, 2011, is made between Martinair Holland, N.V., a foreign corporation registered to do business in the State of Florida ("Sublessor"), and Benihana Inc., a Delaware corporation ("Sublessee").

2. **MASTER LEASE.**
Sublessor is the Tenant under that certain Office Lease Agreement dated March 20, 2007, wherein Hines VAF II Doral, L.P., ("Lessor") leased to Sublessor certain premises consisting of 14,569 rentable square feet known as Suite 300 (the "Master Premises"), located on the third floor of a building in the City of Doral, County of Miami-Dade, State of Florida, commonly known as Doral Corporate Center I, located at 8750 NW 36th Street, Doral, Florida 33178 ("Building"). Said lease is herein referred to as the "Master Lease" and is attached hereto as Exhibit "A." Initially capitalized terms used herein but not defined shall have the meaning given in the Master Lease.

3. **PREMISES.**
Sublessor hereby subleases to Sublessee on the terms and conditions set forth in this Sublease all of the Master Premises ("Premises").

4. **WARRANTY BY SUBLESSOR.**

4.1 Sublessor warrants and represents to Sublessee that (i) the Master Lease is in full force and effect, and has not been amended or modified, (ii) that Sublessor is not now, and as of the commencement of the Term hereof will not be, in default or breach of any of the provisions of the Master Lease, (iii) Sublessor has no knowledge of any claim by Lessor that Sublessor is in default or breach of any of the provisions of the Master Lease, (iv) the Master Lease has not been assigned, nor has any portion of the Premises been subleased, (v) Sublessor holds the entire Tenant's interest in the Master Premises under the Master Lease, free and clear of any liens, claims, mortgages, charges or encumbrances, subleases and occupancies (other than this Sublease and the Master Lease), (vi) Sublessor has full right and power to execute this Sublease and to sublease the Premises to Sublessee, subject only to the consent of Lessor, and (vii) no agreement or understanding exists between Sublessor and Lessor with respect to the Premises except as disclosed in the Master Lease and this Sublease.

4.2 Whenever the consent of Lessor shall be required, or whenever Lessor shall fail to perform its obligations under the Master Lease, Sublessor agrees to use commercially reasonable efforts to assist Sublessee to obtain, such consent and/or performance on behalf of Sublessee.

4.3 Sublessor covenants as follows: (a) not to terminate the Master Lease voluntarily or exercise any option to terminate the Master Lease (except as permitted under the Master Lease following any damage, destruction, or condemnation of the Master Premises or the Building), without the prior written consent of Sublessee, (b) not to modify the Master Lease without the prior written consent of Sublessee in the case that such modification affects the rights of Sublessee under this Sublease, and (c) to take all actions reasonably necessary to preserve and enforce the Master Lease. In the event any damage, destruction or condemnation of the Master Premises or the Building gives Sublessor the right to terminate the Master Lease and Sublessor intends to terminate the Master Lease, Sublessor shall give Sublessee thirty (30) days' prior written notice before terminating the Master Lease.

4.4 Sublessor shall remit all Rent paid under this Sublease, plus the shortfall between the Rent and any sums due to Lessor under the Master Lease, to Lessor on or before the date that such payments are due under the Master Lease.

5. **TERM.**
The term of this Sublease (the "Term") shall commence on December 15, 2011 ("Commencement Date"), or when Lessor consents to this Sublease whichever shall last occur, and end on January 30, 2018 ("Termination Date"), unless otherwise sooner terminated in accordance with the provisions of this Sublease. In the event the Term commences on a date other than the Commencement Date, Sublessor and Sublessee shall execute a memorandum setting forth the actual date of commencement of the Term. Possession of the Premises

Exhibit A

("Possession") shall be delivered to Sublessee on the commencement of the Term. If for any reason Sublessor does not deliver Possession to Sublessee on the commencement of the Term, the Termination Date shall not be extended by the delay, and the validity of this Sublease shall not be impaired, but rent shall abate until delivery of Possession. Notwithstanding the foregoing, if Sublessor has not delivered Possession to Sublessee within fifteen (15) days after the Commencement Date, then at any time thereafter and before delivery of Possession, Sublessee may terminate this Sublease by giving written notice to Sublessor. Said notice shall set forth an effective date for such cancellation which shall be at least five (5) days after delivery of said notice to Sublessor. If Sublessor delivers Possession to Sublessee on or before such effective date, this Sublease shall remain in full force and effect. If Sublessor fails to deliver Possession to Sublessee on or before such effective date, this Sublease shall be cancelled, in which case all sums previously paid by Sublessee to Sublessor in connection with this Sublease shall be returned to Sublessee without any interests, this Sublease shall thereafter be of no further force or effect, and Sublessor shall have no further liability to Sublessee on account of such delay or cancellation. If Sublessor permits Sublessee to take Possession prior to the Commencement Date, such early Possession shall not advance the Termination Date and shall be subject to the provisions of this Sublease, including without limitation the payment of Rent.

6.  **RENT.**

6.1  *Minimum Rent.* Sublessee shall pay to Sublessor as minimum rent, without deduction, set off, notice, or demand, except as otherwise provided in this Sublease, via wire transfer to the following:

**Bank: Citibank New York**
**Account #: 30826866**
**ABA Code: 21000089**
**Beneficiary Name: Martinair Holland N.V.**
**SWIFT Code: CITIUS33**

or as Sublessor shall designate from time to time by notice to Sublessee, the sum of Eleven Dollars ($11.00) per square foot with 4% annual increases, in advance on the first day of each month of the Term. If the Term begins or ends on a day other than the first or last day of a month, the rent for the partial months shall be prorated on a per diem basis. For the avoidance of doubt, the Base Rent is calculated in the following schedule:

| PERIOD OF TERM: | $/RSF | ANNUALIZED BASE RENT: | MONTHLY BASE RENT:* |
|---|---|---|---|
| Commencement Date ~ 1/31/12 | $11.00 | $160,259.00 | $13,354.92 |
| 2/1/12 – 1/31/13 | $11.44 | $166,669.36 | $13,889.11 |
| 2/1/13 – 1/31/14 | $11.90 | $173,371.10 | $14,447.59 |
| 2/1/14 – 1/31/15 | $12.38 | $180,364.22 | $15,030.35 |
| 2/1/15 – 1/31/16 | $12.88 | $187,648.72 | $15,637.39 |
| 2/1/16 – 1/31/17 | $13.40 | $195,224.60 | $16,268.72 |
| 2/1/17 – Termination Date | $13.94 | $203,091.86 | $16,924.32 |

*Plus applicable sales tax

6.2  *Operating Costs.* Sublessee shall pay to Sublessor, as additional rent, the actual Additional Rental payable under the Master Lease, in accordance with the terms and conditions of the Master Lease ("Additional Rental"). Additional Rental shall be payable simultaneously with Sublessee's payments of Base Rent. If adjustments between estimated and actual Additional Rental are made under the Master Lease, then Sublessor shall deliver written notice to Sublessee, whereupon the obligations of Sublessor and Sublessee hereunder shall be adjusted accordingly. If any such adjustment shall occur after the expiration or earlier termination of the Term, then the obligations of Sublessor and Sublessee under this Subsection 6.2 shall survive such expiration or termination. During the Term, Sublessor shall furnish Sublessee with copies of all statements or correspondence related to Additional Rental (including, without limitation, the Annual Operating Expense Statement) within five (5) business days after Sublessor's receipt thereof. Upon Sublessee's request, Sublessor shall review Lessor's records and perform an audit of Operating Expenses on behalf of Sublessee, pursuant to the terms and conditions of Paragraph 2.3 of the Master Lease. Such audit shall be conducted by

a third-party accountant, approved by Sublessee in Sublessee's reasonable discretion. The cost of such audit shall be paid by Sublessee. However if the cost of such audit is reimbursed to Sublessor pursuant to 2.3(e) of the Master Lease, such sum shall be reimbursed to Sublessee within fifteen (15) days after Sublessor's receipt thereof. Base Rent and Additional Rental are sometimes collectively referred to as "Rent."

7.   **FURNITURE LICENSE.**

Sublessor grants Sublessee an irrevocable license during the Term to exclusively use the furniture, fixtures, and equipment described on Exhibit B, attached hereto and incorporated herein by reference, (the "Furniture") at the Premises during the Term of this Sublease, at no cost. Sublessee acknowledges that it accepts the Furniture in as-is condition without any warranty whatsoever express or implied. Sublessee shall deposit with Sublessor upon execution of this Sublease the sum of $25,000.00 (TWENTY FIVE THOUSAND DOLLARS 00/100 US/CY) as security for Sublessee's care and maintenance of the Furniture (the "Furniture Deposit"). Upon the expiration or earlier termination of this Sublease, Sublessee shall leave the Furniture in the Premises, in the same condition, normal wear and tear excepted, as existed on the Commencement Date. If the Furniture or any part thereof is damaged or destroyed during the Term or while in Sublessee's possession, then Sublessor may use or apply all or any portion of the Furniture Deposit for compensation for the cost of the damaged Furniture upon the expiration of the Term. Within thirty (30) days after the Termination Date, the Furniture Deposit, or so much thereof as had not theretofore been applied by Sublessor, shall be returned to Sublessee or to the last assignee, if any, of Sublessee's interest hereunder.

8.   **USE OF PREMISES.**

The Premises shall be used and occupied for any purpose permitted in the Master Lease, and for no other use or purpose.

9.   **ASSIGNMENT AND SUBLETTING.**

Sublessee shall have the right to sublease, assign or otherwise permit occupancy of all or any portion of its space to the extent permissible under the Master Lease, including without limitation, to any related entity, subsidiary, parent company or affiliate of Sublessee, any company in which Sublessee has a controlling interest, or to any successor corporation, whether by merger, consolidation or otherwise or to any person who purchases all or substantially all of Sublessee's assets without the Sublessor's approval or consent but only if and to the extent permitted under the Master Lease and not without the prior written consent of Lessor, if such is required under the terms of the Master Lease.

10.  **OTHER PROVISIONS OF SUBLEASE.**

10.1.  All applicable terms and conditions of the Master Lease are incorporated into and made a part of this Sublease as if Sublessor were the Landlord thereunder (except as otherwise provided in Section 10.3), Sublessee the Tenant thereunder, and the Premises the Master Premises. Sublessee assumes and agrees to perform the obligations of the Tenant under the Master Lease, and shall receive all benefits and rights of the Tenant under the Master Lease, during the Term, except as otherwise set forth in this Sublease.

10.2.  Sublessee shall not commit any act or omission that will violate any of the provisions of the Master Lease (except as set forth in this Sublease). Sublessor shall use best efforts in attempting to cause Lessor to perform its obligations under the Master Lease for the benefit of Sublessee. If the Master Lease terminates, this Sublease shall terminate and the parties shall be relieved of any further liability or obligation under this Sublease, provided however, that if the Master Lease terminates as a result of a default or breach by Sublessor or Sublessee under this Sublease and/or the Master Lease, then the defaulting party shall be liable to the non defaulting party for the damage suffered as a result of such termination but in no event shall either party be liable to the other for  any consequential damages.

10.3.  Notwithstanding the foregoing or anything to the contrary, in the event that any provisions of the Master Lease are contradicted by this Sublease, the terms of this Sublease shall control over the Master Lease as between Sublessee and Sublessor.  The following terms and conditions shall control over any conflicting provisions in the Master Lease:

(A) As between Sublessee and Sublessor, the obligation to pay any sums to Lessor under the Master Lease shall be considered performed by Sublessee to the extent and in the amount of the Rent is paid to Sublessor in accordance with Section 6 of this Sublease.  In the event Sublessee pays the Rent

due under this Sublease and Sublessor fails to pay the full amount of rent due under the Master Lease or in the event Sublessor holds over under the Master Lease beyond the expiration of the term (other than as a result of a hold over by Sublessee), Sublessor shall be liable for all late charges, holdover rent and other charges due under the Master Lease as a result of such failure to pay rent and/or hold over.

(B) The terms and conditions of this Sublease shall <u>not</u> include the terms and conditions of the following provisions of the Master Lease:

    1.  Exhibits D

    2.  Exhibit G

    3.  Paragraphs 1, 3, 4 and 5 of Exhibit H and Exhibit H-1

(C) Upon the expiration of the Term, Sublessee shall remove furniture, fixtures, and equipment owned by Sublessee and leave the Premises in broom clean condition, ordinary wear-and-tear excepted. Sublessee shall repair all damage to the Premises caused by Sublessee's removal of its furniture, fixtures or equipment or otherwise caused by Sublessee's use of the Premises. Sublessee shall not be required to remove any cabling, wiring, improvements or trade fixtures, that it has not installed or the Furniture, and Sublessee shall not be responsible for restoring the Premises to their condition prior to the Commencement Date.

(D) Sublessor represents and warrants that the floor coverings and other improvements in the Premises are "building standard commercial grade" pursuant to Paragraph 3.1(d) of the Master Lease, and that no additional cleaning costs are payable in connection therewith.

(E) In the event that the Base Rental or Additional Rental are abated for any period under the Master Lease (including without limitation, pursuant to Paragraph 3.1 of the Master Lease), the Rent payable under this Sublease shall be abated to the same extent and for the same period. Notwithstanding the foregoing, should Sublessor and Lessor reach a rent abatement agreement in connection with the rent that Sublessor is obligated to pay to Lessor that is in excess of the Rent payable under this Sublease and such agreement is based upon considerations that would not have resulted in an abatement of rent under the terms of the Master Lease then Sublessee shall not be entitled to a corresponding abatement of Rent.

(F) Sublessor shall provide Sublessee 4.4 non-reserved parking spaces, per 1,000 Rentable Square feet of the Premises, as allocated pursuant to Paragraph 3.4 of the Master Lease. Sublessor represents that Lessor has not provided Sublessor with, nor required Sublessor to use, parking permits. Sublessee shall obtain and pay for its own pass cards (or other access devices) for the Building that are acceptable in type and number to Lessor.

(G) Sublessor shall direct Lessor to remove all of Sublessor's graphics, letters, and numerals at the entrance to the Premises, and in the Building directory ("Building Signage"). If Lessor does not remove Sublessor's Building Signage at Lessor's cost, then Sublessor shall pay such cost and Sublessee shall have no liability therefor. Sublessee shall direct Lessor to install Sublessee's Building Signage. If Lessor does not install Sublessee's Building Signage at the Lessor's cost, the Sublessee shall pay such cost and Sublessor shall have no liability therefore.

(H) In the event that Sublessor has a right to terminate the Master Lease (subject to Section 4.3 of this Sublease) due to any condemnation or casualty (including without limitation, pursuant to Article VI of the Master Lease), then Sublessee shall have the same right to terminate this Sublease, except that Sublessee shall deliver any applicable notice to Sublessor instead of to Lessor.

## 11. ATTORNEYS' FEES.

If Sublessor or Sublessee shall commence an action against the other arising out of or in connection with this Sublease, the prevailing party shall be entitled to recover its costs of suit and reasonable attorney's fees at all tribunal levels. If such prevailing party recovers a judgment in any such action, proceeding or appeal, such costs,

expenses and attorneys' fees will be determined by the court handling the proceeding and will be included in and as a part of such judgment.

## 12. AGENCY DISCLOSURE.
Sublessor and Sublessee each warrant that they have dealt with no other real estate broker in connection with this transaction except: CB RICHARD ELLIS, INC., who represents Sublessor ("Sublessor's Broker") and KIMBERLY BARBAR of STILES REALTY CO., who represents Sublessee ("Sublessee's Broker").

## 13. COMMISSION.
Upon execution of this Sublease, and consent thereto by Lessor (if such consent is required under the terms of the Master Lease), Sublessor shall pay Sublessor's Broker a real estate brokerage commission in accordance with Sublessor's contract with Sublessor's Broker for the subleasing of the Premises, for services rendered in effecting this Sublease and Sublessee shall pay Sublessee's Broker a real estate brokerage commission in accordance with Sublessee's contract with Sublessee's Broker for the subleasing of the Premises, for services rendered in effecting this Sublease. Sublessor's Broker and Sublessee's Broker are hereby made third party beneficiaries of this Sublease for the purpose of enforcing their rights to said commissions.

## 14. NOTICES.
Unless otherwise set forth in this Sublease, any notice, demand, or request to be given under this Sublease (i) may be given by either party or its attorney or agent, (ii) shall be in writing, and (iii) shall be deemed to have been properly given (a) on the date delivered personally (including by courier), (b) one (1) business day following deposit with a nationally recognized overnight delivery service, (c) three (3) business days following deposit with the United States Postal Service (designated certified mail, return receipt requested, bearing adequate postage and properly addressed), or (d) upon refusal of delivery by the recipient. Sublessor's address for all notices hereunder and all payments of Rent shall be c/o Martinair Holland, N.V. 1550 Madruga Avenue, Suite 220, Coral Gables, Florida 33146. Sublessee's address for all notices hereunder shall be c/o Benihana Inc., 8750 NW 36th Street, Suite 300, Doral, FL 33178. Sublessor and Sublessee may change their address for notices and payment of Rent upon ten (10) days advanced written notice.

## 15. CONSENT BY LESSOR.
THIS SUBLEASE SHALL BE OF NO FORCE OR EFFECT UNLESS CONSENTED TO BY LESSOR, AS SUCH CONSENT IS REQUIRED UNDER THE TERMS OF THE MASTER LEASE. Pursuant to Paragraph 8.1(e) of the Master Lease, Sublessor shall deliver a fully executed counterpart of this Sublease to Lessor within sixty (60) calendar days after the date of Lessor's written approval of this Sublease.

## 16. COMPLIANCE.
The parties hereto agree to comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, property or the subject matter of this Agreement ("Legal Requirements"), including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment In Real Property Tax Act. Notwithstanding the foregoing, and notwithstanding anything to the contrary in the Master Lease, Sublessee shall be under no obligation to comply with any Legal Requirements (including the ADA) that require any structural alterations to the Premises or alterations to any building systems, unless the alterations are required because of a condition that has been created by, or at the instance of Sublessee or is required because of Sublessee's specific use of the Premises (as opposed to general office use).

## 17. CANCELLATION.
Sublessee shall have the right to terminate this Sublease (the "Termination Option") effective as of the end of the 36th month of the Term, by delivering nine (9) months prior written notice to Sublessor. Sublessee shall pay a termination penalty ("Termination Fee") equal to the unamortized cost (on a straight line basis over the entire Term) of (A)(i) Sublessor's brokerage commissions, not to exceed 8% of the gross rent (base rent and est. CAM) due under the Sublease, incurred in connection with this Sublease (but not the Master Lease), and (ii) Sublessor's attorneys fees incurred in connection with this Sublease (including but not limited to, attorneys fees incurred in connection with Sublessee's exercise of the Termination Option, but not including any attorneys fees related to negotiation or enforcement of the Master Lease), plus (B) three (3) months' Base Rent and Operating Costs at the rates in-effect as of the 36th month of the Term. Sublessor's attorneys fees incurred in connection with the negotiation of this Sublease are deemed to be $12,000.00. Sublessor's attorneys fees incurred in connection with Sublessee's exercise of the Termination Option shall not exceed $500.00 unless Sublessee fails to exercise the Termination Option as set forth herein and a dispute arises as a result thereof. Upon Sublessee's written request, Sublessor shall deliver to Sublessee a written statement itemizing the actual

amount of the Termination Fee, with detailed invoices of Sublessor's to attorney's fees and brokerage commissions.

18. **TIME.** Time is of the essence with respect to the obligations of any party under this Sublease.

19. **HEIRS, ASSIGNS, SUCCESSORS.** This Sublease is binding upon and inures to the benefit of the assigns and successors in interest of Lessor and Sublessor.

20. **ENTIRE AGREEMENT, HEADINGS.** This Sublease, together with all Exhibits attached hereto, constitutes the entire agreement between the parties and may be modified only by a writing signed by both parties. The headings in this Sublease are inserted for convenience only and shall not be used to define, construe or limit any provisions of this Sublease.

21 **GOVERNING LAW.** This Sublease shall be construed in accordance with the laws of the State of Florida. Exclusive venue in any legal proceeding related to or arising out of this Sublease shall be in the county and state where the Premises are located, and Sublessor and Sublessee submit to personal jurisdiction and venue in such forum.

22 **WAIVER OF THE RIGHT TO TRIAL BY JURY.** SUBLESSOR AND SUBLESSEE HEREBY KNOWINGLY AND INTENTIONALLY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING THAT SUBLESSOR OR SUBLESSEE MAY HEREINAFTER INSTITUTE AGAINST EACH OTHER WITH RESPECT TO ANY MATTER ARISING OUT OF OR RELATED TO THIS SUBLEASE OR THE PREMISES WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE.

23. **COUNTERPARTS.** This Sublease may be executed in any number of counterparts, which when taken together shall constitute one complete document. PDF or facsimile signatures shall constitute originals for all purposes.

24. **DAYS.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Sublease shall mean and refer to business days.

25. **NOTICE AND CURE RIGHT.** Any default by Sublessor under the Master Lease that is not the result of Sublessee's actions or inactions shall constitute a default by Sublessor under this Sublease. Notwithstanding, and in addition to any obligations of Sublessor under Paragraph 26 below, or any separate agreement that may exist between Lessor, Sublessor, and Sublessee, Sublessor shall provide Sublessee with notice and cure rights under the Master Lease, in accordance with this Paragraph 25. Sublessor shall deliver to Sublessee, copies of all correspondence related to the Master Lease within three (3) business days after Sublessor's receipt thereof. In the event that Sublessor has failed to perform any obligation of the Tenant under the Master Lease or has otherwise defaulted under the Master Lease, Sublessee shall have the right (but not the obligation) to perform such obligation or cure such default on Sublessor's behalf, and offset the cost of such performance (including attorney's fees incurred in connection therewith) against Sublessee's obligation to pay Rent under this Sublease, or be reimbursed by Sublessor upon written demand. Sublessor irrevocably appoints Sublessee as Sublessor's attorney-in-fact coupled with an interest for the limited purpose of effectuating such substitute performance. If Lessor refuses to accept any payment made by Sublessee for the purpose of curing a default on Sublessor's behalf, then Sublessee may (but shall not be obligated) to tender such payment to Sublessor, whereupon Sublessor shall immediately remit such payment to Lessor in satisfaction of the default, and Sublessee may offset such sum against Sublessee's obligation to pay Rent, as set forth above.

26. **RECOGNITION AGREEMENT.** It shall be a condition precedent to the effectiveness of this Sublease that Lessor, Sublessor, and Sublessee enter into a "recognition agreement" or similar tri-party agreement, in which Lessor agrees to (i) provide notice to Sublessee of any default by Sublessor under the Master Lease, simultaneously with delivery of notice to Sublessor under the Master Lease, (ii) grant Sublessee the right (but not the obligation) to cure any default by Sublessor under the Master Lease, and, (iii) in the event that the Master Lease is terminated due to a default by Sublessor, permit Sublessee (at Sublessee's option) to become the Tenant of the Master Premises pursuant to the terms of the Master Lease, whereupon Lessor shall recognize Sublessee as a direct tenant thereunder.

27. **SECURITY.** Sublessee may, at Sublessee's cost, install a security system and controlled access devices within the Premises and at points of ingress and egress from Common Areas, if permitted under the terms of the Master Lease and upon obtaining Lessor's approval (if required). Notwithstanding the foregoing, Sublessor will use

commercially reasonable efforts to assign and transfer control of Sublessor's current security-system and contract for the Premises to Sublessee, whereupon Sublessee shall assume all costs associated therewith during the Term.

## 28. INDEMNIFICATION.

(A) Sublessee covenants and agrees that Sublessee, at all times, does and shall indemnify and hold harmless Sublessor from all losses, claims, damages, injuries, liabilities, litigation and other expenses, and attorneys' fees, disbursements and costs, including those for appellate matters, which may arise or be claimed against Sublessor and be in favor of any persons, firms or corporations for any injuries or damages to the person or property of any persons, firms or corporations, that (i) arise from the use or occupancy of the Premises by Sublessee, (ii) relate to events that occurred from and after the Commencement Date, and (iii) derive from any negligent or willful acts or omissions of Sublessee, its agents, employees, or licensees, or Sublessee's failure to comply with any laws, statutes, ordinances, codes or regulations applicable to the Building or Premises. Sublessor shall not be liable to Sublesseee for any damages, losses or injuries to the persons or property of Sublessee which may be caused by the acts, neglect, omissions or faults of any persons, firms or corporations, except when such injury, loss or damage results directly from the negligence or willful malfeasance of Sublessor, its agents, servants or employees.

(B) Sublessor covenants and agrees that Sublessor, at all times, does and shall indemnify and hold harmless Sublessee from all losses, claims, damages, injuries, liabilities, litigation and other expenses, and attorneys' fees, disbursements and costs, including those for appellate matters, which may arise or be claimed against Sublessee and be in favor of any persons, firms or corporations for any injuries or damages to the person or property of any persons, firms or corporations, that (i) relate to events that occurred prior to the Commencement Date, and (ii) derive from any negligent or willful acts or omissions of Sublessor, its agents, employees, or licensees, or Sublessor's failure to comply with any laws, statutes, ordinances, codes or regulations applicable to the Building or Premises. Sublessee shall not be liable to Sublessor for any damages, losses or injuries to the persons or property of Sublessor which may be caused by the acts, neglect, omissions or faults of any persons, firms or corporations, except when such injury, loss or damage results directly from the negligence or willful malfeasance of Sublessee, its agents, servants or employees.

### [SIGNATURES FOLLOW ON NEXT PAGE]

WITNESSES:

Print Name: _Edna L. Gurley_

Print Name: _Andrew J Hall_

Print Name: _____

Print Name: _____

SUBLESSOR:

MARTINAIR HOLLAND, N.V., a foreign corporation

By: _____
Name: _Ronald Van de Geer_
Title: _Finance Director_

SUBLESSEE:

BENIHANA, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

Form No. 5432
MIAMI 2806735.11 7919937070

WITNESSES:

Print Name:_____

Print Name: _____

Print Name: CHRIS AMES

Print Name: BETTY GEORGE

SUBLESSOR:

MARTINAIR  HOLLAND,  N.V.,  a  foreign corporation

By:_____
Name: _____
Title: _____

SUBLESSEE:

BENIHANA, INC., a Delaware corporation

By: Cristina L. Mendoza
Name: CRISTINA L. MENDOZA
Title: Secretary

Exhibit A

"Master Lease"

EXECUTION COPY

OFFICE LEASE AGREEMENT

BY AND BETWEEN

HINES VAF II DORAL, L.P.,
AS LANDLORD

AND

MARTINAIR HOLLAND NV,
AS TENANT

<u>BASIC LEASE INFORMATION</u>

| | |
|---|---|
| Lease Date: | March 20, 2007 |
| Tenant: | MARTINAIR HOLLAND NV |
| Address of Tenant: | <u>Prior to the Commencement Date:</u><br>5550 Glades Road, Suite 500<br>Boca Raton, Florida 33431-7215<br>Attention: Karen Zall |
| | <u>From and After the Commencement Date:</u><br>8750 NW 36th Street, Suite 300<br>Doral, FL 33178<br>Attention: Mr. Ron Vandegeer<br>                Director of Finance |
| Primary Contact: | Karen Zall (prior to the Commencement Date)<br>Ron Vandegeer (from and after the Commencement Date) |
| Landlord: | Hines VAF II Doral, L.P. |
| Address of Landlord: | c/o Hines<br>Value Added Fund<br>300 Atlantic Street, Suite 206<br>Stamford, CT  06901<br>Attention:  David Congdon |
| Leased Premises: | Approximately 14,569 Rentable Square Feet located on Floor 3 of 8750 NW 36th Street, Doral, Florida (Doral Corporate Center I) |
| Estimated Commencement Date: | August 1, 2007 |
| Landlord Leased Premises Delivery Date: | Upon full execution of this Lease |
| Security Deposit: | None Required |
| Lease Term: | One hundred twenty-six (126) months |
| Base Rental: | Months 1-12      $14.20<br>Months 13-24    $15.20<br>Months 25-36    $16.20<br>Months 37-48    $17.20<br>Months 49-60    $18.20<br>Months 61-72    $19.45<br>Months 73-84    $20.70<br>Months 85-96    $21.95<br>Months 97-108  $23.20<br>Months 109-120  $24.45<br>Months 121-126  $25.70 |

## TABLE OF CONTENTS

PAGE

ARTICLE I ........................................................................................................................ 1
    1.1    Leased Premises ......................................................................................... 1
    1.2    Term ............................................................................................................ 2
    1.3    Use .............................................................................................................. 2
    1.4    Intentionally Omitted ................................................................................. 3
    1.5    Surrender of Leased Premises .................................................................... 3
    1.6    Survival ...................................................................................................... 3

ARTICLE II ....................................................................................................................... 4
    2.1    Rental Payments ......................................................................................... 4
    2.2    Base Rental ................................................................................................. 4
    2.3    Additional Rental ....................................................................................... 4
    2.4    Operating Expenses .................................................................................... 6
    2.5    INTENTIONALLY OMITTED .................................................................. 9
    2.6    Landlord's Lien ........................................................................................ 10
    2.7    Sales Tax .................................................................................................. 10

ARTICLE III ................................................................................................................... 10
    3.1    Services .................................................................................................... 10
    3.2    Keys and Locks ........................................................................................ 12
    3.3    Graphics, Building Directory and Name ................................................. 12
    3.4    Parking .................................................................................................... 12

ARTICLE IV .................................................................................................................... 13
    4.1    Care of Leased Premises .......................................................................... 13
    4.2    Entry for Repairs and Inspection ............................................................. 13
    4.3    Nuisance .................................................................................................. 13
    4.4    Laws and Regulations; Encumbrances; Rules of Building ...................... 14
    4.5    Legal Use and Violations of Insurance Coverage .................................... 14
    4.6    Hazardous Substances ............................................................................. 14
    4.7    Tenant Taxes ............................................................................................ 15

ARTICLE V ..................................................................................................................... 15
    5.1    Leasehold Improvements .......................................................................... 15
    5.2    Repairs by Landlord ................................................................................. 17
    5.3    Repairs by Tenant .................................................................................... 17

ARTICLE VI .................................................................................................................... 17
    6.1    Condemnation .......................................................................................... 17
    6.2    Damages From Certain Causes ................................................................ 18
    6.3    Clarity Clause .......................................................................................... 18
    6.4    Casualty Insurance ................................................................................... 19
    6.5    Liability Insurance ................................................................................... 20
    6.6    Hold Harmless ......................................................................................... 20
    6.7    Waiver of Subrogation Rights ................................................................. 20

ARTICLE VII .................................................................................................................. 20
    7.1    Default and Remedies .............................................................................. 20
    7.2    Insolvency or Bankruptcy ........................................................................ 24
    7.3    Late Payments ......................................................................................... 24
    7.4    Attorneys Fees ......................................................................................... 24
    7.5    Waiver of Homestead .............................................................................. 24
    7.6    No Waiver of Rights ................................................................................ 25
    7.7    Holding Over ........................................................................................... 25

**PAGE**

7.8     Subordination........................................................................................25
7.9     Estoppel Certificate..............................................................................27

ARTICLE VIII...................................................................................................27

8.1     Sublease or Assignment by Tenant.......................................................27
8.2     Assignment by Landlord........................................................................30
8.3     Peaceful Enjoyment..............................................................................30
8.4     Limitation of Landlord's Personal Liability...........................................30
8.5     Force Majeure.......................................................................................30

ARTICLE IX.....................................................................................................31

9.1     Notices..................................................................................................31
9.2     Miscellaneous.......................................................................................32

**EXHIBITS**

EXHIBIT A       DESCRIPTION OF LAND
EXHIBIT B       FLOOR PLAN OF LEASED PREMISES
EXHIBIT C       BASE BUILDING SHELL CONDITION
EXHIBIT D       CONSTRUCTION OF INITIAL LEASEHOLD IMPROVEMENTS
EXHIBIT E       AIR CONDITIONING AND HEATING SERVICES
EXHIBIT F       BUILDING RULES AND REGULATIONS
EXHIBIT G       COMMENCEMENT DATE
EXHIBIT H       SPECIAL STIPULATIONS
EXHIBIT H-1     PREVAILING MARKET RATE
EXHIBIT I       JANITORIAL SPECIFICATIONS

# DORAL CORPORATE CENTER I

## OFFICE LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is made and entered into on this 2Q day of March, 2007, by and between HINES VAF II DORAL, L.P., a limited partnership formed under the laws of the State of Delaware (hereinafter called "Landlord"), and MARTINAIR HOLLAND NV, (hereinafter called "Tenant").

## ARTICLE I.

### 1.1.   Leased Premises.

(a)      Landlord's predecessor has constructed certain improvements on a certain tract or parcel of land described in **Exhibit A**, attached hereto and incorporated herein by this reference (the "Land"). The improvements include an office building commonly referred to as "Doral Corporate Center I, located at 8750 NW 36th Street, Doral, Florida (the "Building") and the Parking Areas (as defined herein). The Building, the Parking Areas, and the Land together with all common areas not specifically made a part of the Building or the Parking Areas, and all other improvements from time to time located thereon or related thereto are hereinafter collectively referred to as the "Project". The parties acknowledge that the Project is commonly known as "Doral Corporate Center I". Landlord grants Tenant, its employees, agents, contractors and invitees the non-exclusive rights of access to and use of the Project as set forth herein, subject to the terms of this Lease. Subject to and upon the terms hereinafter set forth, and in consideration of the sum of Ten Dollars ($10.00), the premises, and the mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby lease and demise to Tenant and Tenant does hereby lease and take from Landlord (subject to all matters of record in Miami-Dade County, Florida, that affect the Project) those certain premises (hereinafter sometimes called the "Leased Premises") located in the Building, such Leased Premises being more particularly described as follows:

> Approximately 14,569 square feet of Rentable Square Feet on the 3rd Floor of the Building and as generally described or depicted on **Exhibit B**, attached hereto and incorporated herein ("Leased Premises").

(b)      The terms "Rentable Square Feet" and "RSF," as used herein, shall mean the figures which Landlord and Tenant have agreed to use for calculation of Rental (as defined hereinafter) and Tenant's Additional Rental (as defined hereinafter) and other matters referenced in this Lease. The Rentable Square Feet of the Leased Premises is hereby stipulated to be as set forth in Section 1.1(a) above, and the Rentable Square Feet of the Building is 139,481 (such figures have been agreed upon by Landlord and Tenant prior to the date hereof, are conclusive for all purposes of this Lease, and are not subject to remeasurement). The measurement set forth herein shall be binding on Landlord and Tenant for all purposes of the Lease regardless of whether any future or differing measurements of the Leased Premises or Building are consistent or inconsistent.

(c)      "Parking Areas" shall mean any parking structure that is constructed and located on the Land and the surface parking spaces that are located on the Land (the "Parking Areas"), together with any connecting walkways or other means of access to said building or buildings, the grounds related thereto and any additional improvements at any time related thereto. The Parking Areas may be operated by a parking contractor designated from time to time by Landlord. Subject to Section 3.4, parking for the initial lease term and any extension or renewal shall be at no cost to the Tenant.

(d)      This Lease does not grant Tenant any rights to light, air or view over or about the Land or any other real property. Landlord specifically excepts and reserves to itself all rights to and the use of any roofs, the exterior portions of the Leased Premises, the Land, improvements and air and other rights below the improved floor level of the Leased Premises, the improvements and air and other rights above the improved ceiling of Leased Premises, the improvements and air and other rights located outside the demising walls of the Leased Premises and such areas within the Leased Premises as are required for installation of utility lines and other installations required to serve the Building or any occupants of the Building, and Landlord specifically reserves to itself the right to use,

maintain and repair same, and no rights with respect thereto are conferred upon Tenant, unless otherwise specifically provided herein. Notwithstanding the foregoing, the rights granted to Landlord herein shall not permit any blocking of the windows of the Leased Premises by Landlord with any material put thereon for such purpose (which is not intended in any way to prohibit further development or construction of the Land or any adjacent property), except such temporary blockage that may be affected by routine maintenance and repair of the Building and Landlord's periodic window cleaning or as may be required following any Casualty, as hereinafter defined. Further, Landlord's access above the improved ceiling of the Leased Premises and below the improved floor of the Leased Premises shall be affected in a manner that does not disrupt Tenant's peaceful enjoyment of the Leased Premises and does not impair any low voltage wiring or other permitted uses by Tenant of such areas.

(e) Tenant's taking possession of the Leased Premises or any portion thereof on the Landlord Leased Premises Delivery Date, as defined in **Exhibit D** attached hereto, shall be conclusive evidence against Tenant that such portion of the Leased Premises was then in good order and satisfactory condition and in full compliance with this Lease. Tenant acknowledges that no promise by or on behalf of Landlord, any of Landlord's beneficiaries, the managing agent of the Building, the leasing agent of the Building or any of their respective agents, partners or employees to alter, remodel, improve, repair, decorate or clean the Leased Premises has been made to or relied upon by Tenant, and that no representation respecting the condition of the Leased Premises or the Building by or on behalf of Landlord, any of Landlord's beneficiaries, the managing agent of the Building, the leasing agent of the Building or any of their respective agents, partners or employees has been made to or relied upon by Tenant, except to the extent expressly set forth in this Lease and the exhibits and schedules attached hereto.

    1.2.    Term.

(a) Subject to and upon the terms and conditions set forth herein, or in any exhibit hereto, the term of this Lease shall commence on the Commencement Date (as defined hereinafter) and shall expire on the last day of the month that is one hundred twenty six (126) calendar months after the Commencement Date at 12:00 midnight.

(b) As used herein, "Commencement Date" means the earlier to occur of (i) the date Tenant occupies the Leased Premises for the purpose of conducting business; or (ii) August 1, 2007; subject to extension on a day by day basis (i) pursuant to Section 2(e) of **Exhibit D** attached hereto, and (ii) for delays caused by Force Majeure, as defined in Section 8.5 hereof, and (iii) for delays caused by Landlord under **Exhibit D** attached hereto by not approving or disapproving the Space Plan or Tenant Working Drawings in accordance with the review schedule contained therein or otherwise failing to comply with any term of **Exhibit D** attached hereto applicable to Landlord which ultimately results in a delay in completing Tenant's Work (all of such capitalized terms being defined in **Exhibit D** attached hereto).

(c) Within twenty (20) days after the Commencement Date, Landlord shall deliver to Tenant, and Tenant shall promptly sign and return to Landlord, **Exhibit G**, attached hereto and incorporated herein, which shall set forth the date upon which the Commencement Date and Rent Commencement Date (as defined hereinafter) of this Lease occurred.

    1.3.    Use. The Leased Premises are to be used and occupied by Tenant (and its permitted assignees and subtenants) solely for the purpose of office space consistent with a first class office building and for no other purpose. Landlord acknowledges and agrees that each of the following uses are consistent with the foregoing requirements and the first class standards of the Building: (i) Tenant's use of a portion of the Leased Premises for a "break room" in which its employees and invitees can prepare food and beverages using a microwave oven, coffee maker, and similar small appliances, (ii) for Tenant's corporate information technology center and for a computer room; (iii) for executive and administrative offices and associated staff support uses; (iv) for the provision of offices services, duplicating, delivery, facsimile and similar services to persons working in the Leased Premises; (v) for staff meetings and for meetings with Tenant's customers, prospects, service providers, regulators, and other third parties, and (vi) for other typical office uses. The Leased Premises shall not be used for any purpose which would create unreasonable elevator loads or otherwise unreasonably interfere with Building operations, and Tenant shall not engage in any activity which is not in keeping with the first class standards of the Building. In no event shall the Leased Premises be used for the purpose of installing, marketing, operating, or providing electronic telecommunications, information or data processing, storage or transmissions, or other electronic office services or

-2-

equipment for tenants or other occupants of the Building on a shared-usage basis through a central switch or a local area network. The Leased Premises shall not be used as or for (i) any health care professionals or service organization, except for administrative offices where no diagnostic treatment or laboratory services are performed; (ii) schools or other training facilities that are not ancillary to executive, professional or corporate administrative office use; (iii) retail or restaurant uses; (iv) broadcast studios or other broadcast production facilities such as radio and/or television stations; (v) product display or demonstration facilities (i.e., use of the Leased Premises for product displays or demonstrations more than twice in any one week and/or to an audience of more than fifty persons per display or demonstration); (vi) offices at which deposits or bills are regularly paid in person by customers; or (vii) personnel agencies, except offices of executive search firms.

       1.4.    Intentionally Omitted.

       1.5.    Surrender of Leased Premises.

          (a)    Upon the termination of this Lease by lapse of time or otherwise or upon the earlier termination of Tenant's right of possession, Tenant shall quit and surrender possession of the Leased Premises to Landlord, broom clean, in the same condition as exists on the Commencement Date, normal wear and tear and damage by casualty and condemnation (subject to the terms of this Lease) excepted. Before surrendering possession of the Leased Premises, Tenant shall, without expense to Landlord, remove all signs, furnishings, equipment (including all communication and other cables), trade fixtures, merchandise and other personal property installed or placed in the Leased Premises and all debris and rubbish, and Tenant shall repair all damage to the Leased Premises resulting from such removal. If Tenant fails to remove any of the signs, furnishings, equipment, trade fixtures, merchandise and other personal property installed or placed in the Leased Premises by the expiration or termination of this Lease, then Landlord may, at its sole option, (i) deem any or all of such items abandoned and the sole property of Landlord, or (ii) remove any and all such items and dispose of same in any manner. Tenant shall pay Landlord on demand any and all commercially reasonable expenses incurred by Landlord in connection with the removal of such items, including, without limitation, the cost of repairing any damage to the Leased Premises or the Building caused by such removal and storage charges (if Landlord elects to store such property). In no event, however, shall Tenant be required to remove any of Tenant's Work constructed in the Leased Premises under Exhibit "D" hereto, except as otherwise set forth in this Lease (such as, without limitation, removal of the supplemental HVAC system, and removal of the generators) and, if Tenant constructs or installs any subsequent alterations similar to Tenant's Work, Tenant shall not be required to remove such subsequent alterations unless Landlord, at the time it issues any consent thereto, then imposes the requirement of removal.

          (b)    All installations, additions, partitions, hardware, cables, wires, fixtures and improvements, temporary or permanent (including, but not limited to, Tenant's Extra Work), except for Tenant's signs, furnishings, equipment, communication cables, telephone switches, trade fixtures, merchandise and other personal property, in or upon the Leased Premises, whether placed there by Tenant or Landlord, shall, upon the termination of this Lease by lapse of time or otherwise or upon the earlier termination of Tenant's right of possession, become Landlord's property and shall remain upon the Leased Premises, all without compensation, allowance or credit to Tenant; provided, however, that if at the time Landlord consents to Tenant's installation of any installations, additions, partitions, hardware, cables, wires, fixtures and improvements or at any time prior to termination of this Lease, Landlord requires removal of the same upon termination, then Tenant, at Tenant's sole cost and expense, upon termination of this Lease by lapse of time or otherwise or upon the earlier termination of Tenant's right of possession, shall promptly remove such designated items placed in or upon the Leased Premises by or on behalf of Tenant and repair any damage to the Leased Premises or the Building caused by such removal, failing which Landlord may remove the same and repair the Leased Premises or the Building, as the case may be, and Tenant shall pay the cost thereof to Landlord on written demand.

       1.6.    Survival.  Any claim, cause of action, liability or obligation arising under the term of this Lease and under the provisions hereof in favor of a party hereto against or obligating the other party hereto and all of Tenant's indemnification obligations hereunder shall survive the expiration or any earlier termination of this Lease.

-3-

## ARTICLE II.

**2.1.**   Rental Payments.

(a)   Commencing on the Rent Commencement Date and continuing thereafter throughout the full term of this Lease, Tenant hereby agrees to pay the Base Rental (as defined hereinafter), and Tenant's Forecast Additional Rental (as defined hereinafter), subject to Tenant's Additional Rental Adjustment (as defined hereinafter) in accordance with this Article after the expiration of the Abatement Period (as defined in Exhibit H). Subject to the Abatement Period, Base Rental and Tenant's Forecast Additional Rental shall be due and payable in equal monthly installments on the first day of each calendar month during the initial term of this Lease and any extensions or renewals hereof, and Tenant hereby agrees to so pay such rent to Landlord at Landlord's address as provided herein (or such other address as may be designated by Landlord from time to time) monthly in advance.

(b)   If the Commencement Date or Rent Commencement Date is other than the first day of a calendar month, then the installments of Base Rental and Tenant's Forecast Additional Rental for such month shall be prorated and the installment or installments so prorated shall be paid in advance. Said installments for such prorated month shall be calculated by multiplying the equal monthly installment by a fraction, the numerator of which shall be the number of days of the Lease term occurring during said commencement month, and the denominator of which shall be thirty (30). If the term of this Lease commences or expires on other than the first day of a calendar year, Tenant's Forecast Additional Rental and Tenant's Additional Rental (as defined hereinafter) shall be prorated for such commencement or expiration year, as the case may be, by multiplying Tenant's Forecast Additional Rental and Tenant's Additional Rental by a fraction, the numerator of which shall be the number of whole and partial months of the Lease term during the commencement or expiration year as the case may be (and, with respect to the commencement year, the number of months shall be calculated from the Rent Commencement Date), and the denominator of which shall be twelve (12). In such event the Tenant's Additional Rental Adjustment shall be made as soon as reasonably possible after the termination of this Lease, but in no event later than one hundred twenty (120) days after the last day of the calendar year in which this Lease expires or is earlier terminated.

(c)   For purposes hereof, the term "Rental" shall mean and collectively refer to the Base Rental, Tenant's Forecast Additional Rental, Tenant's Additional Rental Adjustment and other sums payable by Tenant hereunder. Tenant agrees to pay all Rental at the times and in the manner provided in this Lease, without abatement (except as may be otherwise expressly provided herein, including without limitation for the Abatement Period as defined in Exhibit H), and without demand, notice, setoff, deduction or counterclaim (except as may be otherwise expressly provided herein), and all sums payable under this Lease by Tenant shall be deemed to be rent due and owing hereunder. Notwithstanding the foregoing, however, Tenant shall receive prior written notice of Tenant's Forecast Additional Rental, Tenant's Additional Rental Adjustment, and all other nonrecurring charges under this Lease and, in each instance, Tenant shall have a period of thirty (30) days from the date Landlord gives Tenant written notice of such charges until payment shall be due (and such thirty (30) day period shall be applicable to all requirements herein that Tenant pay sums immediately, on demand, or under words of similar effect.) All Rental not paid within ten (10) days of when due shall bear interest from the date such payment was due until paid at the lesser of (i) a per annum rate equal to the "prime rate" announced by Chase Manhattan Bank, New York, New York, or its successor (or if the "prime rate" is discontinued, the rate announced as that being charged to the most credit-worthy commercial borrowers) plus two percent (2%) or (ii) the maximum interest rate per annum allowed by law.

**2.2.**   Base Rental.   Throughout the full term of this Lease, Tenant hereby agrees to pay a base annual rental (the "Base Rental") in accordance with the schedule set forth in Special Stipulation No. 1 of Exhibit H attached hereto and incorporated herein, as such dollar amount may be adjusted from lease year to lease year pursuant to the terms of Special Stipulation No. 1 of Exhibit H.

**2.3.**   Additional Rental.

(a)   Commencing with the calendar year in which the Commencement Date occurs and continuing thereafter for each calendar year during the full term of this Lease, Landlord shall present to Tenant prior to the beginning of said calendar year (or for the calendar year in which the Lease term commences, on or before the Commencement Date) a statement of Tenant's Forecast Additional Rental. Landlord's failure to deliver such a statement of Tenant's Forecast Additional Rental shall not operate to excuse Tenant from the payment of the

monthly installment of Tenant's Forecast Additional Rental due under Section 2.1(a). Rather, Tenant shall continue to pay the monthly installment of Tenant's Forecast Additional Rental based on Landlord's most recent calculation thereof until such a statement is delivered to Tenant, with such statement being applied retroactively to the beginning of the calendar year and Tenant making up any under payments immediately upon its receipt of such statement. Landlord may recalculate Tenant's Forecast Additional Rental in order to more accurately reflect Landlord's good faith estimate of Tenant's Additional Rental, and Tenant shall commence paying the recalculated Tenant's Forecast Additional Rental, in accordance with Section 2.1(a) hereof, immediately after receiving notice thereof.

(b)  As used herein, "Tenant's Forecast Additional Rental" shall mean Landlord's reasonable estimate of Tenant's Additional Rental for the coming calendar year (or, in the calendar year in which the lease term commences, for such calendar year).

(c)  As part of Tenant's Additional Rental, Tenant shall be responsible for paying its pro rata share of the Operating Expenses for each calendar year. For purposes hereof, "Tenant's Additional Rental" for any calendar year shall mean Tenant's Percentage Share (as defined hereinafter) of the Operating Expenses for such calendar year. As used herein, "Tenant's Percentage Share" shall mean a fraction, the numerator of which is the total number of square feet of Rentable Square Feet within the Leased Premises and the denominator of which is the greater of (i) ninety-five percent (95%) of the total square footage of all Rentable Square Feet in the Building held for lease, or (ii) the total square footage of all Rentable Square Feet in the Building actually leased to rent paying tenants or used by Landlord or its affiliated companies or management company without the requirement of the payment of rent.

(d)  Landlord shall use reasonable efforts to provide Tenant, within one hundred twenty (120) days after the end of the calendar year in which the Commencement Date occurs and of each calendar year thereafter during the Lease Term of this Lease, with a statement detailing the Operating Expenses for each such calendar year (the "Annual Operating Expense Statement") and a statement prepared by Landlord comparing Tenant's Forecast Additional Rental with Tenant's Additional Rental. In the event that Tenant's Forecast Additional Rental exceeds Tenant's Additional Rental for said calendar year, Landlord shall pay Tenant, within thirty (30) days following such statement (in the form of a credit against rentals next due or, upon expiration of this Lease, in the form of Landlord's check) an amount equal to such excess. In the event that the Tenant's Additional Rental exceeds Tenant's Forecast Additional Rental for said calendar year, Tenant hereby agrees to pay Landlord, within thirty (30) days of receipt of the statement, an amount equal to such difference ("Tenant's Additional Rental Adjustment"). Landlord shall not be permitted to include charges for Operating Expenses in any Annual Operating Expense Statement that is issued later than the second year following the calendar year in which such expense was incurred other than any Operating Expense that is then under appeal, protest or dispute and any consulting fees related thereto and other than any capital cost that is amortized over a period extending beyond such 2-year period, in accordance with Section 2.4(b)(ix) below.

(e)  Upon receipt of the Annual Operating Expense Statement and prior to electing to conduct an audit as set forth herein, Tenant shall be entitled to have its director of finance or another internal accounting professional employee of Tenant review Landlord's records in order to determine whether an audit will be necessary, so long as such review is conducted in a manner that does not unreasonably interfere with the conduct of Landlord's business. If Tenant desires to conduct an audit, then Tenant, at Tenant's sole cost and expense, shall have the right, to be exercised by written notice given to Landlord within one hundred twenty (120) days after receipt of the Annual Operating Expense Statement for any calendar year, to audit Landlord's books and records pertaining only to the Operating Expenses for such calendar year, provided such audit must commence within thirty (30) days after Tenant's notice to Landlord and thereafter proceed regularly and continuously to conclusion and, provided, further, that such audit must be conducted by a nationally or regionally recognized independent public accounting firm in a manner that does not unreasonably interfere with the conduct of Landlord's business. Notwithstanding the foregoing, Tenant shall not have the right to audit Landlord's books and records regarding the Operating Expenses for any calendar year if Tenant is in default under the terms of this Lease beyond any applicable grace or cure period at the time of audit. Landlord agrees to cooperate in good faith with Tenant in the conduct of any such audit. Tenant (and its agents, employees and accountants) shall hold the results of such audits in strict confidence and not disclose the same to any third party, except as is necessary during any dispute between Landlord and Tenant related thereto, as required by law, or in connection with any financial reporting requirement applicable

to Tenant. A copy of the results of any such audit shall be promptly provided to Landlord, and Landlord may conduct an independent review of the same. If Tenant's audit determines that actual Operating Expenses have been overstated by more than five percent (5%) then, subject to Landlord's right to review and/or contest the audit results, Landlord shall reimburse Tenant for the out of pocket costs of such audit. Tenant's rent shall be adjusted to reflect any overstatement in Operating Expenses, and Tenant shall be credited with the amount of such overpayment (whatever the scope of the overpayment) or, if at the end of the term such overpayment shall be refunded to Tenant by Landlord within thirty (30) days following the resolution of such audit. If there is any disagreement regarding the results of any such audit, the parties shall select a third party auditor to resolve the dispute. Tenant shall not employ any person or entity to audit Landlord's books and records whose compensation is based, in whole or in part, on a contingency fee or the results of the audit.

2.4.   Operating Expenses.

(a)   "Operating Expenses" for each calendar year, shall consist of (i) all Operating Costs (as defined hereinafter) for the Land and Building, and (ii) an amount equal to the sum of the total ownership, management, maintenance, repair, replacement and operating costs accruing during each such calendar year for other portions of the Project not within the Building that are designated or maintained from time to time as common areas, including those areas which are for the benefit of the occupants of the Project whether or not so designated or maintained as common areas (net of any contribution required from time to time from the owners of the other portions of the Project for such expenses, which requirements shall proportionally allocate such costs and expenses to such portions of the Project).

(b)   For the purposes of this Lease, "Operating Costs" shall mean all expenses, costs and accruals (excluding therefrom, however, specific costs billed to or otherwise incurred for the particular benefit of specific tenants of the Building) of every kind and nature, computed on an accrual basis, incurred or accrued in connection with, or relating to, the ownership, operation, management, maintenance, repair and replacement of the Building during each calendar year, including, but not limited to, the following:

(i)   wages and salaries, including taxes, insurance and benefits, of all on and off-site employees of Landlord and any affiliates engaged in operations, management, maintenance, repair, replacement or access control, as reasonably allocated by Landlord and commercially reasonable and actual rent for and expenses associated with the Project's management office; in the event that any employee of Landlord or any affiliate provides services other than in connection with the Building, then such employee's time with respect to the Building shall be proportionally allocated;

(ii)   cost of all supplies, tools, equipment and materials to the extent used in operations, management, maintenance, repairs or replacements, as reasonably allocated by Landlord;

(iii)   actual third party cost of all utilities, including, but not limited to, the cost of electricity, the cost of water and the cost of power for heating, lighting, air conditioning and ventilating;

(iv)   the cost of trash and garbage removal, cleaning, vermin extermination and debris removal, and other similar custodial services;

(v)   cost related to and fees payable under all maintenance, management and service agreements, including, but not limited to, a management fee contribution equal to three percent (3%) of the gross revenues of the Building;

(vi)   costs related to those agreements related to access control services, garage operations, window cleaning, elevator maintenance, janitorial service, pest control and landscaping maintenance;

- 6 -

(vii)   cost of inspections, repairs, maintenance and replacements (except to the extent covered by proceeds of insurance); provided the cost of capital repairs and replacements shall be amortized over such reasonable period of time as Landlord shall determine and only the portion of such costs allocable to any calendar year (plus interest on the unpaid balance of such costs) may be included in the Operating Costs for such calendar year;

(viii)  the cost of legal and accounting services incurred by Landlord relating to management and maintenance of the Building but not including any such expenses related to leasing of space in the Building, lease disputes, financing, or any other matter not directly related to the provision of the goods and services that are permitted Operating Costs;

(ix)    amortization of the cost (plus interest on the unpaid balance of such costs) of any system, apparatus, device, or equipment which is installed for the principal purpose of (i) reducing Operating Expenses, (ii) promoting safety, or (iii) complying with governmental requirements first effective following the Commencement Date;

(x)     the cost of all insurance, including, but not limited to, the cost of casualty, rental loss and liability insurance, and insurance on Landlord's personal property in the Building used in connection with providing services to tenants in the Building, plus the cost of all deductible and co-insurance payments made by Landlord in connection therewith;

(xi)    amounts due under easements, operating agreements, parking operating agreements, declarations, covenants or instruments encumbering the Land, none of which exists as of the date of this Lease and a copy of which will be provided to Tenant if the Land is ever subjected to any such instruments;

(xii)   cost of maintaining, striping, repairing, replacing (subject to Section 2.4(b)(ix) above), repaving and lighting grounds, streets, parking areas, sidewalks, curbs, walkways, landscaping, drainage and lighting facilities; and

(xiii)  all taxes, assessments and governmental charges, whether or not directly paid by Landlord, whether federal, state, county or municipal and whether they be by taxing districts or authorities presently taxing the Land, Building, Project, Parking Areas and related common areas or by others subsequently created or otherwise, and any other taxes, assessments and governmental charges attributable to the Land, Building, Project, Parking Areas and that portion of the common areas or their operation, excluding, however, taxes and assessments attributable to the personal property of other tenants, federal and state taxes on income, death taxes, franchise taxes, and any taxes imposed or measured on or by the income of Landlord from the operation of the Building or imposed in connection with any change of ownership of the Building; provided, however, that if at any time during the Lease Term of this Lease, the present method of taxation or assessment shall be so changed that the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed or imposed on real estate and the improvements thereon shall be discontinued and as a substitute therefor, or in lieu of or in addition thereto, taxes, assessments, levies, impositions or charges shall be levied, assessed or imposed, wholly or partially, as a capital levy or otherwise, on the rents received from the Building or the rents reserved herein or any part thereof, then such substitute or additional taxes, assessments, levies, impositions or charges, to the extent so levied, assessed or imposed with respect to the Building, shall be deemed to be included within the Operating Costs. Tenant acknowledges and agrees that Landlord

-7-

shall have the exclusive right to contest, protest and/or appeal taxes, assessments, levies, impositions on the Project, including the Building, Consultation, legal fees and costs resulting from any challenge of tax assessments as reasonably allocated by Landlord shall also be included in Operating Costs. It is agreed that Tenant will be responsible for ad valorem taxes on its personal property and on the value of the leasehold improvements in the Leased Premises to the extent that the same exceed the Tenant Improvement Allowance (and if the taxing authorities do not separately assess Tenant's leasehold improvements, Landlord may make a reasonable allocation of the ad valorem taxes allocated to the Building to give effect to this sentence). In the case of special taxes and assessments which may be payable in installments, only the amount of such installment accruing during a calendar year shall be included in the Operating Costs for such year.

(c)     Notwithstanding any language contained herein to the contrary, Tenant hereby agrees that, during any calendar year in which the entire Building is not provided with Building Standard Services or is not completely occupied, Landlord shall compute all Variable Operating Costs (as defined hereinafter) for such calendar year as though the entire Building were provided with Building Standard Services and were completely occupied. For purposes of this Lease the term "Variable Operating Costs" shall mean any operating cost that is variable with the level of occupancy of the Building, in Landlord's reasonable judgment. In the event that Landlord excludes from Operating Costs any specific costs billed to or otherwise incurred for the particular benefit of specific tenants of the Building or to other buildings within the Project, Landlord shall have the right to increase Operating Costs by an amount equal to the cost of providing standard services similar to the services for which such excluded specific costs were billed or incurred. In no event shall Landlord receive from all tenants of the Building more than one hundred percent (100%) of any Operating Costs.

(d)     Tenant's obligation to pay increases in Controllable Operating Costs, as hereafter defined, shall be limited to a cumulative increase of five percent (5%) per annum over the term of this Lease. Accordingly, if any portion of such five percent limitation is not exhausted in any calendar year, the unutilized portion shall accumulate and may be included in Controllable Operating Costs for subsequent calendar years in the Lease Term. For example, if Controllable Operating Costs increase by four percent (4%) between the first and second calendar years in the Lease Term and by three percent (3%) between the second and third calendar years in the Lease Term, then Controllable Operating Costs may increase by up to eight (8%) between the third and fourth calendar years in the Lease Term. The term "Controllable Operating Costs" shall mean all Operating Costs except for real estate taxes, utility charges, insurance premiums, labor costs to the extent tied to the minimum wage and labor costs which are subject to unionization, and costs and management fees, which Operating Costs shall not be subject to the foregoing limit or "cap."

(e)     Notwithstanding anything herein to the contrary, Operating Costs shall exclude each of the following:

(i)     repairs or other work occasioned by fire, windstorm or other casualty, the costs of which are reimbursed to Landlord by insurers or by governmental authorities in eminent domain or by others;

(ii)    leasing commissions, broker fees, legal fees, costs and disbursements and other expenses incurred in connection with negotiations or disputes with tenants, other occupants, or prospective tenants of the Building;

(iii)   costs incurred in renovating or otherwise improving or decorating or redecorating space for tenants or other occupants in the Building or vacant tenant space in the Building (including without limitation any allowances or inducements made to any tenants or other occupants);

(iv)    costs of correcting defects in the construction of the Building (including latent defects in the Building) or in the Building equipment (by manufacturer) except that for the purposes

- 8 -

of this subparagraph, maintenance and repair (including painting of common areas, replacement of carpet in elevator lobbies without limitation, even though capital for accounting purposes) and ordinary wear and tear and use shall not be deemed defects;

(v)    Landlord's costs of electricity and other utilities and services furnished to tenants for which Landlord is entitled to be reimbursed by tenants (to the extent billed by Landlord) as a separate additional charge;

(xi)    costs incurred by Landlord for alterations and replacements which are considered capital expenditures under generally accepted cash basis accounting principles, consistently applied, except as otherwise expressly provided in Section 2.4(b)(ix) of the Lease;

(xii)    amortization (except as set forth in Section 2.4(b)(ix) of the Lease) and depreciation;

(xiii)    expenses in connection with services or other benefits of a type which are not building standard but which are provided to another tenant or occupant;

(viii)    costs incurred due to the violation by Landlord or any tenant of any applicable legal requirement, building code, regulation or law existing as of the Rent Commencement Date or costs incurred due to the Project being in violation of any such legal requirement, building code, regulation or law existing as of the Rent Commencement Date or costs incurred due to acts of any tenant causing an increase in the rate of insurance on the Project or its contents as a result of any use other than office use;

(ix)    principal and interest on any debt or rental under any ground or underlying leases or lease affecting the Project or any part thereof (other than payments which would have been incurred if Landlord were the fee owner, such as taxes and insurance);

(x)    any compensation paid to clerks, attendants or other persons in commercial concessions operated by Landlord (but the foregoing shall not apply to the operation of a parking facility);

(xi)    costs incurred in installing, operating and maintaining any specialty facility such as an observatory, broadcasting facility (other than the Building's music system and life support and security system), luncheon club, athletic or recreational club, except for the express benefit of the tenants;

(xii)    any expenses relating to replacements of the foundation, exterior or interior structural walls of the Building;

(xiii)    financing and refinancing costs;

(xiv)    advertising and promotional expenditures for marketing space in the Project;

(xv)    remediation and other costs required by Landlord's breach of environmental laws that exist on the Commencement Date;

(xvi)    overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services in the Building to the extent the same exceeds the costs of such goods and/or services rendered by unaffiliated third parties on a competitive basis; and

(xvii)    costs for the acquisition of sculpture, paintings or other objects of art in excess of $5,000 collectively in any calendar year.

2.5.    [INTENTIONALLY OMITTED].

2.6.   Landlord's Lien.   Landlord hereby waives any contractual or statutory lien on goods, wares, equipment, merchandise, fixtures (including trade fixtures), furniture, improvements, and other property of Tenant presently or hereafter situated in the Leased Premises.

2.7.   Sales Tax.   Simultaneously with each payment by Tenant of Base Rental, Tenant's Additional Rental and any other amount due pursuant to this Lease, Tenant shall also pay to Landlord all applicable sales tax, use tax or other tax imposed by any governmental entity thereon. Such tax shall be collectable by Landlord and payment thereof shall be enforced in the same manner provided herein for enforcing payment of Base Rental and Tenant's Additional Rental.

ARTICLE III.

3.1.   Services.   Landlord shall furnish the following services to Tenant during the Lease Term of this Lease, each in a manner consistent with a Class A office building in the Doral/West Airport submarket of Miami-Dade County, Florida ("Building Standard Services"):

(a)   Hot and cold domestic water to common use rest rooms and toilets, in such amounts as are reasonably determined by Landlord.

(b)   Subject to curtailment as required by governmental laws, rules or mandatory regulations, central heat and air conditioning, at such temperatures and in such amounts as are reasonably determined by Landlord and on such dates and at such times as are more particularly described on Exhibit E attached hereto and incorporated herein.

(c)   Electric lighting service for the Leased Premises and all public areas and special service areas of the Building in such amounts and locations as are reasonably determined by Landlord.

(d)   Janitor service shall be provided five (5) days per week, exclusive of holidays, in accordance with the janitorial specifications set forth in Exhibit I hereto; provided, however, if Tenant's floor coverings or other improvements are other than building standard commercial grade, Tenant shall pay one hundred and fifteen percent (115%) of the actual additional cleaning cost, if any, attributable thereto, if Tenant requests Landlord or its janitorial company to provide cleaning services relative thereto.

(e)   Access control for the Building shall be provided to the extent and in the manner reasonably determined by Landlord; provided, however, Landlord shall have no responsibility to prevent, and shall not be liable to Tenant for, any liability or loss to Tenant, its agents, employees and visitors arising out of losses due to theft, burglary, or damage or injury to persons or property caused by persons gaining access to the Leased Premises, and Tenant hereby releases Landlord from all liability for such losses, damages or injury, but such release shall not be applicable to the gross negligence or willful misconduct of Landlord or Landlord's agents and contractors. Tenant shall have access to the Leased Premises and the Building twenty-four (24) hours per day seven (7) days per week, fifty-two (52) weeks per year, subject to Landlord's right to close the Building in the event of an emergency or casualty.

(f)   Electrical service shall be provided to Tenant as specified in Exhibit C hereto.

Should Tenant's total rated electrical design load exceed the Building Standard rated electrical design load for either low or high voltage electrical consumption, or if Tenant's electrical design requires low voltage or high voltage circuits in excess of Tenant's share of the Building Standard Shell Condition circuits, Landlord will (subject to Tenant's reimbursement to Landlord of Landlord's actual and commercially reasonable third party costs thereof) install one (1) additional high voltage panel and/or one (1) additional low voltage panel with associated transformer, space for which has been provided in the base building electrical closets based on a maximum of two (2) such additional panels per floor for all tenants on the floor (which additional panels and transformers shall be hereinafter referred to as the "additional electrical equipment"). If the additional electrical equipment is installed because Tenant's low or high voltage rated electrical design load exceeds the applicable Building Standard rated electrical design load, then a meter shall also be added (subject to Tenant's reimbursement to Landlord of Landlord's actual

- 10 -

and commercially reasonable third party costs thereof) to measure the electricity used through the additional electrical equipment.

The design and installation of any additional electrical equipment (or any related meter) required by Tenant shall be subject to the prior approval of Landlord (which approval shall not be unreasonably withheld). All actual and commercially reasonable third party expenses incurred by Landlord in connection with the review and approval of any additional electrical equipment shall also be reimbursed to Landlord by Tenant. Tenant shall also pay on demand the actual metered cost of electricity consumed through the additional electrical equipment (if applicable), plus any actual and commercially reasonable accounting expenses incurred by Landlord in connection with the metering thereof.

If Tenant requires that certain areas within the Leased Premises must routinely operate in excess of the normal Building Operating Hours (as defined in Exhibit E attached hereto), the electrical service to such areas shall be separately circuited and metered such that Tenant shall be billed the costs associated with electricity consumed during hours other than Building Operating Hours. At Tenant's election, Tenant may install a package HVAC unit to be installed to service areas of the Leased Premises that much be cooled on a 24 hour per day basis, such as Tenant's computer room, with such package units to be separately sub-metered at Tenant's expense. In the event of any such Tenant election, the specifications for such package HVAC unit and the plans and specifications shall be subject to Landlord's reasonable written approval. In the event of any such installation, Tenant shall enter into a service contract for such unit with a duly licensed HVAC contractor providing for at least quarterly service. Tenant shall, at Landlord's request, which Landlord will use commercially reasonable efforts to provide at least thirty (30) days prior to the end of the term (or upon termination if this Lease is terminated prior thereto), remove such unit at the end of the lease term and repair any damage to the Building caused thereby. Tenant will have fifteen (15) business days from the later of (i) Landlord's request, or (ii) the end of the term (whether by natural expiration or earlier termination), to remove such unit and repair any damage, as aforesaid.

If any of Tenant's electrical equipment requires conditioned air in excess of Building Standard Shell Condition air conditioning, the same shall be installed by Landlord (on Tenant's behalf), and Tenant shall pay all design, installation, metering and operating costs relating thereto.

     (g)    All Building Standard fluorescent bulb replacement in all areas and all incandescent bulb replacement in the common areas.

     (h)    Non-exclusive multiple cab passenger service to the Leased Premises during Building Operating Hours (as defined in Exhibit E) and at least one (1) cab passenger service to the Leased Premises twenty-four (24) hours per day and non-exclusive freight elevator service during Building Operating Hours (all subject to temporary cessation for ordinary repair and maintenance and during times when life safety systems override normal building operating systems) with such freight elevator service available at other times upon reasonable prior notice and the payment by Tenant to Landlord of any additional expense actually incurred by Landlord in connection therewith.

     (i)    If Tenant requires heating, ventilating and air conditioning within the Leased Premises during periods in excess of those hours set forth in Exhibit E hereto, Landlord shall bill Tenant for the number of hours used as Tenant's Additional Rental at the rate equal to $35.00 per hour per floor, subject to increase from time to time in Landlord's reasonable discretion, to provide such services taking into account electrical consumption, wear and tear on equipment and systems, labor and administrative costs. Landlord and Tenant agree that Landlord's HVAC system is not designed to cool the air to comply with requirements of heavy machinery or other than normal office equipment. After hours HVAC will only be supplied if the request has been received by 3:00 PM the day the service is required. For after hours HVAC on Saturday or Sunday, the request must be received by the management office by 3:00 PM on the preceding Friday.

To the extent the services described in subsection (a), (b), (c), (e), (f), (h) and (i) above require electricity and water supplied by public utilities, Landlord's covenants thereunder shall only impose on Landlord the obligation to use its good faith, reasonable efforts to cause the applicable public utilities to furnish the same. Failure by Landlord to furnish the services described in this Section, or any cessation thereof, shall not render Landlord liable for damages to either person or property, nor be construed as an eviction of Tenant, nor work an abatement of rent,

- 11 -

nor relieve Tenant from fulfillment of any covenant or agreement hereof. In addition to the foregoing, should any of the equipment or machinery, for any cause, fail to operate or function properly, Tenant shall have no claim for rebate of rent or damages on account of an interruption in service occasioned thereby or resulting therefrom; provided, however, Landlord agrees to use reasonable efforts to repair said equipment or machinery promptly and to restore said services. Notwithstanding anything to the contrary contained in this Lease, if Tenant cannot reasonably use the Leased Premises for Tenant's intended business operations by reason of any interruption in services to be provided by Landlord (and Tenant does not in fact use the Leased Premises) and such condition exists for five (5) consecutive business days, then Tenant's Base Rental shall be equitably abated for that portion of the Leased Premises that Tenant is unable to use for Tenant's intended business operations until such service is restored to the Leased Premises. Tenant shall not, however, be entitled to any abatement of Base Rental if the interruption or abatement in service or the failure by Landlord to furnish such service is the result of force majeure or is the result of an interruption or abatement in service of a public utility. By way of example only, there shall be no abatement of Base Rental if Landlord is unable to furnish water or electricity to the Leased Premises if no water or electricity is then being made available to the Building by the supplying utility company or municipality. At the time of the loss of service or as soon thereafter as may be practicable under the circumstances, Tenant must give, as a condition of such rent abatement, written notice promptly to Landlord of the loss of service and its claim for abatement and Tenant only shall be entitled to abatement of Base Rental in proportion to the area rendered unusable. Landlord may prevent or stop abatement by providing substantially the same service in similar quality and quantity by temporary or alternative means until the cause of the loss of service can be corrected. Such abatement shall be Tenant's sole remedy for loss of service and Tenant shall have no right to terminate this Lease, except to the extent that such loss of service constitutes a constructive eviction under Florida law.

3.2.   Keys and Locks.  Pass-cards will be furnished by Landlord based on a ratio of 4.4 persons per 1,000 Rentable Square Feet upon an order signed by Tenant, which shall initially be 64 pass-cards. Pass-cards issued in connection with an expansion of the Leased Premises will be issued based on such same ratio. Additional pass-cards in excess of such ratio will be furnished at Tenant's request for a commercially reasonable cost to Tenant. Landlord will also furnish five (5) keys to Tenant to each lock on doors in the Leased Premises. Any additional keys will be furnished at Tenant's expense. All such pass-cards and keys shall remain the property of Landlord. No additional locks shall be allowed on any door of the Leased Premises without Landlord's permission, and Tenant shall not make or permit to be made any duplicate keys or pass-cards. Upon termination of this Lease, Tenant shall surrender to Landlord all keys and pass cards to any locks on doors entering or within the Leased Premises, and give to Landlord the combination for all locks for safes, safe cabinets and vault doors, if any, in the Leased Premises.

3.3.   Graphics, Building Directory and Name.  Landlord shall provide and install all graphics, letters, and numerals at the entrance to the Leased Premises on multi-tenant floors, if any (it being understood that Tenant shall be responsible for all graphics on full floors occupied by Tenant). Landlord shall maintain a directory in such main lobby which shall include such information relating to Tenant at Landlord's cost. All such letters and numerals shall be in the Building standard graphics (font size to be reasonably approved by Landlord). Tenant agrees that Landlord shall not be liable for any inconvenience or damage occurring as a result of any error or omission in any directory or graphics. If an error or omission in any directory or graphics is discovered, Landlord agrees to use commercially reasonable efforts to promptly correct same. Any cost associated with correcting an error or omission which is attributable to Tenant, will be paid for by Tenant. No signs, numerals, letters or other graphics shall be used or permitted on the exterior of, or may be visible from outside, the Leased Premises, unless approved in writing by Landlord. All on-floor graphics for full-floor tenants shall be removed by Tenant upon lease expiration.

3.4.   Parking.

(a)   Subject to the other provisions hereof, during the entire Term, Landlord hereby agrees to make available, or to cause the lessee or operator of the Parking Areas, if any (the "Parking Operator"), to make available to Tenant and Tenant shall take and lease four and four-tenths (4.4) non-reserved parking permits per each 1,000 square feet of Rentable Square Feet within the Leased Premises (rounded down to the nearest 1,000 square feet). The parking permits shall entitle Tenant and its employees to park in that portion of the Parking Areas being the surface lot and any parking garage located immediately adjacent to the Building, upon the terms and conditions set forth below (the "Parking Permits"). Parking for the initial lease term and any extension or renewal shall be at no cost to the Tenant; provided, however, if Landlord constructs a structured parking deck which reduces the number of surface parking lot spaces that are available for the Building, Landlord will have the right at its option to

- 12 -

reallocate the Parking Permits allocated to Tenant hereunder to a portion on the surface lot and/or a portion in the parking deck, all at no cost to Tenant so long as Tenant abides by the stated allocation between the surface lot and the parking deck. However, if Landlord or the Parking Operator has instituted parking charges for the parking deck and Tenant desires additional spaces in the parking deck above its stated allocation therein, such additional spaces will be at the then current cost. Landlord shall also provide (or cause the Parking Operator to provide) visitor parking in a portion of the Parking Areas on a "first come-first served" basis at no cost throughout the initial term of this Lease and upon such commercially reasonable and uniformly enforced conditions as Landlord or the Parking Operator, as applicable, shall establish from time to time. If coded access cards are required for Tenant parking then the initial cards based upon the 4.4/1,000 ratio shall be at Landlord's cost.

        (b)     If the Leased Premises are increased pursuant to any expansion option, right of first offer or otherwise, the number of Parking Permits which Landlord shall make available to Tenant and which Tenant shall take and lease shall be 4.4 spaces per 1,000 square feet of Rentable Square Feet within the expansion space so leased (rounded down to the nearest 1,000 RSF).

        (c)     Landlord or the Parking Operator may make, modify and enforce reasonable, nondiscriminatory rules and regulations relating to the parking of vehicles in the Parking Areas, and Tenant agrees to abide by such rules and regulations provided Tenant continues to have rights to its 4.4/1,000 ratio during the term of this Lease. Except as expressly provided herein, this Lease does not grant Tenant (or its agents, employees, contractors and visitors) the right to use the Parking Facilities or any other parking therein located on the Land or serving the Building. So long as Landlord ensures that there is sufficient parking available in the Parking Facilities to accommodate the holders of the Parking Permits, Landlord or the Parking Operator may, from time to time, (x) valet park cars, and (y) may designate specific portions of the Parking Facilities as reserved areas and Tenant shall have no right to park in such reserved areas, except Tenant may park in reserved areas made available to tenants of the Building to the extent Tenant has purchased Parking Permits specifically entitling Tenant to use the same. Tenant's principals and employees shall not park in any of the surface parking spaces located around the Building designated as visitor parking. Tenant shall have access to the Parking Areas twenty-four (24) hours per day seven (7) days per week, fifty-two (52) weeks per year, subject to Landlord's right to close the Building and/or Parking Areas in the event of an emergency or casualty.

## ARTICLE IV.

    4.1.    Care of Leased Premises. Tenant shall not commit or allow to be committed by Tenant's employees, agents or contractors, any waste or damage to any portion of the Leased Premises or the Building. Upon the expiration or any earlier termination of this Lease, Landlord shall have the right to re-enter and resume possession of the Leased Premises immediately.

    4.2.    Entry for Repairs and Inspection. Tenant shall permit Landlord and its contractors, agents or representatives to enter into and upon any part of the Leased Premises during reasonable hours to inspect or clean the same, make repairs, alterations or additions thereto, and, upon reasonable prior notice to Tenant, for the purpose of showing the same to prospective tenants or purchasers and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof. Provided that Tenant is not in default of the terms hereof beyond any applicable grace or cure period, Landlord shall not be permitted to show the Leased Premises to prospective tenants before nine (9) months prior to the expiration date hereof. Landlord shall use its reasonable efforts not to interfere with the operation of Tenant's business during any such entry. Tenant shall be permitted to have a representative present during the course of Landlord's entry for purposes of showing the Leased Premises to prospective tenants, lenders, or purchasers but not for routine janitorial service or for maintenance or repairs. Landlord shall not, except in an emergency, enter any secured areas of the Leased Premises, which have been designated as such in writing to Landlord by Tenant, without first making such arrangements with Tenant to have a Tenant representative present.

    4.3.    Nuisance. Tenant shall conduct its business and use commercially reasonable and good faith efforts to control its agents, employees, invitees, contractors and visitors in such a manner as not to create any nuisance, or interfere with, annoy or disturb any other tenant or Landlord in its operation of the Building. Landlord shall also impose this requirement on other tenants and occupants of the Building.

**4.4.** **Laws and Regulations; Encumbrances; Rules of Building.** Tenant shall comply with, and Tenant shall cause its employees, contractors and agents to comply with, and shall use its commercially reasonable efforts to cause its visitors and invitees to comply with, (i) all laws, ordinances, orders, rules and regulations of all state, federal, municipal and other governmental or judicial agencies or bodies relating to the use, condition or occupancy of the Leased Premises, including, without limitation, the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., and those for the correction, prevention and abatement of nuisance, unsafe conditions, or other grievances arising from or pertaining to the use or occupancy of the Leased Premises, (ii) all recorded easements, operating agreements, parking agreements, declarations, covenants and instruments encumbering the Leased Premises provided that Tenant has first received written notice and a copy thereof, and (iii) the nondiscriminatory rules of the Building reasonably adopted and altered by Landlord from time to time for the safety, care and cleanliness of the Leased Premises and Building and for the preservation of good order therein (the "Legal Requirements") from and after the Landlord Premises Delivery Date; provided, however, Tenant shall not be required to make (and Landlord will make subject to the exceptions herein) any alterations to the Leased Premises or the Building as the result of Legal Requirements that are structural in nature, are within the common areas, or that affect the Building systems that do not exclusively serve the Leased Premises except to the extent that the same are required either by reason of alterations made by Tenant to the Leased Premises, including Tenant's Work (as defined in Exhibit D), or as the result of Tenant's particular (i.e. other than general office) use of the Leased Premises, or are the result of Tenant's or its agents', employees' or contractors' negligence or willful misconduct. The initial rules of the Building are attached hereto and incorporated herein as Exhibit F attached hereto. In the event of any conflict between the terms of this Lease and the Building rules and regulations (as may be amended from time to time), the terms of this Lease will control. With respect to costs related to complying with requirements after the Commencement Date of any state, federal, municipal and other governmental or judicial agencies or bodies which involve capital items to include the Americans With Disabilities Act, the portions of the cost thereof attributable to the Lease Term of the Lease shall be paid by Tenant each year (amortized over the useful life in accordance with generally accepted accounting principles of such capital item) together with interest at ten percent (10%) per annum on the unamortized balance) as Operating Expenses payable by Tenant.

**4.5.** **Legal Use and Violations of Insurance Coverage.** Tenant shall not occupy or use the Leased Premises, or permit any portion of the Leased Premises to be occupied or used, for any business or purpose which is unlawful, reasonably determined to be disreputable or deemed to be hazardous in any manner, or permit anything to be done which would in any way increase the rate of fire, liability, or any other insurance coverage on the Building or its contents.

**4.6.** **Hazardous Substances.** Tenant shall comply, at its sole expense, with all laws, ordinances, orders, rules and regulations of all state, federal, municipal and other governmental or judicial agencies or bodies relating to the protection of public health, safety, welfare or the environment (collectively, "Environmental Laws") in the use, occupancy and operation of the Leased Premises. Tenant agrees that no Hazardous Substances (as defined hereinafter) shall be used, located, stored or processed on the Leased Premises or be brought onto any other portion of the Building by Tenant or any of its agents, employees, contractors, assigns, subtenants, guests or invitees, and no Hazardous Substances will be released or discharged from the Leased Premises (including, but not limited to, ground water contamination). Notwithstanding the foregoing, however, Tenant shall be permitted to have such reasonable quantities of Hazardous Substances in the Leased Premises that are reasonably and typically associated with the uses permitted under Section 1.3 hereof (such as copy machine toner and standard office cleaning supplies) provided that Tenant's use thereof is in compliance with applicable legal requirements. The term "Hazardous Substances" shall mean and include all hazardous and toxic substances, waste or materials, any pollutant or contaminant, including, without limitation, PCB's, asbestos and raw materials that include hazardous constituents or any other similar substances or materials that are now or hereafter included under or regulated by any Environmental Laws or that would pose a health, safety or environmental hazard. Tenant hereby agrees to indemnify, defend and hold harmless Landlord from and against any and all losses, liabilities (including, but not limited to, strict liability), damages, injuries, expenses (including, but not limited to, court costs, litigation expenses, reasonable attorneys' fees and costs of settlement or judgment), suits and claims of any and every kind whatsoever paid, incurred or suffered by, or asserted against, Landlord by any person, entity or governmental agency, with respect to, or as a direct or indirect result of, the presence in or the escape, leakage, spillage, discharge, emission or release from the Leased Premises of any Hazardous Substances or the presence of any Hazardous Substances placed on or discharged from the Building by Tenant or any of its agents, employees, contractors, assigns, subtenants, guests or invitees, including, without limitation, any losses, liabilities (including, but not limited to, strict liability), damages, injuries,

- 14 -

expenses (including, but not limited to, court costs, litigation expenses, reasonable attorneys' fees and costs of settlement or judgment), suits and claims asserted or arising under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), any so-called federal, state or local "Superfund" or "Superlien" laws or any other Environmental Law. This Section 4.6 does not, however, impose any liability whatsoever upon Tenant for any Hazardous Substances or breaches of Environmental Laws that have not occurred by, through or under Tenant.

4.7.   Tenant Taxes.   Tenant shall pay promptly when due all taxes directly or indirectly imposed or assessed upon Tenant's gross sales, business operations, machinery, equipment, trade fixtures and other personal property or assets, whether such taxes are assessed against Tenant, Landlord or the Building. In the event that such taxes are imposed or assessed against Landlord or the Building, Landlord shall furnish Tenant with all applicable tax bills, public charges and other assessments or impositions and Tenant shall forthwith pay the same either directly to the taxing authority or, at Landlord's option, to Landlord and, if paid to Landlord, then Landlord shall promptly remit such sums to the applicable taxing authority.

## ARTICLE V.

5.1.   Leasehold Improvements.

(a)   Tenant shall receive a tenant improvement allowance of $40.00 per Rentable Square Foot of the Leased Premises (the "Tenant Improvement Allowance").Tenant hereby agrees that the provisions of Exhibit D attached hereto shall govern the construction of Tenant's initial leasehold improvements. In addition the Tenant, at Tenant's option, shall have the right to amortize an additional $5.00 per Rentable Square Foot, as further defined in Exhibit D, together with an additional amount computed like interest thereon at the rate of ten percent (10%) per annum. Tenant shall not install any improvements which are not compatible with Landlord's plans and specifications for the Building, as reasonably determined by Landlord in the course of Landlord's review of Tenant's plans and specifications for Tenant's Work (or any subsequent Alterations, as hereafter defined) or which are not approved reasonably by Landlord or Landlord's architect. Landlord shall at Landlord's cost provide to Tenant on-floor improvements as described in Exhibit C "Base Building Shell Condition".

(b)   Notwithstanding any language contained herein or in Exhibit D to the contrary, if for any reason the Leased Premises should not be ready for occupancy by the Commencement Date, Landlord shall not be liable or responsible for any claims, damages or liabilities in connection therewith or by reason thereof.

(c)   Tenant shall not make or allow to be made any alterations, additions or improvements in or to the Leased Premises, of any kind or nature, including, without limitation, alterations, additions or improvements in, to or on, telephone or computer installations, or place safes, vaults or other heavy furniture or equipment within the Leased Premises (any and all of such alterations, additions or improvements, except for the initial leasehold improvements, are collectively referred to as the "Alterations"), without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Moving telephone or computer installations which do not include altering or penetrating walls, floors, or ceilings, or the hanging of decorative items (which action does not disturb the quiet enjoyment of any other tenants in the Building) do not require prior consent of Landlord. Tenant further specifically agrees that no food, soft drink or other vending machine will be installed within the Leased Premises without the written consent of Landlord, which consent shall not be unreasonably withheld. Landlord agrees, however, that Tenant may install up to two (2) vending machines in the "break room" area of the Leased Premises, which machines must not be visible from the outside of the Building or the outside of the Leased Premises within the Building. Tenant shall submit to Landlord detailed drawings and plans of the proposed Alterations at the time Landlord's consent is sought. Should Landlord consent to any proposed Alterations by Tenant, such consent may be conditioned as Landlord deems appropriate including, without limitation, upon Tenant's agreement to comply with (i) all commercially reasonable requirements established by Landlord, including, without limitation, safety requirements, and (ii) the matters referenced in Section 4.4 of this Lease. Tenant shall deliver to Landlord a copy of the "as built" plans and specifications for all Alterations made in or to the Leased Premises which are of such a nature that plans and specifications were required. All Alterations made hereunder shall be Tenant's property and, at the expiration or earlier termination of the term of this Lease, Tenant shall, at Tenant's expense, remove Alterations made by or on behalf of Tenant and restore the Leased Premises to their original condition, reasonable wear and tear and damage by casualty excepted, subject to the terms of this Lease, if

- 15 -

Landlord marks Tenant's plans and specifications at the time of Landlord's approval thereof indicating which items Tenant shall be required to remove. Notwithstanding the foregoing, Tenant shall not be required to remove cosmetic Alterations, such as painting or carpeting. Tenant shall not, in any event whatsoever, make, cause to be made or permit any Alteration which involves or affects in any manner whatsoever the structure, roof, base building systems or exterior appearance of the Building in which the portion of the Leased Premises that is the subject of the applicable Alteration is located.

(d)     Tenant shall indemnify and hold Landlord harmless from and against all costs (including reasonable attorneys' fees and costs of suit), losses, liabilities, or causes of action arising out of or relating to any alterations, additions or improvements made by Tenant to the Leased Premises, including, but not limited to, any mechanics' or materialmen's liens asserted in connection therewith.   No portion of Landlord's interest in the Building, the Project and/or this Lease shall be subject to liens (whether pursuant to Florida Statutes Chapter 713 or common law or otherwise) on account of any work performed by or on account of Tenant, and Tenant shall provide written notice of same to all of its contractors.

(e)     Should any mechanic's or other liens be filed against any portion of the Building or the Project by reason of Tenant's acts or omissions or because of a claim against Tenant, Tenant shall cause the same to be canceled or discharged of record by bond or otherwise within thirty (30) days after notice by Landlord. If Tenant shall fail to cancel or discharge said lien or liens, within said thirty (30) day period, Landlord may, at its sole option, cancel or discharge the same and upon Landlord's demand, Tenant shall promptly reimburse Landlord for all reasonable costs incurred in canceling or discharging such liens, and if canceling or discharging such liens requires active managerial oversight by Landlord, Landlord shall be entitled to collect an administrative fee equal to fifteen percent (15%) of the cost thereof. This provision shall relate only to work that has been done for the Tenant and at the Tenant's request.

(f)     (i)     If Tenant requests Landlord to act as construction manager and supervise the construction of an Alteration, Tenant shall pay to Landlord as Tenant's Additional Rental in connection with each Alteration a fee equal to five percent (5%) of the total construction cost of such Alteration costing or more plus applicable sales taxes (the "Administration Fee") for Landlord's overhead in connection with each Alteration, for Landlord's review and approval of all plans and specifications for each Alteration, for Landlord's monitoring of each Alteration, and for all other reasonable costs and expenses incurred by Landlord as a result of or in connection with each Alteration, including Landlord's costs to engage architects, engineers, etc. to review proposed plans for any such Alteration. Excluded from the computation of the construction cost of each Alteration the cost of furniture, removable furnishings, office equipment, painting, carpeting, raised flooring in the computer room, decorative flooring (i.e., not structural flooring or the slab) and professionals' fees.

(II)     If Tenant does not request Landlord to act as construction manager, then Tenant will pay all of Landlord's costs to engage architects, engineers, etc. to review proposed plans, as well as, on an hourly cost basis, the costs associated with time spent by Landlord's agents and employees in reviewing and approving (or disapproving) all plans and specifications associated with each Alteration.

(iii)     Prior to making any Alteration, Tenant shall submit to Landlord a statement of Tenant's architect, if one is employed, or Tenant's contractor, estimating the total construction cost of such Alteration and the estimated time required to complete such Alteration. The Administration Fee shall be calculated on the basis of such estimate and shall be paid by Tenant to Landlord prior to commencement of any Alteration.

(iv)     Within ten (10) business days after completion of any Alteration, Tenant shall submit to Landlord a statement of Tenant's independent architect, if one is employed, or Tenant's contractor, certifying the total construction cost of such Alteration, together with a copy of the certificate of occupancy for the Leased Premises (if required by local law). The Administration Fee shall be adjusted, if necessary, based on the certification. In the event all or any portion of the Administration Fee is not paid by Tenant as, herein required, such amount shall bear interest at eighteen percent (18%) per annum (the "Default Rate") until paid.

- 16 -

(v)   Tenant shall promptly deliver to Landlord copies of any and all building permits and any similar or related documentation required by any applicable law, ordinance, rule, regulation, or governmental or quasi-governmental authority in connection with any Alteration performed by or on behalf of Tenant, regardless of whether or not Landlord's approval is required for such Alteration.

5.2.   Repairs by Landlord.   All repairs, alterations or additions that materially affect the Building's structural components or the Building's mechanical, electrical and plumbing systems shall be made solely by Landlord or its contractor.  In the event of any damage to such components or systems or any other portion of the Building caused by Tenant or Tenant's agents, contractors, employees, visitors or invitees, the cost of repair or restoration of such damage shall be paid for solely by Tenant in an amount equal to Landlord's actual and commercially reasonable out of pocket costs plus ten percent (10%) for administrative cost recovery, which costs shall become Tenant's Additional Rental.  Landlord shall make repairs to Building Standard Shell Condition improvements as may be deemed necessary by Landlord for normal maintenance operations of the Building and Landlord shall not otherwise be obligated to make improvements to, or repairs of, the Leased Premises. Notwithstanding the foregoing, in the event that Landlord performs any modifications to the existing fire alarm system in the Building and such modifications trigger the requirement of changes to the horns, strobes, and speakers in the Leased Premises and their connection to the Building's main system, then Landlord shall also, at its expense, make such changes in the Leased Premises subject to reimbursement as Operating Expenses.

5.3.   Repairs by Tenant.   Subject to Section 5.2, Tenant shall at its own cost and expense, keep the Leased Premises and all leasehold improvements in a condition similar to the condition as of the Commencement Date, normal wear and tear and damage by casualty, subject to the provisions of this Lease, excepted, and Tenant shall perform all maintenance, repairs and replacements necessary to accomplish the same. In addition, Tenant shall perform all maintenance, repairs, replacements and improvements required by any governmental law, ordinance, rule or regulation that is specifically applicable to Tenant's use of the Leased Premises or required as the result of any alterations made or proposed to be made by Tenant to the Leased Premises. If Tenant fails to commence any maintenance, repairs, replacements or improvements which it is required to perform hereunder within ten (10) business days after written notice from Landlord to Tenant (or such longer period as may be reasonably required if a building permit must first be obtained) and thereafter diligently proceed with such work until completion, Landlord may, at its option, by first giving Tenant ten (10) business days written notice and an opportunity to cure, perform any such maintenance, repairs, replacements or improvements deemed reasonably necessary by Landlord, and Tenant shall pay to Landlord on demand Landlord's commercially reasonable and actual third party cost thereof plus a charge of ten percent (10%) for administrative cost recovery, which amount shall be deemed Tenant's Additional Rental. Nothing in this Section 5.3 shall impose upon Tenant any duty whatsoever with respect to the Building's structure and systems that affect all tenants of the Building in a similar manner.

## ARTICLE VI

6.1.   Condemnation.   If all or any portion of the Leased Premises or the Building or reasonable access to, or reasonable parking for, the Leased Premises, as would, in any of the foregoing events, render, in Landlord's reasonable judgment, the continuance of Tenant's business from the Leased Premises impracticable, shall be permanently taken or condemned for any public purpose, then this Lease, at the option of Tenant or Landlord upon the giving of written notice to the other party within ten (10) days from the date of such condemnation or taking, shall forthwith cease and terminate.  If less then the foregoing shall be permanently taken or condemned for any public purpose, then Landlord shall have the option of terminating this Lease by written notice to Tenant within ten (10) days from the date of such condemnation or taking, provided that Landlord also terminates the leases of all similarly affected tenants.  If this Lease is terminated as provided above, this Lease shall cease and expire as if the date of transfer of possession of the Leased Premises, the Building, or any portion thereof, to the same extent as if such date of transfer was the expiration date of this Lease.  In the event that this Lease is not terminated by either Landlord or Tenant as aforesaid, Tenant shall pay the Rental up to the date of transfer of possession of such portion of the Building so taken or condemned and this Lease shall thereupon cease and terminate with respect to such portion of the Leased Premises so taken or condemned as if the date of transfer of possession of the Leased Premises was the expiration date of the term of this Lease relating to such portion of the Leased Premises.  Thereafter the Base Rental, Tenant's Forecast Additional Rental and Tenant's Additional Rental shall be adjusted on a pro rata, net rentable square foot basis.  In the event of any such condemnation or taking and this Lease is not so terminated, Landlord shall promptly repair the Leased Premises or the Building, as the case may be, to Building Standard Shell

Condition so that the remaining portion of the Leased Premises or Building, as the case may be, shall constitute an architectural unit, fit for Tenant's occupancy and business; provided, however, that Landlord's obligation to repair hereunder shall be limited to the extent of the net proceeds made available to Landlord for such repair from any such condemnation or taking so long as Landlord has maintained the insurance required to be maintained by Landlord under this Lease. In the event of any temporary taking or condemnation for any public purpose of the Leased Premises or any portion thereof, then this Lease shall continue in full force and effect except that Base Rental, Tenant's Forecast Additional Rental, and Tenant's Additional Rental shall be adjusted on a pro rata net rentable square foot basis for the period of time that the Leased Premises are so taken as of the date of transfer of possession of the Leased Premises and Landlord shall be under no obligation to make any repairs or alterations. In the event of any condemnation or taking of the Leased Premises, Tenant hereby assigns to Landlord the value of all or any portion of the unexpired term of the Lease and all leasehold improvements and Tenant may not assert a claim for a condemnation award therefor; provided, however, that Landlord agrees to cooperate with Tenant in including in Landlord's claim, for Tenant's behalf and for payment to Tenant, an award or compensation against or from the condemning authority for (i) the value of any fixtures, furniture, furnishings, Tenant's Extra Work and other personal property which were paid for by Tenant and not by Landlord and which were condemned but which under the terms of this Lease, and for other property Tenant is permitted to remove at the end of the term of this Lease, (ii) relocation and moving expenses, and (iii) compensation for loss to Tenant's business, so long as such claim on behalf of Tenant does not otherwise diminish any award otherwise payable to Landlord.

**6.2.**   **Damages From Certain Causes.**   Neither Landlord nor Tenant shall not be liable or responsible to the other for any loss or damage to any property or person occasioned by theft, fire, act of God, public enemy, riot, strike, insurrection, war, act or omission of any tenant or occupant of the Building, requisition or order of governmental body or authority, court order or injunction, or any cause beyond Landlord's or Tenant's control or, except in the case of the negligence or intentional misconduct of Landlord or Tenant, as the case may be, for any damage or inconvenience which may arise through repair or alteration of any part of the Building. The foregoing shall not serve to excuse or delay any of Tenant's monetary obligations under this Lease unless such obligations are otherwise affected by the terms hereof, as, for example, by the terms of Section 6.3 hereof. Tenant shall notify Landlord of any damage to the Leased Premises, regardless of the cause of such damage.

**6.3.**   **Casualty Clause.**

(a)   In the event any portion of the Leased Premises or any portion of the common areas of the Building is damaged by fire or other casualty, earthquake or flood or by any other cause of any kind or nature (hereinafter collectively referred to as the "Damaged property") and the damaged property can, in the opinion of the Landlord's architect, be repaired within ninety (90) calendar days from the date of notice of Landlord's architect's opinion, then Landlord shall proceed to rebuild or restore the damaged property to Building Standard Shell Condition, but also including those permanent improvements included in Tenant's Work and described in the plans and specifications for Tenant's Work approved by Landlord, to the extent the cost thereof is covered by Landlord's insurance so long as Landlord has maintained the insurance required to be maintained by Landlord under this Lease, subject to subsection (e) hereof.

(b)   In the event the damaged property can not, in the opinion of Landlord's architect, be repaired within ninety (90) days from the date of notice of Landlord's architect's opinion, but can be repaired within two hundred seventy (270) days from the date of the Repair Notice, as hereafter defined, Landlord, at Landlord's sole option, shall have the right (i) to terminate this Lease by notifying Tenant of such termination within twenty (20) days of receipt of Landlord's architect's opinion, or (ii) to restore or rebuild the damaged property to Building Standard Shell Condition, subject to subsection (e) hereof.

(c)   If the Repair Notice states that, in the opinion of Landlord's architect, damage to the damaged property cannot be repaired within two hundred seventy (270) days from the date of the Repair Notice, then both Landlord and Tenant shall have the right to terminate this Lease by notifying the other party in writing of such termination within twenty (20) days of receipt of Landlord's architect's opinion.

(d)   Notwithstanding any language herein to the contrary, if at the time of any such damage, less than one (1) year remains in the term of this Lease, exclusive of any renewal options (but any renewal options

- 18 -

which have then been exercised shall be included in the term of this Lease for purposes of this computation), then Landlord, at Landlord's sole option, shall have the right to terminate this Lease by written notice to Tenant.

(e)     If at anytime during the Lease Term of this Lease the Building is damaged and the cost of repairing and restoring the same exceeds twenty-five percent (25%) of the replacement cost of the improvements comprising the Building, then Landlord, at Landlord's sole option, shall have the right to terminate this Lease by written notice to Tenant not later than ninety (90) days following the date of damage.

(f)     Notwithstanding any language contained herein to the contrary, in the event this Lease is not terminated as provided hereunder (i) Landlord shall be obligated to rebuild or restore the damaged property only to the extent of the net insurance proceeds available to Landlord for the purpose of rebuilding and restoration, (ii) if the damaged property is all or any portion of the Leased Premises Landlord shall be obligated to rebuild or restore the damaged property only to Building Standard Shell Condition, except that Tenant shall have the right to require Landlord to rebuild or restore the damaged property substantially to the condition which existed immediately prior to such damage, provided that Tenant shall bear all costs and expenses, including without limitation, rentals that are lost due to extended construction time, in excess of the lesser of (A) any net insurance proceeds available to Landlord for the purpose of rebuilding or restoration, or (B) the cost to Landlord of rebuilding and restoring the damaged property to Building Standard condition (with Building Standard Tenant Allowances); and (iii) to the extent Landlord has rental loss insurance proceeds available with respect to the Leased Premises, Tenant shall be entitled to a pro rata abatement of Base Rental, Tenant's Forecast Additional Rental, and Tenant's Additional Rental during the period of time the Leased Premises, or any portion thereof, are untenantable due to such damage. Landlord covenants to carry rental loss insurance so long as such insurance is available for a reasonable cost in the market. Landlord's architect's opinion (the "Repair Notice") shall be delivered to both Landlord and Tenant within thirty (30) days from the date of any such damage. In the event of any termination of this Lease under this Section, this Lease shall cease and terminate as if the date of such damage was the expiration date of the term of this Lease. Notwithstanding any contrary language in this Section, if the Leased Premises, the Building, or any portion thereof shall be damaged through the negligence or willful misconduct of Tenant and the cost of repairing the same is not covered by Landlord's insurance, such damage shall be repaired by Landlord at the sole expense of Tenant and rent shall continue hereunder unabated.

(g)     If any portion of Tenant's leasehold improvements (including, but not limited to, Tenant's Extra Work), alterations, additions, improvements, fixtures, furnishing, equipment or trade fixtures are damaged by fire or other casualty, hurricane, earthquake or flood or by any other cause of any kind or nature, Tenant shall immediately restore the same to the condition existing immediately prior to such damage or such other reasonable condition as may be deemed practicable by Tenant, unless such damage is so extensive as to permit termination of this Lease as provided herein and the Lease is terminated in accordance with such provisions.

6.4.     Casualty Insurance.  Landlord shall maintain all-risk property insurance on the Building and on all Building Standard Shell Condition improvements. Said insurance shall be maintained with an insurance company authorized to do business in Florida and having a rating of A minus VII or better by A.M. Best and Company, at full replacement cost and payments for losses thereunder shall be made solely to Landlord. Tenant shall maintain at its expense all-risk property insurance on the full replacement cost of all its personal property, including removable trade fixtures, located in the Leased Premises and on Tenant's Extra Work and all other additions and improvements (including fixtures) made by Tenant and not required to be insured by Landlord above, regardless of whether such improvements were made at Landlord's or Tenant's expense. Said insurance shall be maintained with an insurance company authorized to do business in Florida and having a rating of A minus or better by A.M. Best and Company, If the annual premiums to be paid by Landlord shall exceed the standard rates because of Tenant's operations within, or contents of, the Leased Premises or because the improvements to the Leased Premises are in excess of improvements contemplated by the Tenant Improvement Allowance, Tenant shall promptly pay the excess amount of the premium upon request by Landlord on the condition that Landlord imposes such payment requirement on other tenants in the Building (and if necessary, Landlord may allocate the insurance costs of the Building to give effect to this sentence). Upon the request of Landlord, a duly executed certificate of insurance, reflecting Tenant's maintenance of the insurance required under this Section 6.4 and Section 6.5, shall be delivered to Landlord.

Notwithstanding the foregoing, Landlord and Tenant have agreed that Tenant shall not be obligated to carry business interruption insurance. In the event of a loss or other event which would have been covered by such insurance,

- 19 -

Tenant shall make funds available, without recourse to or against Landlord but subject to Section 3.1 hereof, in the same manner as an insurance carrier would have made such funds available to the extent required by the terms of this Lease. In the event Tenant assigns this Lease or subleases all or any portion of the Premises to a party requiring Landlord's consent, such assignee, subtenant, or successor shall, at Landlord's option, be required to obtain and maintain business interruption insurance.

6.5.    Liability Insurance.   Landlord and Tenant shall each maintain a policy or policies of commercial general liability insurance with the premiums thereon fully paid on or before the due dates, issued by and binding upon an insurance company authorized to transact business in Florida and having a rating of A-VII or better by A.M. Best and Company.  Such insurance shall be written on an occurrence basis and shall afford minimum protection (which may be affected by primary and/or excess coverage) of not less than $2,000,000.00 combined single limit for bodily injury and property damage in any one occurrence; provided, however, Tenant shall carry such reasonably greater limits of coverage as Landlord may reasonably request from time to time so long as Landlord maintains similar limits of coverage and so long as Landlord uniformly applies such requirement to other tenants in the Building.

6.6.    Hold Harmless.   Landlord shall not be liable to Tenant, its agents, servants, employees, contractors, customers or invitees for any damage to person or property caused by any act, omission or neglect of Tenant.  Without limiting or being limited by any other indemnity in this Lease, but rather in confirmation and furtherance thereof, Tenant agrees to indemnify, defend by counsel reasonably acceptable to Landlord and hold Landlord, Landlord's beneficiaries (if Landlord is a land trust), the managing agent of the Building, the leasing agent of the Building and their respective agents, partners, shareholders, officers, directors and employees of the Building harmless of, from and against any and all losses, damages, liabilities, claims, liens, costs and expenses (including, but not limited to, court costs, reasonable attorneys' fees and litigation expenses) in connection with injury to or death of any person or damage to or theft, loss or loss of the use of any property occurring in or about the Leased Premises or the Building arising from Tenant's occupancy of the Leased Premises, or the conduct of its business or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Leased Premises, or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or, with respect to occurrences in the Building, due to any other act or negligence or willful misconduct of Tenant or any of its agents, employees, contractors, assigns, subtenants, guests or invitees. Nothing in this indemnity shall impose upon Tenant the obligation to indemnify Landlord for its negligence or willful misconduct or to indemnify the managing agent of the Building, the leasing agent of the Building and their respective agents, partners, shareholders, officers, directors and employees from their negligent acts or negligent omissions.

6.7.    Waiver of Subrogation Rights.  Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each hereby waives any and all rights of recovery, claim, action or cause of action, against the other, its agents, servants, partners, shareholders, officers or employees, for personal injury, loss or damage to business, and loss or damage that may occur to the Leased Premises, the Building or any improvements thereto or thereon or any personal property of such party therein or thereon by reason of fire, the elements, or any other cause to the extent such loss or damage is covered by terms of the all-risk property insurance policies referred to in Section 6.4 hereof, the commercial general liability insurance referred to in Section 6.5 but only up to the amount of the required insurance amount, or any other insurance policy required to be maintained by Landlord or Tenant, as applicable, regardless of cause or origin, including negligence of the other party hereto, its agents, officers, partners, shareholders, servants or employees, and covenants that no insurer shall hold any right of subrogation against such other party.  The foregoing waiver shall apply regardless of the cause or origin of such claim, including but not limited to the negligence of a party, or such party's agents, officers, employees or contractors, but shall not apply if it would have the effect, but only to the extent of such effect, of invalidating any insurance coverage of Landlord or Tenant.  Each party shall obtain any special endorsements, if any, required by their respective insurers to evidence compliance with the aforementioned waiver.

ARTICLE VII.

7.1.    Default and Remedies.

- 20 -

(a)     The occurrence of any of the following shall constitute an event of default under and breach of this Lease by Tenant (an "Event of Default"):

(i)     Failure by Tenant to pay any Rental within (5) days after the same becomes due hereunder provided, however, that Tenant shall receive written notice of late payment two (2) times in any calendar year and a period of three (3) business days to make payment before an Event of Default shall have occurred;

(ii)    The Leased Premises are deserted, vacated, or not used as regularly or consistently as would normally be expected for similar premises put to general office use. Notwithstanding the foregoing, Tenant shall be permitted to vacate the Leased Premises after first giving written notice to Landlord, which written notice shall include a notice address for Tenant apart from the Leased Premises, and provided that Tenant shall continue to abide by each of its obligations under this Lease;

(iii)   Failure by Tenant to observe or perform any of the covenants in respect of assignment and subletting set forth in Article VIII;

(iv)    Failure by Tenant to cure forthwith, immediately after receipt of notice from Landlord, any hazardous condition in the Leased Premises which Tenant has created or permitted in violation of law or of this Lease or, with respect to the Building, which Tenant has created;

(v)     Failure by Tenant to complete, execute and deliver any instrument or document required to be completed, executed and delivered by Tenant pursuant to Section 7.8 or Section 7.9 of this Lease, within ten (10) days after the initial written demand therefor to Tenant provided, however, that before an Event of Default shall have occurred, Landlord shall give Tenant a second written notice, which shall provide that an Event of Default shall occur if Tenant does not complete, execute and deliver the required document within three (3) business days following Tenant's receipt of such second notice;

(vi)    Failure by Tenant to observe or perform any other covenant, agreement, condition or provision of this Lease, if such failure shall continue for thirty (30) days after written notice thereof from Landlord to Tenant; provided, however, if such default is curable, such thirty (30) day period shall be extended for the time reasonably required to complete such cure, if such failure cannot reasonably be cured within said thirty (30) day period and Tenant commences to cure such failure within said thirty (30) day period and thereafter diligently and continuously proceeds to cure such failure;

(vii)   The levy upon execution or the attachment by legal process of the leasehold interest of Tenant, or the filing or creation of a lien in respect of such leasehold interest, which lien shall not be released or discharged within thirty (30) days from the date of such filing;

(viii)  Any default under or breach by any guarantor of the terms of any guaranty of this Lease or any obligations hereunder;

(ix)    Tenant or any guarantor of Tenant's obligations under this Lease becomes insolvent or bankrupt or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver for all or a major part of its property;

- 21 -

(x)   A trustee or receiver is appointed for Tenant, any guarantor of Tenant's obligations under this Lease or for a major part of either party's property and is not discharged within ninety (90) days after such appointment;

(xi)  Any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding for relief under any bankruptcy law or similar law for the relief of debtors is instituted (A) by Tenant or any guarantor of Tenant's obligations under this Lease, or (B) against Tenant or any guarantor of Tenant's obligations under this Lease and is allowed against it or is consented to by it or is not dismissed within sixty (60) days after such institution;

(xii) Tenant's repeated or continued failure to timely pay any Rental due Landlord hereunder where such failure shall continue or be repeated for two (2) consecutive months, or for a total of four (4) months in any period of twelve (12) consecutive months;

(xiii) Tenant's repeated or continued failure to pay any Rental due Landlord hereunder on or before the date such Rental is due where such failure shall be repeated for three (3) non-consecutive months in any period of twelve (12) consecutive months; or

(xiv) Tenant's repeated failure to observe or perform any of the other covenants, terms or conditions hereof which have a material effect on the Building or Landlord more than three (3) times, in the aggregate, in any period of twelve (12) consecutive months.

(b)   Upon the occurrence of an Event of Default, Landlord shall have the option to do and perform any one or more of the following in addition to, and not in limitation of, any other remedy or right permitted it by law or in equity or by this Lease:

(i)   Landlord, with or without terminating this Lease, may immediately or at any time thereafter re-enter the Leased Premises and correct or repair any condition which shall constitute a failure on Tenant's part to keep, observe, perform, satisfy, or abide by any term, condition, covenant, agreement, or obligation of this Lease or of the Rules and Regulations now in effect or hereafter adopted or of any notice given Tenant by Landlord pursuant to the terms of this Lease, and Tenant shall fully reimburse and compensate Landlord on demand for Landlord's actual and commercially reasonable costs.

(ii)  Landlord, with or without terminating this Lease, may immediately or at any time thereafter demand in writing that Tenant vacate the Leased Premises and thereupon Tenant shall vacate the Leased Premises and remove therefrom all property thereon belonging to or placed on the Leased Premises by, at the direction of, or with consent of Tenant within ten (10) days of receipt by Tenant of such notice from Landlord, whereupon Landlord shall have the right to re-enter and take possession of the Leased Premises. Any such demand, re-entry and taking possession of the Leased Premises by Landlord shall not of itself constitute an acceptance by Landlord of a surrender of this Lease or of the Leased Premises by Tenant and shall not of itself constitute a termination of this Lease by Landlord.

(iii) Landlord, with or without terminating this Lease, may immediately or at any time thereafter, re-enter the Leased Premises and remove therefrom Tenant and all property belonging to or placed on the Leased Premises by, at the direction of, or with consent of Tenant. Any such re-entry and removal by Landlord shall not of itself constitute an acceptance by Landlord of a surrender of this Lease or

- 22 -

of the Leased Premises by Tenant and shall not of itself constitute a termination of this Lease by Landlord.

(iv)   Landlord, with or without terminating this Lease, may immediately or at any time thereafter relet the Leased Premises or any part thereof for such time or times, at such rental or rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable, and Landlord may make any alterations or repairs to the Leased Premises which it may deem necessary or proper to facilitate such reletting; and Tenant shall pay all costs of such reletting including but not limited to the cost of any such alterations and repairs to the Leased Premises, attorneys' fees, leasing inducements, and brokerage commissions to the extent any is not amortized in the rent being collected from such third party; and if this Lease shall not have been terminated, Tenant shall continue to pay all rent and all other charges due under this Lease up to and including the date of beginning of payment of rent by any subsequent tenant of part or all of the Leased Premises, and thereafter Tenant shall pay monthly during the remainder of the term of this Lease the difference, if any, between the rent and other charges collected from any such subsequent tenant or tenants and the rent and other charges reserved in this Lease, but Tenant shall not be entitled to receive any excess of any such rents collected over the rents reserved herein.

(v)   Landlord may immediately or at any time thereafter terminate this Lease, and this Lease shall be deemed to have been terminated upon receipt by Tenant of written notice of such termination; upon such termination Landlord shall recover from Tenant all damages Landlord may suffer by reason of such termination including, without limitation, unamortized sums expended by Landlord for leasing commissions and construction of tenant improvements, all arrearages in rentals, costs, charges, additional rentals, and reimbursements, the cost (including court costs and attorneys' fees) of recovering possession of the Leased Premises, the cost of any alteration of or repair to the Leased Premises which is necessary or proper to prepare the same for reletting and, in addition thereto, Landlord at its election shall have and recover from Tenant either (A) an amount equal to the excess, if any, of the total amount of all rents and other charges to be paid by Tenant for the remainder of the term of this Lease over the then reasonable rental value of the Leased Premises for the remainder of the term of this Lease, or (B) the rents and other charges which Landlord would be entitled to receive from Tenant pursuant to the provisions of Section 7.1(b)(iv) if the Lease were not terminated. Such election shall be made by Landlord by serving written notice upon Tenant of its choice of one of the two said alternatives within thirty (30) days of the notice of termination.

(vi)   Landlord, may, without re-entering, retaking or resuming possession of the Leased Premises, sue for all rents provided for hereunder, including but not limited to Base Rental and Tenant's Additional Rental, and all other sums, charges, payments, costs and expenses due from tenant to Landlord hereunder, either: (i) as they become due under this Lease, or (ii) at Landlord's option, Landlord may accelerate the maturity and due date of the whole or any part of the Base Rental and Tenant's Additional Rental for the balance of the term of the Lease, as well as all other sums, charges, payments, costs and expenses required to be paid by Tenant to Landlord hereunder, including, without limitation, damages for a breach or default of Tenant's obligations hereunder in existence at the time of such acceleration, such that all sums due and payable under this Lease for the balance of the term of the Lease shall, following such acceleration, be treated as being and, in fact, due and payable in advance as of the date of such acceleration. Landlord may recover and collect all such unpaid Base Rental, Tenant's Additional Rental and other sums due and owing by

-23-

Tenant by distress, levy, execution or otherwise.   Regardless of which alternative remedy is chosen by Landlord under the foregoing provision of this subparagraph, Landlord shall not be required to relet the Leased Premises, but Landlord shall be required to use commercially reasonable efforts to relet the Leased Premises and mitigate its damages provided, however, that the foregoing shall not require Landlord to use more than its normal marketing efforts or to favor the Leased Premises over other premises that Landlord holds for direct lease.

(c)   If, in accordance with applicable laws, Landlord re-enters the Leased Premises or terminates this Lease pursuant to any of the provisions of this Lease, Tenant hereby waives all claims for damages which may be caused by such re-entry or termination by Landlord.  Tenant shall and does hereby indemnify and hold Landlord harmless from any loss, cost (including court costs and attorneys' fees), or damages suffered by Landlord by reason of such re-entry or termination.  No such re-entry or termination shall be considered or construed to be a forcible entry.

(d)   The exercise by Landlord of any one or more of the rights and remedies provided in this Lease shall not prevent the subsequent exercise by Landlord of any one or more of the other rights and remedies herein provided.  All remedies provided for in this Lease are cumulative and may, at the election of Landlord, be exercised alternatively, successively, or in any other manner and are in addition to any other rights provided for or allowed by law or in equity; provided, however, that nothing herein shall permit Landlord to recover any specific monetary claim or damage more than one (1) time.

(e)   No act by Landlord with respect to the Leased Premises shall terminate this Lease, including, but not limited to, acceptance of the keys, institution of an action for detainer or other dispossessory proceedings, it being understood that this Lease may only be terminated by express written notice from Landlord to Tenant, and any reletting of the Leased Premises shall be presumed to be for and on behalf of Tenant, and not Landlord, unless Landlord expressly provides otherwise in writing to Tenant.

7.2.   **Insolvency or Bankruptcy.**   The appointment of a receiver to take possession of all or substantially all of the assets of Tenant or any guarantor of Tenant's obligations under this Lease, or any general assignment by Tenant or any guarantor of Tenant's obligations under this Lease for the benefit of creditors, or any action taken or suffered by Tenant or any guarantor of Tenant's obligations under this Lease under any insolvency, bankruptcy, or reorganization act, shall, at Landlord's option, constitute a breach of this Lease by Tenant.  Upon the happening of any such event or at any time thereafter, this Lease shall terminate five (5) days after written notice of termination from Landlord to Tenant.  In no event shall this Lease be assigned or assignable by operation of law or by voluntary or involuntary bankruptcy proceedings or otherwise and in no event shall this Lease or any rights or privileges hereunder be an asset of Tenant under any bankruptcy, insolvency, or reorganization proceedings.

7.3.   **Late Payments.**   Tenant shall pay, as a one (1) time late charge on each installment of any Rental owed by Tenant hereunder that is not paid when due, the greater of $100.00 or an amount equal to five percent (5%) of the amount due for each and every thirty (30) day period that said amount remains unpaid (but in no event shall the amount of such late charge exceed an amount based upon the highest legally permissible rate chargeable at any time by Landlord under the circumstances).  Should Tenant make a partial payment of past due amounts, the amount of such partial payment shall be applied first to reduce all accrued and unpaid late charges, in inverse order of their maturity, and then to reduce all other past due amounts, in inverse order of their maturity.  Such late charge shall not apply to the first late payment in each Lease Year.

7.4.   **Attorneys' Fees.**   If Landlord or Tenant initiates any action to enforce its rights under this Lease or the terms hereof, the prevailing party shall be entitled to collect from the non-prevailing party all court costs, reasonable attorneys fees and litigation expenses, including, but not limited to, costs of depositions and expert witnesses, that the prevailing party incurs in connection with such action at the trial level and in any bankruptcy, administrative or post-judgment proceeding.

7.5.   **Waiver of Homestead.**   Tenant hereby waives and renounces all homestead or exemption rights which Tenant may have under or by virtue of the Constitutions and Laws of the United States, the State of Florida,

- 24 -

and any other State as against any debt or sum Tenant may owe Landlord under this Lease and hereby transfers, conveys, and assigns to Landlord all homestead or exemption rights which may be allowed or set apart to Tenant, including such as may be set apart in any bankruptcy proceeding, to pay any debt or sum owing by Tenant to Landlord hereunder.

7.6.    No Waiver of Rights.  No failure or delay of Landlord or Tenant to exercise any right or power given it herein or to insist upon strict compliance by the other of any obligation imposed on it herein and no custom or practice of either party hereto at variance with any term hereof shall constitute a waiver or a modification of the terms hereof by Landlord or Tenant or any right it has herein to demand strict compliance with the terms hereof by Landlord or Tenant.  No waiver of any right of Landlord or Tenant or any default by Landlord or Tenant on one occasion shall operate as a waiver of any of such party's other rights or of any subsequent default.  No express waiver shall effect any condition, covenant, rule, or regulation other than the one specified in such waiver and then only for the time and in the manner specified in such waiver.  No person has or shall have any authority to waive any provision of this Lease unless such waiver is expressly made in writing and signed by an authorized officer of Landlord and Tenant.

7.7.    Holding Over.  In the event of holding over by Tenant after expiration or termination of this Lease without the written consent of Landlord, Tenant shall pay, solely for such holding over, 150% the Rental that would have been payable if this Lease had not so terminated or expired) for the first month of such holdover period and double the Rental for each month thereafter during the holdover period.  No holding over by Tenant after the term of this Lease shall be construed to extend this Lease, and Tenant shall be deemed a tenant at will, terminable on ten (10) business days notice from Landlord.  In the event Landlord has provided Tenant with at least forty-five (45) days written notice that Landlord is in negotiations or has negotiated the terms of a lease (or amendment) with a successor tenant(s) for all or any portion of the Leased Premises but Tenant nevertheless fails to vacate and surrender the Leased Premises at the end of the term in accordance with the terms of this Lease, then Tenant shall indemnify Landlord against all claims for damages by any other tenant to whom Landlord shall have leased all or any part of the Leased Premises effective upon the termination of this Lease.  Regardless of such 45-day period and prior to the end of the term, Landlord agrees to use commercially reasonable efforts to give Tenant written notice of any lease or amendment it has entered into for all or any portion of the Premises after same has been executed.  Any holding over with the express written consent of Landlord shall thereafter constitute this Lease to be a lease from month to month (terminable by either party on thirty (30) days notice) at a Base Rental, Tenant's Forecast Additional Rental, and all other sums required to be paid by Tenant prior to the expiration or termination of this Lease.

7.8.    Subordination.

(a)    Landlord may have heretofore or may hereafter encumber with a mortgage, deed of trust, deed to secure debt, financing statement or other security interests (collectively, a "Mortgage") the Land, the Building, the Project or any part thereof or any interest therein, may sell and lease back the Land, the Project or any part thereof, and may encumber the leasehold estate under such a sale and leaseback arrangement with a Mortgage. (The holder of any Mortgage is herein called a "Mortgagee".  A lease creating Landlord's interest in the Land, the Building, the Project or part thereof is herein called a "Ground Lease" and the lessor under any such Ground Lease is herein called a "Ground Lessor".)  This Lease and the rights of Tenant hereunder shall be and are hereby expressly made subject to and subordinate at all times to any Mortgage and to any Ground Lease now or hereafter existing, and to all amendments, modifications, renewals, extensions, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security thereof; provided, however, that the Mortgagee or Ground Lessor shall not, so long as Tenant shall not be in default under this Lease beyond any applicable grace or cure period, disturb Tenant in its possession of the Leased Premises or terminate or modify Tenant's rights hereunder.  Tenant agrees to execute and deliver to Landlord such further instruments consenting to or confirming the subordination of this Lease to any Mortgage and to any Ground Lease and containing such other provisions which may be reasonably requested in writing by Landlord within ten (10) business days after Tenant's receipt of such written request, provided that such instrument is consistent with the non-disturbance and other provisions benefiting Tenant under this Section 7.8(a).

(b)    Tenant agrees that if Landlord defaults in the performance or observance of any covenant or condition of this Lease required to be performed or observed by Landlord hereunder, Tenant will give written

notice specifying such default by certified or registered mail, postage prepaid, to any Mortgagee or Ground Lessor of which Tenant has been notified in writing, and before Tenant exercises any right or remedy which it may have on account of any such default of Landlord, such Mortgagee or Ground Lessor shall have a reasonable amount of time to cure such default of Landlord, if such default can be cured without such Mortgagee or Ground Lessor taking possession of the mortgaged or leased estate, or to obtain possession of the mortgaged or leased estate and then to cure such default of Landlord, if such default cannot be cured without such Mortgagee or Ground Lessor taking possession of the mortgaged or leased estate; provided, however, that if Landlord's default has a material adverse affect upon Tenant's rights under this Lease or Tenant's ability to peacefully enjoy the Leased Premises, the cure period of such Mortgagee or Ground Lessor shall not exceed thirty (30) days from receipt of Tenant's written notice; provided, however, if such default is curable, such thirty (30) day period shall be extended for the time reasonably required to complete such cure, if such failure cannot reasonably be cured within said thirty (30) day period and Landlord or such Mortgagee or Ground Lessor commences to cure such failure within said thirty (30) day period and thereafter diligently and continuously proceeds to cure such failure.

        (c)     If any Mortgage is foreclosed, or Landlord's interest under this Lease is conveyed or transferred in lieu of foreclosure, or if any Ground Lease is terminated:

        (i)     No person or entity which as the result of any of the foregoing has succeeded to the interest of Landlord in this Lease (any such person or entity being hereafter called a "Successor") shall be liable for any default by Landlord or any other matter which occurred prior to the date such Successor succeeded to Landlord's interest in this Lease, nor shall such Successor be bound by or subject to any offsets or defenses which Tenant may have against Landlord or any other predecessor in interest to such Successor, but any Successor shall be liable for each default to the extent that it continues from and after the date of succession.

        (ii)     Upon written request of any Successor, such Successor and Tenant will confirm their attornment and non-disturbance to the other, as Landlord and Tenant under this Lease, subject to the provisions of this Section 7.8(c) and Section 7.8(e), and will execute and deliver such instruments as may be reasonably necessary or appropriate to evidence such attornment within ten (10) days after receipt of a written request to do so.

        (iii)     No Successor shall be bound to recognize any prepayment by more than thirty (30) days of any Rental payable by Tenant hereunder.

        (d)     Notwithstanding anything to the contrary contained herein, any Mortgage may subordinate, in whole or in part, its Mortgage to this Lease by sending Tenant notice in writing subordinating all or any part of such Mortgage to this Lease, and Tenant agrees to execute and deliver to such Mortgagee such further instruments consenting to or confirming the subordination of all or any portion of its Mortgage to this Lease and containing such other provisions which may be requested in writing by such Mortgagee within ten (10) days after Tenant's receipt of such written request.

        (e)     Whether or not any Mortgage is foreclosed or any Ground Lease is terminated, or any Mortgagee or Ground Lessor succeeds to any interest of Landlord under this Lease, no Mortgagee or Ground Lessor shall have any liability to Tenant for any security deposit paid to Landlord by Tenant hereunder, unless such security deposit has actually been received by such Mortgagee or Ground Lessor.

        (f)     Should any prospective Mortgagee or Ground Lessor require a modification or modifications of this Lease, which modification or modifications will not cause an increased cost or expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, in the reasonable judgment of Tenant, then and in such event, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are required therefor and deliver the same to Landlord within ten (10) business days following written request therefor. Should any prospective Mortgagee or Ground Lessor require execution of a short form of this Lease for recording (containing, among other customary provisions, the names of the parties, a

description of the Leased Premises and the term of this Lease), Tenant agrees to execute such short form of lease and deliver the same to Landlord within ten (10) business days following the request therefor.

(g)     If Tenant fails within ten (10) business days after initial written demand therefor to execute and deliver any instruments as may be necessary or proper to effectuate any of the covenants of Tenant set forth above in this Section, and if Tenant's failure continues for a period of three (3) days following Tenant's receipt of a second written notice, then, at Landlord's option, Tenant's consent to such instrument shall be deemed to have been granted, or such failure shall constitute a default hereunder.

(h)     Landlord agrees to use commercially reasonable efforts to obtain for Tenant a subordination, non-disturbance and attornment agreement from any present or future Mortgagee or Ground Lessor on such Mortgagee or Ground Lessor's standard form.

(i)     No Mortgagee or Ground Lessor of which Tenant has been notified, in writing, shall be bound any amendment or modification of this Lease made without the written consent of such Mortgagee or Ground Lessor.

(j)     As of the date of this Lease, there is no Mortgage encumbering the Building.

7.9.    Estoppel Certificates.  Tenant agrees that, from time to time upon not less than ten (10) days' prior request by Landlord, or any existing or prospective Mortgagee or Ground Lessor, Tenant will, and Tenant will cause any subtenant, licensee, concessionaire or other occupant of the Leased Premises claiming by, through or under Tenant, to complete, execute and deliver to Landlord or Landlord's designee or to any existing or prospective mortgagee or ground lessor, a written estoppel certificate certifying (i) that this Lease is unmodified and is in full force and effect (or if there have been modifications, that this Lease, as modified, is in full force and effect and setting forth the modifications); (ii) the amounts of the monthly installments of Base Rental, Tenant's Forecast Additional Rental, Tenant's Additional Rental Adjustment and other sums then required to be paid under this Lease by Tenant; (iii) the date to which the Base Rental, Tenant's Forecast Additional Rental, Tenant's Additional Rental Adjustment and other sums required to be paid under this Lease by Tenant have been paid; (iv) that Landlord is not in default under any of the provisions of this Lease, or if in default, the nature thereof in detail and what is required to cure same; and (v) such other information concerning the status of this Lease or the parties' performance hereunder reasonably requested by Landlord or the party to whom such estoppel certificate is to be addressed. Landlord agrees, not more than one (1) time in any calendar year, to provide a similar written estoppel certificate with respect to Tenant's performance under this Lease within thirty (30) days following Tenant's written request from time to time.

ARTICLE VIII.

8.1.    Sublease or Assignment by Tenant.

(a)     The Tenant shall not, without the Landlord's prior written consent which shall not be unreasonably withheld or delayed, (i) assign, convey, mortgage, pledge, encumber, or otherwise transfer (whether voluntarily, by operation of law, or otherwise) this Lease or any interest hereunder; (ii) allow any lien to be placed upon Tenant's interest hereunder; (iii) sublet the Leased Premises or any part thereof; or (iv) permit the use or occupancy of the Leased Premises or any part thereof by any one other than Tenant and its employees.  Any attempt to consummate any of the foregoing without Landlord's consent shall be void and of no force or effect.  If Tenant is an entity, other than a corporation whose shares are traded on a nationally recognized stock exchange, any change to the structure of such entity or any disposition(s) of any of the interests therein by sale, assignment, operation of law or otherwise, or any change in the power to vote the interests therein, shall be treated as a prohibited assignment of this Lease requiring Tenant to obtain Landlord's prior written consent.  Notwithstanding the foregoing, any divestiture, transfers of any interest in Tenant, or other change in the ownership of Tenant resulting from requirements imposed by the European Commission shall not be deemed to be in violation of the restrictions herein. Furthermore, any transfers of interests between the current owners or future owners of Tenant shall not be deemed to be in violation hereof, and each shall be permitted without restriction or interference by Landlord so long as the net worth of Tenant is not materially diminished.

- 27 -

(b)     Notwithstanding anything herein to the contrary, but subject to the exceptions set forth in Section 8.1(a) above, if at any time or from time to time during the Lease Term of this Lease, Tenant desires to sublet all or any portion of the Leased Premises or assign Tenant's interest in this Lease, Tenant shall notify Landlord in writing (hereinafter referred to in this Section as the "Notice") of the terms of the proposed subletting or assignment, the identity of the proposed sublessee or assignee, and the area proposed to be sublet (hereinafter referred to as "Sublet Space"), and such other information as Landlord may reasonably request to evaluate Tenant's request to sublet or assign.  Landlord shall then have the option (i) to sublet the Sublet Space from Tenant as provided in subsection (c) hereof at the same Base Rental and Tenant's Additional Rental as Tenant is required to pay to Landlord under this Lease for the Sublet Space, (ii) to terminate this Lease as to the Sublet Space as provided in subsection (d) hereof, (iii) to allow the proposed sublease or assignment subject only to the final review for approval as provided in subsection (e) hereof, or (iv) to reasonably refuse to consent, in which case Tenant may not proceed with the sublease or assignment.  Landlord shall not, however, be permitted to recapture the Sublet Space or terminate this Lease with respect thereto unless the proposed sublease is for (i) all or substantially all of the remaining Lease term or (ii) fifty percent (50%) or more in the aggregate of the Rentable Square Feet of the Leased Premises, nor shall Landlord's option to recapture the Sublet Space or terminate this Lease with respect to the Sublet Space be applicable if the proposed subtenant is affiliated with Tenant or will provide services to Tenant from the Sublet Space, evidence of all of which must be provided to Landlord.  Landlord's option (iii) to sublet, to terminate, or to allow the proposed sublease or assignment subject to final review, as the case may be, shall be exercisable by Landlord in writing within a period of fifteen (15) business days after receipt of the Notice and any failure by Landlord to exercise any of such options within said thirty (30) day period shall be deemed to constitute the election of option (iii) above.

(c)     In the event Landlord exercises the option to sublet the Sublet Space pursuant to Landlord's options set forth above, the term of the subletting from the Tenant to Landlord shall be the term set forth in the Notice (which shall not be longer than the then current term of this Lease unless Landlord expressly agrees in writing that any extension or renewal option contained in this Lease will apply to such Sublet Space) and shall be on such terms and conditions as are contained in this Lease to the extent applicable, except that the Landlord shall have the right to further sublet the Sublet Space freely and without any consent or approval from Tenant and upon such terms and for such rent as Landlord shall agree upon in its sole and absolute discretion, and Landlord shall bear all costs required to demise the Sublet Space as separate premises from the Leased Premises.

(d)     If Landlord elects to terminate this Lease pursuant to Landlord's options set forth above, then this Lease shall terminate as to the Sublet Space on the date set forth in Landlord's notice to Tenant, which date shall be no less than the proposed commencement date of Tenant's sublease and no more than ninety (90) days after the proposed commencement date of Tenant's sublease.  If the Sublet Space does not constitute the entire Leased Premises and Landlord exercises its option to terminate this Lease with respect to the Sublet Space, as to that portion of the Leased Premises which is not part of the Sublet Space, this Lease shall remain in full force and effect except that Base Rental, Tenant's Forecast Additional Rental, and Tenant's Additional Rental shall be calculated on the difference between the Rentable Square Feet prior to such termination and the Rentable Square Feet of the Sublet Space.

(e)     If Landlord elects or is deemed to have elected to allow the proposed sublease or assignment subject to final review, Tenant shall submit to Landlord, within twenty (20) calendar days after receipt of Landlord's notice of election (or the expiration of said fifteen (15) business-day period if no such election is made), a copy of the proposed sublease or assignment, which sublease or assignment must provide for the assumption of all of Tenant's obligations under this Lease, and such additional information concerning the business, reputation and credit-worthiness of the proposed sublessee or assignee as shall be sufficient to allow Landlord to form a commercially reasonable judgment with respect thereto.  Landlord agrees not to unreasonably withhold its approval of any proposed form of sublease or assignment and, in the event Landlord fails to approve or disapprove any such sublease or assignment within thirty (30) days after Landlord's receipt of such submission from Tenant, such sublease or assignment shall be deemed to be approved; provided, however, that if Landlord approves any proposed sublease or assignment, Landlord shall be entitled to receive from Tenant as additional rent hereunder fifty percent (50%) of any rents or other sums received by Tenant pursuant to said sublease or assignment in excess of the rentals payable to Landlord by Tenant under this Lease with respect to the Sublet Space (after deducting all of Tenant's reasonable costs associated therewith, including reasonable brokerage fees and the reasonable cost of remodeling or otherwise improving the Leased Premises for said sublessee or assignee), as such rents or other sums are received by

- 28 -

Tenant from the approved sublessee or assignee.  Landlord may require that any rent or other sums paid by a sublessee or assignee be paid directly to Landlord.  If Landlord approves in writing the proposed sublessee or assignee and the terms of the proposed sublease or assignment, but a fully executed counterpart of such sublease or assignment is not delivered to Landlord within sixty (60) calendar days after the date of Landlord's written approval, then Landlord's approval of the proposed sublease or assignment shall be deemed null and void and Tenant shall again comply with all the conditions of this Section as if the Notice and options hereinabove referred to had not been given, received or exercised.  If Landlord fails to approve the form of sublease or assignment or the sublessee or assignee, Tenant shall have the right to submit amended forms or other sublessees or assignees to Landlord to review for approval.

(f)     Notwithstanding the giving by Landlord of its consent to any sublease or assignment with respect to the Leased Premises, no sublessee or assignee may exercise any expansion option, right of first refusal option, or renewal option under this Lease unless a separate written agreement is entered into directly between such sublessee or assignee and Landlord (and Landlord shall have sole discretion as to whether to enter into such a separate agreement).  Tenant may not exercise any such right with respect to any space that Tenant has sublet or assigned.

(g)     Notwithstanding the giving by Landlord of its consent to any subletting, assignment or occupancy as provided hereunder or any language contained in such lease, sublease or assignment to the contrary (i) unless this Lease is expressly terminated by Landlord or Landlord recaptures any Sublet Space, Tenant shall not be relieved of any of Tenant's obligations or covenants under this Lease and Tenant shall remain fully liable hereunder; and (ii) no such consent or language shall be deemed to be Landlord's consent to any future sublease or assignment.

(h)     If, with the consent of the Landlord, the Leased Premises or any part thereof is sublet or occupied by other than Tenant or this Lease is assigned, Landlord may, after default by Tenant, collect rent from the subtenant, assignee or occupant, and apply the net amount collected to the Rental herein reserved.  No such subletting, assignment, occupancy, or collection shall be deemed (i) a waiver of any of Tenant's covenants contained in this Lease, (ii) release of Tenant from further performance by Tenant of its covenants under this Lease, or (iii) a waiver of any of Landlord's other rights hereunder.

(i)     In no event shall Tenant assign this Lease or enter into any sublease, license, concession or other agreement for use, occupancy or utilization of any part of the Leased Premises which provides for a rental or other payment for such use, occupancy or utilization based in whole or in part on the income or profits derived by any person from the Leased Premises leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of gross receipts of sales), and Tenant agrees that all assignments, subleases, licenses, concessions or other agreements for use, occupancy or utilization of any part of the Leased Premises shall provide that the person having an interest in the possession, use, occupancy or utilization of the Leased Premises shall not enter into any lease, sublease, license, concession or other agreement for use, occupancy or utilization of space in the Leased Premises which provides for a rental or other payment for such use, occupancy or utilization based in whole or in part on the income or profits derived by any person from the Leased Premises leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of gross receipts of sales) and any such purported assignment, sublease, license, concession or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Leased Premises.  Notwithstanding anything in this Lease to the contrary, in no event shall Tenant assign this Lease or enter into any sublease, license, concession or other agreement for use, occupancy or utilization of any part of the Leased Premises, or otherwise transfer its rights hereunder, if the same would (i) require the payment of any consideration that would not qualify as "rents from real property", as that term is defined in Section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code"), or (ii) cause any portion of the amounts payable under this Lease to fail to qualify as rents from real property within the meaning of said Section 856(d) of the Code.

(j)     Tenant shall pay to Landlord, as Landlord's cost of processing, each proposed assignment or subletting, an amount equal to the sum of (i) Landlord's reasonable attorneys' and other professional fees, plus (ii) the sum of $250.00 for the cost of Landlord's administrative, accounting and clerical time (collectively, "Processing Costs"), and the amount of all direct and indirect costs and expenses incurred by Landlord arising from the assignee or sublessee taking occupancy of the subject space (including, without limitation, costs of freight

elevator operation for moving of furnishings and trade fixtures, security service, janitorial and cleaning service, and rubbish removal service).

(k)   ERISA and UBTI Restrictions.   Notwithstanding anything to the contrary contained herein, including, without limitation, this Section 8.1, no assignment or subletting by Tenant, nor any other transfer or vesting of Tenant's interest hereunder (whether by merger, operation of law or otherwise), shall be permitted if (i) Landlord, or any person designated by Landlord as having an interest therein, directly or indirectly, controls, is controlled by, or is under common control with (A) the proposed assignee, sublessee or successor-in-interest of Tenant or (B) any person which, directly or indirectly, controls, is controlled by or is under common control with, the proposed assignee, sublessee or successor-in-interest of Tenant; (ii) the proposed assignment or sublease (A) provides for a rental or other payment for the leasing, use, occupancy or utilization of all or any portion of the Leased Premises based, in whole or in part, on the income or profits derived by any person from the property so leased, used, occupied or utilized other than an amount based on a fixed percentage or percentages of gross receipts or sales or (B) does not provide that such assignee or subtenant shall not enter into any lease, sublease, license, concession or other agreement for the use, occupancy or utilization of all or any portion of the Leased Premises which provides for a rental or other payment for such use, occupancy or utilization based, in whole or in part, on the income or profits derived by any person from the property so leased, used, occupied or utilized other than an amount based on a fixed percentage or percentages of gross receipts or sales; or (iii) in the reasonable opinion of Landlord and Landlord's counsel, such proposed assignment, subletting or other transfer or vesting of Tenant's interest hereunder (whether by merger, operation at law or otherwise) will (A) cause a violation of the Employee Retirement Income Security Act of 1974 by Landlord, or by any person which, directly or indirectly, controls, is controlled by, or is under common control with, Landlord or any person who controls Landlord or (B) result or may in the future result in Landlord, or any person which, directly or indirectly, has an interest in Landlord, receiving "unrelated business taxable income" (as defined in the Internal Revenue Code).

8.2.   Assignment by Landlord.   Landlord shall have the right to transfer and assign, in whole or in part, all its rights and obligations hereunder, in the Building, the Land and all other property referred to herein, and in such event and upon such transfer (any such transferee to have the benefit of, and be subject to, the provisions of Sections 8.3 and 8.4 hereof) no further liability or obligation shall thereafter accrue against Landlord hereunder from and after the date of such transfer.

8.3.   Peaceful Enjoyment.   Landlord covenants that Tenant shall and may peacefully have, hold and enjoy the Leased Premises free from hindrance by Landlord or any person claiming by, through or under Landlord but subject to the other terms hereof, provided that Tenant pays the rental and other sums herein recited to be paid by Tenant and performs all of Tenant's covenants and agreements herein contained. It is understood and agreed that this covenant and any and all other covenants of Landlord contained in this Lease shall be binding upon Landlord and its successors only with respect to breaches occurring during the ownership of the Landlord's interest hereunder.

8.4.   Limitation of Landlord's Personal Liability.   Tenant specifically agrees to look solely to Landlord's equity interest in the Project for the recovery of any monetary judgment against Landlord, it being agreed that Landlord (and its partners and shareholders) shall never be personally liable for any such judgment. The provision contained in the foregoing sentence is not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest or any suit or action in connection with enforcement or collection of amounts which may become owing or payable under or on account of insurance maintained by Landlord.

8.5.   Force Majeure.   Landlord and Tenant (except with respect to the payment of Rental or any other monetary obligation under this Lease, including any payment obligations arising pursuant to Exhibit D hereto) shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any of the terms, covenants and conditions of this Lease when prevented from so doing by a cause or causes beyond the Landlord's or Tenant's (as the case may be) control (excluding financial inability to perform), which shall include, without limitation, all labor disputes, governmental regulations or controls, fire or other casualty, inability to obtain any material or services, acts of God, or any other cause not within the reasonable control of Landlord or Tenant (as the case may be).

- 30 -

## ARTICLE IX.

9.1.  **Notices.**  Any notice or other communications required or permitted to be given under this Lease must be in writing and shall be effectively given or delivered if (i) hand delivered to the addresses for Landlord and Tenant stated below, (ii) sent by certified or registered United States Mail, return receipt requested, to said addresses, or (iii) sent by nationally recognized overnight courier (such as FedEx, UPS Next-day Air or DHL), with all delivery charges paid by the sender and signature required for delivery, to said address. Any notice mailed shall be deemed to have been given upon receipt or refusal thereof. Notice effected by hand delivery shall be deemed to have been given at the time of actual delivery. Either party shall have the right to change its address to which notices shall thereafter be sent and the party to whose attention such notice shall be directed by giving the other party notice thereof in accordance with the provisions of this Section 9.1. The initial addresses of the parties for purposes of this Lease are:

|  |  |
|---|---|
| If to Landlord: | Hines Interests Limited Partnership<br>2555 Ponce de Leon, Suite 225<br>Coral Gables, Florida 33134<br>Attn:   Mr. Tom Roth<br>Tel:    (305) 444-5350<br>Fax:    (305) 444-0164 |
|  | Hines Interests Limited Partnership<br>Doral Corporate Center I<br>3750 NW 87th Avenue<br>Doral, Florida 33178<br>Attn:    Property Manager<br>Tel:    (305) 592-3258<br>Fax:    (305) 592-3959 |
|  | Hines Interests Limited Partnership<br>One South Dearborn<br>Chicago, Illinois 60603<br>Attn:   Mr. C. Kevin Shannahan<br>Tel:    (312) 419-4900<br>Fax:    (312) 346-4180 |
|  | Hines Value Added Funds<br>300 Atlantic Street<br>Stamford, CT 06901<br>Attn:   Mr. David Congdon<br>Tel:    (203) 967-2510<br>Fax:    (203) 967-4488 |
| With a copy to: | Sheley & Hall, P.C.<br>303 Peachtree Street, Suite 4440<br>Atlanta, GA 30308<br>Attn:   Raymond P. Sheley, Esq.<br>Tel:    (404) 880-1350<br>Fax:    (404) 880-1351 |
| If to Tenant: | If before the Commencement Date:<br>5550 Glades Road, Suite 500<br>Boca Raton, Florida 33431-7215<br>Attention: Karen Zall |

- 31 -

From and After the Commencement Date:
8750 NW 36th Street, Suite 300
Doral, FL 33178
Attention: Ron Vandeger, Director of Finance

Tenant shall also send a copy of each such notice to each Mortgagee that notifies Tenant in writing of its interest and the address to which notices are to be sent.

9.2.   Miscellaneous.

(a)   This Lease shall be binding upon and inure to the benefit of the successors and assigns of Landlord, and shall be binding upon and inure to the benefit of Tenant, its successors, and, to the extent assignment may be approved by Landlord hereunder, Tenant's assigns. Where appropriate the pronouns of any gender shall include the other gender, and either the singular or the plural shall include the other.

(b)   All rights and remedies of Landlord and Tenant under this Lease shall be cumulative and none shall exclude any other rights or remedies allowed by law. This Lease is declared to be a Florida contract, and all of the terms hereof shall be construed according to the laws of the State of Florida.

(c)   This Lease may not be altered, changed or amended, except by an instrument in writing executed by all parties hereto. Further, the terms and provisions of this Lease shall not be construed against or in favor of a party hereto merely because such party is the "Landlord" or the "Tenant" hereunder or such party or its counsel is the draftsman of this Lease.

(d)   If Tenant is a corporation, partnership or other entity, Tenant warrants that all consents or approvals required of third parties (including but not limited to its Board of Directors or partners) for the execution, delivery and performance of this Lease have been obtained and that Tenant has the right and authority to enter into and perform its covenants contained in this Lease. Likewise, if Landlord is a corporation, partnership or other entity, Landlord warrants that all consent or approval required of third parties (including but not limited to its Board of Directors or partners) for the execution, delivery and performance of this Lease have been obtained and that Landlord has the right and authority to enter into and perform its covenants contained in this Lease.

(e)   TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE LEASED PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE. IN THE EVENT LANDLORD COMMENCES ANY PROCEEDINGS FOR NONPAYMENT OF RENT OR ANY OTHER AMOUNTS PAYABLE HEREUNDER, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING, UNLESS THE FAILURE TO RAISE THE SAME WOULD CONSTITUTE A WAIVER THEREOF. THIS SHALL NOT, HOWEVER, BE CONSTRUED AS A WAIVER OF TENANT'S RIGHT TO ASSERT SUCH CLAIMS IN ANY SEPARATE ACTION BROUGHT BY TENANT.

(f)   Wherever in this Lease there is imposed upon Landlord the obligation to use best or reasonable efforts or due diligence, Landlord shall be required to do so only to the extent the same is economically feasible and otherwise will not impose upon Landlord extreme financial or other burdens.

(g)   If any term or provision of this Lease, or the application thereof to any person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and shall be enforceable to the extent permitted by law.

(h)   Time is of the essence in this Lease.

- 32 -

(i)     Tenant represents and warrants to Landlord that Tenant did not deal with any broker in connection with this Lease other than Cushman & Wakesfield of Florida, Inc. ("Broker"), who shall be paid by Landlord.  Tenant shall indemnify, defend and hold Landlord, Landlord's beneficiaries, the managing agent of the Building, the leasing agent of the Building and their respective agents, partners and employees and the Building harmless of, from and against any and all losses, damages, liabilities, claims, liens, costs and expenses (including, without limitation, court costs, reasonable attorneys' fees and litigation expenses) arising from any claims or demands of any other broker or brokers or finders for any commission alleged to be due such other broker or brokers or finders claiming to have dealt with Tenant in connection with this Lease or with whom Tenant hereafter deals or whom Tenant employs.  The provisions of this subsection shall survive the expiration or earlier termination of this Lease.

(j)     If Tenant consists of more than one person, corporation, partnership, limited liability company or other entity, the liability hereunder of all such persons, corporations, partnerships or other entities shall be joint and several.

(k)     Landlord's receipt of any Rental payable by Tenant hereunder with knowledge of the breach of a covenant or agreement contained in this Lease shall not be deemed a waiver of the breach.  No acceptance by Landlord of a lesser amount than the installment of Rental which is due shall be considered, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed, an accord and satisfaction.  Landlord may accept a check or payment without prejudice to Landlord's right to recover the balance due or to pursue any other remedy provided in this Lease.

(l)     Wherever Landlord's consent or approval is required pursuant to the terms of this Lease, Landlord may grant or withhold the same in Landlord's sole and absolute discretion, except as otherwise expressly provided herein.

(m)     Tenant covenants and agrees to keep strictly confidential all of the financial terms of this Lease and not to disseminate any such information to any third parties without the prior written consent of Landlord.  Landlord and Tenant each further covenant and agree that, at all times after the date of this Lease and prior to the Commencement Date, unless consented to in writing by Landlord or Tenant, as applicable, no press release or other public disclosure concerning this Lease shall be made by Tenant.

(n)     Submission of this instrument for examination shall not constitute a reservation of or option to lease the Leased Premises or in any manner bind Landlord or Tenant, and no lease or obligation on Landlord or Tenant shall arise until this instrument is signed and delivered by Landlord and Tenant; provided, however, the execution and delivery by Tenant of this Lease to Landlord, or the managing agent of the Building or the leasing agent of the Building shall constitute an irrevocable offer by Tenant to lease the Leased Premises on the terms and conditions herein contained, which offer may not be revoked for thirty (30) days after such delivery.

(o)     Tenant, upon Landlord's reasonable request and from time to time throughout the term of this Lease, shall submit to Landlord its most recent audited quarterly report (if audited quarterly reports are then available, and unaudited if audited quarterly reports are not available and if Tenant has in fact promulgated quarterly reports) and audited annual report.

(p)     Radon Gas.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.

(q)     Mold and Mildew.  The parties acknowledge that each of them have the responsibilities set forth in this paragraph.  Landlord acknowledges that it is necessary for Landlord to provide appropriate climate control at the Leased Premises and in the Building during all Business Operating Hours in accordance with Exhibit E of this Lease, and to maintain the roof, windows and structure of the Building in good order and watertight condition, in order to deter Mold and Mold Conditions from developing and accumulating in the Leased Premises.  Tenant agrees not to block or cover any of the heating, ventilation or air-conditioning ducts in the Leased Premises or to tamper with the climate controls from within the Leased Premises in accordance with the parameters set forth

-33-

in Exhibit E. Tenant agrees to promptly report to the Landlord upon Tenant's becoming aware thereof: (i) any evidence of a water leak or excessive moisture in the Leased Premises; and (ii) any evidence of Mold or a Mold Condition that cannot be removed by simply applying a common household cleaner and wiping the area, Provided that Landlord has complied with each of its obligations under this Section 9.2(q), Tenant hereby (A) assumes the risks associated with Mold and/or a Mold Condition, (B) waives any claim or cause of action against Landlord arising out of the existence of Mold or a Mold Condition in the Leased Premises and/or the Building, and (C) releases the Landlord from any and all liabilities resulting from Mold or any Mold Condition. Provided that Tenant has complied with each of its obligations under this Section 9.2(q), Landlord hereby (X) waives any claim or cause of action against Tenant arising out of the existence of Mold or a Mold Condition in the Leased Premises and/or the Building, and (Y) releases the Tenant from any and all liabilities resulting from Mold or any Mold Condition. As used herein, "Mold" means mold, mildew, fungus or other potentially dangerous organisms in amounts sufficient to create a health risk to humans, and "Mold Condition" means the presence or suspected presence of Mold or any condition(s) that reasonably can be expected to give rise to or indicate the presence of Mold, including observed or suspected instances of water damage or intrusion, the presence of wet or damp wood, cellular wallboard, floor coverings or other materials, inappropriate climate control, discoloration of walls, ceilings or floors, complaints of respiratory ailment or eye irritation by residents, employees or any other occupants or invitees in the Building, or any notice from a governmental agency of complaints regarding the indoor air quality at the Building.

(r)     The exhibits, including, without limitation, the special stipulations attached hereto on Exhibit H and made a part hereof are hereby made a part of this Lease and shall control if in conflict with any of the foregoing provisions of this Lease.

[CONTINUED ON FOLLOWING PAGE]

- 34 -

[CONTINUED FROM PREVIOUS PAGE]

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Lease as of the date aforesaid.

LANDLORD:

HINES VAF II DORAL, L.P.,
a Delaware limited partnership

By      Hines VAF II Doral GP LLC,
        a Delaware limited liability company

        By: Hines U.S. Office Value Added Fund II, L.P.,
        its sole member

        By: Hines U.S. Office Value Added Fund II, LLC,
        its general partner

            By: Hines Interests Limited Partnership, its managing
            member

                By:   Hines Holdings, Inc.,
                      its general partner

Witness:                                        By:
Print Name    LOREA ZULMETALE           Name: C. Kevin Shannahan
                                        Title: Exec. Vice President
Print Name    Sheryl Maselli


TENANT:

MARTINAIR HOLLAND NV,
a business entity existing under the laws of Holland
and qualified to do business in the State of Florida

Witness:                                        By:
Print Name    Karen Call                Name: Peter Scholtes
Print Name    Holly Long                Title: VP & General Mgr

- 35 -

## EXHIBIT A

## DESCRIPTION OF LAND

Parcel 1:

A portion of land lying in the North ½ of the Northeast ¼ of Section 28, Township 53 South, Range 40 East, Dade County, Florida, being more particularly described as follows:

Commence at the Northeast corner of said Section 28; thence run South 0 degrees 11 minutes 13 seconds East, along the East line of the Northeast ¼ of said Section 28, a distance of 1319.10 feet to the Southeast corner of the North ½ of the Northeast ¼ of said Section 28; thence run North 89 degrees 54 minutes 26 seconds West, along the South line of the North ½ of the Northeast ¼ of said Section 28, for a distance of 1035.42 feet to the Point of Beginning of the following described parcel of land.

Thence continue North 89 degrees 54 minutes 26 seconds West, along the last described course, for a distance of 232.44 feet to a point on the Southwesterly right-of-way line of the 80 feet wide Drossel's Dairy Canal, as recorded in Official Records Book 5176, page 40, Public Records of Dade County, Florida; thence run North 46 degrees 02 minutes 36 seconds East, along said Drossel's Dairy Canal right-of-way line, for a distance of 1,027.86 feet to a point on the Southerly right-of-way line of NW 36th Street Extension, as recorded in Official Records Book 9234, page 1825, Public Records of Dade County, Florida; thence run South 79 degrees 27 minutes 59 seconds East, along said NW 36th Street Extension right-of-way line and along a line radial to the next mentioned curve, for a distance of 135.00 feet to a point on the arc of a circular curve concave to the Northeast, having a radius of 425.00 feet; thence run Southwesterly and Southeasterly, along the arc of said curve to the left, for a distance of 343.74 feet through a central angle of 46 degrees 20 minutes 27 seconds to the point of compound curvature with a circular curve to the left, having a radius of 326.69 feet; thence run Southeasterly, along the arc of said curve, a distance of 141.84 feet; through a central angle of 24 degrees 52 minutes 54 seconds to a point on the arc of a circular curve concave to the North, having a radius of 404.50 feet and a radial bearing of South 51 degrees 42 minutes 23 seconds East from the center of said curve; thence run Southwesterly, Westerly and Northwesterly along the arc of said curve to the right, for a distance of 660.70 feet; through a central angle of 93 degrees 35 minutes 09 seconds to a point; thence run South 46 degrees 02 minutes 36 seconds West, along a line parallel with and 164.50 feet Southeasterly of the Southeast right-of-way line of said Drossel's Dairy Canal, for a distance of 320.75 feet to the Point of Beginning.

The above described parcel is also known as Tract "B" and a portion of Tract "C" of DORAL PLAZA, according to the Plat thereof recorded in Plat Book 122, page 19, Public Records of Dade County, Florida.

Parcel 2:

Tract "C" and "D" of DORAL PLAZA, according to the Plat thereof recorded in Plat Book 122, page 19, Public Records of Dade County, Florida, less that portion of Tract "C" described in Exhibit "B" to that certain Quit Claim Deed filed in Official Records Book 13715, page 900, Public Records of Dade County, Florida, and less the South 30 feet of the East 30 feet of Tract "C".

ALSO DESCRIBED AS:

A portion of Tract "C" and all of Tract "D", of DORAL PLAZA, according to the Plat thereof recorded in

Exhibit A

o

Plat Book 123, page 19, Public Records of Dade County, Florida, being particularly described as follows:

Commence at the Southeast corner of Tract "C", of DORAL PLAZA, according to the Plat thereof recorded in Plat Book 123, page 19, Public Records of Dade County, Florida; thence , run North 88 degrees 54 minutes 26 seconds West along the South boundary of Tract "C" for a distance of 30.00 feet to the Point of Beginning of the parcel herein described;

Thence from the above established Point of Beginning, continue North 88 degrees 54 minutes 26 seconds West along the said South boundary of Tract "C" for a distance of 950.41 feet to a point of intersection with a line that is parallel to and 164.50 feet Southeasterly of, as measured at right angles to, the Northwesterly boundary of said Tract "C"; thence run North 46 degrees 02 minutes 36 seconds East along the last described line for a distance of 320.75 feet to the point of intersection with the arc of a curve concave to the North having a radius of 404.50 feet, said point bearing South 41 degrees 52 minutes 47 seconds West from the center of said curve; thence run Southeasterly, Easterly and Northeasterly along the arc of said curve to the left, through a central angle of 93 degrees 35 minutes 09 seconds for a distance of 660.70 feet to a point of intersection with the arc of a curve, concave to the Northeast, having a radius of 326.69 feet, said point bearing South 29 degrees 19 minutes 00 seconds West from the center of said curve, said curve being the Southwesterly boundary of Tract "D" of said Doral Plaza; thence run Northwesterly along the last described line and along the arc of a curve to the right, through a central angle of 24 degrees 52 minutes 34 seconds, for a distance of 141.84 feet to a point of compound curvature of a curve to the right, having a radius of 425.00 feet; thence run Northwesterly along the arc of said curve, having a central angle of 46 degrees 20 minutes 27 seconds, for a distance of 343.74 feet to a point of intersection with the Southerly right-of-way boundary of N.W. 36th Street Extension, as recorded in Official Records Book 9234, page 1835, Public Records of Dade County, Florida, said right-of-way boundary being the Northerly boundary of said Tract "D"; thence run South 79 degrees 52 minutes 59 seconds East along the last described line for a distance of 302.23 feet to the point of curvature of a curve, concave to the Southwest, having a radius of 50.00 feet; thence run Southeasterly along the arc of said curve, through a central angle of 79 degrees 16 minutes 46 seconds for a distance of 69.18 feet to the point of tangency, said point lying on the West right-of-way boundary of N.W. 87th Avenue, as said right-of-way is recorded in Official Records Book 9234, page 1833, Public Records of Dade County, Florida, said right-of-way boundary being the East boundary of said Tract "D"; thence run South 00 degrees 11 minutes 13 seconds East along the East boundary of said Tracts "C" and "D" for a distance of 577.66 feet; thence North 88 degrees 54 minutes 26 seconds West for a distance of 90.00 feet; thence South 00 degrees 11 minutes 13 seconds East for a distance of 30.00 feet to the Point of Beginning.

Together with the rights of ingress and egress set forth in that certain Grant and Easement dated March 6, 1990 and recorded on March 8, 1990 in Official Records Book 14461, page 462, Public Records of Dade County, Florida, made between Howard Kaskel and Steven M. Jacobson, as Trustee under certain Trusts more particularly described in Exhibit "A" to said Grant of Easement, established by Agreements of Trust dated May 26, 1981, and amendments thereto recorded on October 29, 1985, in Official Records Book 12682, pages 2194 through 2295, Public Records of Dade County, Florida, and Doral OPA, Inc., a Florida corporation, pertaining to the following described property:

A portion of Tract "C" of DORAL PLAZA, according to the Plat thereof recorded in Plat Book 123, page 19, Public Records of Dade County, Florida, being particularly described as follows:

Commence at the Southeast corner of said Tract "C" thence North 88 degrees 54 minutes 26 seconds West along the South line of said Tract "C" for 980.41 feet; thence North 46 degrees 02 minutes 36 seconds East for 320.75 feet to the point of a curve concave to the Northeast, said point bearing South 41 degrees 52 minutes 47 seconds West from the center of said curve; thence Southeasterly, Easterly and Northeasterly along said curve to the left having for its elements a radius of 404.50 feet and a central

Exhibit A

angle of 65 degrees 13 minutes 36 seconds for an arc distance of 460.59 feet to the Point of Beginning of the parcel herein described; thence from the above established Point of Beginning run North 01 degrees 05 minutes 34 seconds East for 48.96 feet to a point of a curve concentric to the last described curve, said point bearing South 26 degrees 34 minutes 28 seconds East for the center of said curve; thence Northeasterly along said curve to the left having for its elements a radius of 360.50 feet and a central angle of 15 degrees 42 minutes 46 seconds for an arc distance of 98.86 feet to a point; thence North 05 degrees 13 minutes 52 seconds West for 18.14 feet to a point on a curve concave to the Northwest, said point bearing South 05 degrees 13 minutes 52 seconds East from the center of said curve; thence Northeasterly, Northerly and Northwesterly along said curve to the left having for its radius of 15.00 feet and a central angle of 135 degrees 44 minutes 29 seconds for an arc distance of 35.01 feet to a point on the Westerly line of the reciprocal driveway easement as said easement is recorded in Official Records Book 12555, page 356 and Official Records Book 13715, page 977. Public Records of Dade County, Florida, said point being on a curve concave to the Northeast, said point bearing South 41 degrees 01 minutes 48 seconds West from the center of said curve; thence Southeasterly along said Westerly line of the reciprocal driveway easement along said curve to the left having for its elements a radius of 346.69 feet and a central angle of 11 degrees 06 minutes 22 seconds for an arc distance of 67.20 feet to a point on a curve concave to the Southwest, said point bearing North 29 degrees 55 minutes 26 seconds East from the center of said curve; thence Northwesterly, Westerly, Southwesterly, Southerly and Southeasterly along said curve to the left having for its elements a radius of 15.00 feet and a central angle of 153 degrees 22 minutes 05 seconds for an arc distance of 40.15 feet to a point on a curve concave to the Northwest, said point bearing South 44 degrees 41 minutes 32 seconds East from the center of said curve; thence Southwesterly along said curve to the right having for its elements a radius of 404.50 feet and a central angle of 03 degrees 45 minutes 26 seconds for an arc distance of 26.52 feet to a point on a curve concave to the Northeast, said point bearing South 52 degrees 00 minutes 40 seconds West from the center of said curve; thence Northwesterly along said curve to the right having for its elements a radius of 400.69 feet and a central angle of 01 degrees 54 minutes 39 seconds for an arc distance of 13.36 feet to a point on a curve concave to the South, said point bearing North 33 degrees 55 minutes 19 seconds East from center of said curve; thence Northwesterly, Westerly and Southwesterly along said curve to the left having for its elements a radius of 10.00 feet and a central angle of 72 degrees 55 minutes 00 seconds for an arc distance of 12.73 feet to a point on a curve concave to the Northwest, said point bearing South 98 degrees 59 minutes 41 seconds East from the center of said curve; thence Southwesterly along said curve to the right having for its elements a radius of 384.50 feet and a central angle of 08 degrees 24 minutes 51 seconds for an arc distance of 56.45 feet to a point on a curve concave to the Southeast, said point bearing North 30 degrees 34 minutes 50 seconds West from the center of said curve; thence Southwesterly along said curve to the left having for its elements a radius of 20.00 feet and a central angle of 58 degrees 19 minutes 36 seconds for an arc distance of 20.36 feet to the point of tangency; thence South 01 degrees 05 minutes 34 seconds West for 11.56 feet to a point of a curve concave to the Northwest, said point bearing South 27 degrees 18 minutes 28 seconds East from the center of said curve; thence Southwesterly along said curve to the right having for its elements a radius of 404.50 feet and a central angle of 03 degrees 57 minutes 18 seconds for an arc distance of 27.92 feet to the Point of Beginning.

Exhibit A

EXHIBIT B

FLOOR PLAN OF LEASED PREMISES



14,569 RSF

Exhibit B

EXHIBIT C

BASE BUILDING SHELL CONDITION

The following Base Building Condition shall be provided by Landlord at Landlord's sole cost and shall not be deducted from the Tenant Construction Allowance.  The Building in the base shell condition described in this Exhibit C may be referred to in the Lease and the exhibits attached to the Lease as either the "Base Building" or the "Base Shell Condition" or the "Building":

a.     Tenant will provide on-floor panels and distribution as part of the Initial Improvements.

b.     Typical multi-tenant floor corridor walls to be completed with common area side only.

c.     Life Safety

    i.     In all tenant spaces sprinkler heads, in a code compliant configuration, shall be provided.  All required drops, relocation of sprinkler heads or additional heads in Tenant Improvement areas will be provided and installed by Tenant at Tenant's cost.  Base Building fire alarm system shall have sufficient capacity for Tenant to tie in, provided that Tenant's demand is reasonably within requirements of comparable office space.

    ii.     Extinguisher cabinets installed at each stairwell (or as otherwise required by code for an unoccupied floor).

    iii.     Exit signs at all stairwells.

    iv.     Smoke detectors, fire extinguishers, fire horns, electric door releases, speakers, cameras and any other life safety equipment required by code for an unoccupied floor.

    v.     Emergency lighting installed in each stairwell.

d.     Interior face of exterior walls will be taped, floated and sanded gypsum board on metal studs to be finished by the tenant.

e.     Mechanical equipment rooms shall be provided and completed.

f.     Toilet room materials and finishes will consist of: counter tops; framed mirrors; ceramic tile floors and painted gypsum board walls; metal toilet partitions; recessed toilet accessories; and a lay-in ceiling system with grid.  Landlord shall renovate the rest rooms in the Common Areas of the third floor, in compliance with Legal Requirements, and in a manner substantially the same as Landlord's recent rest room renovations on the fourth (4th) floor of the Building.  Landlord will use reasonable, diligent efforts to complete such renovations on or about the Commencement Date.  If such renovations are not completed within thirty (30) days after Tenant takes occupancy of the Leased Premises for the conduct of its business for reasons not attributable to Force Majeure and otherwise within Landlord's control, then Landlord agrees to provide Tenant an abatement of Base Rental for each day beyond such 30-day period that such work is not completed equal to $5,000 per month, prorated on a per-diem basis based on the number of days of delay.

g.     Floor Slab Design Load Capacities as per original specifications of the buildings construction (refer to base building architectural drawings).

h.     Building standard blinds to be provided and installed by Tenant.  Landlord will replace the elevator lobby and multi-tenant corridor finishes with building standard finishes.  Landlord will use reasonable, diligent efforts to complete such replacements prior to the date that Tenant takes occupancy of the Leased Premises for the conduct of its business, as such work is anticipated to be done contemporaneously with the restroom renovations referenced in (f) above.

i.     Typical multi-tenant floor corridor materials and finishes will include: gypsum board on corridor side with vinyl wall covering; two-foot by two-foot acoustical lay-in ceiling tile with exposed metal grid; and

Exhibit C

building standard carpet. Landlord will use reasonable, diligent efforts to complete such replacements prior to the date that Tenant takes occupancy of the Leased Premises for the conduct of its business, as such work is anticipated to be done contemporaneously with the restroom renovations referenced in (f) above

j.   Service Core

   i.     Stairways
   ii.    Electrical, telephone, and mechanical rooms.
   iii.   Finished men's and women's washrooms.
   iv.   Domestic water and drainage.

k.   Core Doors

   i.     Building standard core doors for stairwells, electrical, mechanical, and telephone rooms and all washrooms.
   ii.    Doors finished and complete with frame, trim, hardware, locking devices, electric door releases and closers (where applicable).

l.   Walls and Windows

   i.     Curtain wall installed and sealed.
   ii.    Exterior windows installed and sealed.
   iii.   Insulation from slab-to-slab installed and sealed.
   iv.   Core walls and elevator lobby walls installed, sheet rocked, taped, sanded, patched, filled, dusted, and ready to be finished by tenant.

m.   Sleeves in core telephone rooms for telephone access.

n.   HVAC

The equipment to furnish central heat and air conditioning shall meet specifications designed to maintain during Building Operation Hours a minimum of 72°F dry bulb ±2° in the winter when the outdoor temperature is not lower than 10°F dry bulb and a maximum of 78°F dry bulb ±2° in the summer when the outdoor temperature is not higher than 93°F dry bulb.

o.   Electrical/Back-Up Power

If required by Tenant, Landlord shall provide Tenant space and access for Tenant's backup power generator, including a conduit path and riser space within the shell building common area from the backup power generator to the Tenant demised premises. Tenant's backup power generator shall be separate from the shell building backup power system. Tenant, as part of premises improvements, will install all conduit, feeders, switches, controls, and other associated equipment required by the Tenant's backup power system. The location, design, construction, size, capacity and all other aspects of such generator shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld. Tenant shall shield or screen the generator from public view. In the event that the generator is located in the parking facilities servicing the Building, any parking space(s) taken by the generator shall be counted towards the total number of parking spaces allocated to Tenant under this Lease. The expense of installing, construction, maintaining and removing the generator shall be the sole cost and expense of Tenant and shall be paid directly to Landlord. Tenant shall be responsible for all costs and expenses associated with such generator and Tenant shall promptly repair any damage to the Building or the Land resulting from the installation, construction, maintenance or removal of such generator. Upon the termination or expiration of the Lease, Tenant shall promptly remove the generator at its sole cost and expense. Tenant shall restore any portion of the Building or Land affected by the generator to substantially the same condition existing prior to the installation of the generator, normal wear and tear excepted.

Exhibit C

In addition to the foregoing, to the best of Landlord's knowledge, another tenant in the Building, Citicorp ("Citicorp"), currently has a power generator that provides back-up power to the 3rd floor electrical panels according to plans provided to Landlord by Citicorp. Tenant has indicated to Landlord that it would like to connect or tie-in to such generator through individual circuits for back-up power if Citicorp is willing to permit same. Landlord agrees to use reasonable efforts to facilitate discussions between Tenant and Citicorp to determine whether Citicorp will agree to such connection or tie-in but Landlord does not make any representations or guarantees regarding same. Tenant will be solely responsible for any and all costs and expenses incurred by Tenant in connection with such discussions or any actual connection or tie-in into Citicorp's generator. If Citicorp permits same, Landlord will have the right to approve, which approval will not be unreasonably withheld, any and all of Tenant's plans and specifications regarding such connection or tie-in.

Exhibit C

**EXHIBIT D**

## CONSTRUCTION OF INITIAL LEASEHOLD IMPROVEMENTS

I.  **SCHEDULE OF CRITICAL DATES**

The following is a schedule of certain critical dates relating to Landlord's and Tenant's respective obligations with respect to construction of the leasehold improvements for the Leased Premises. These dates, the specific references (e.g., the "Working Drawings Delivery Date") and the respective obligations of Landlord and Tenant are more fully described in II below.

All references to days mean calendar days, not working or business days.

| Item | Responsible Party | Date Due |
|---|---|---|
| Landlord Premises Delivery Date | Landlord | Within three (3) business days after execution of this Lease and delivery of signed Lease |
| Initial Space Plan Review Date | Landlord | Within 7 Days after Initial Space Plan Delivery Date |
| Initial Working Drawing Review Date | Landlord | Within 14 Days after Initial Working Drawing Delivery Date |

II.  **LANDLORD AND TENANT PRE-CONSTRUCTION OBLIGATIONS**

1.  Tenant will prepare and submit for Landlord's review a space plan consistent with the requirements of Article IV below (the "Space Plan"), which Space Plan will be used to prepare the Tenant Working Drawings (as defined hereinafter). Landlord shall provide Tenant with an initial space planning allowance of $.15 per square foot of Rentable Square Feet (the "Initial Space Planning Allowance") for costs incurred in connection with the preparation of the initial Space Plan. Landlord shall reimburse Tenant by check for the amount up to the Initial Space Planning Allowance within thirty (30) days of the receipt of an invoice(s) therefor from Tenant. Any costs for the initial Space Plan exceeding the Initial Space Planning Allowance shall be paid for by Tenant. If Tenant has not fully utilized the Initial Space Planning Allowance within three (3) months after the Commencement Date, any remaining balance of the Initial Space Planning Allowance will be forfeited by Tenant and retained by Landlord.

2.  On or before the Initial Space Plan Review Date, Landlord will advise Tenant of any required changes to the Initial Space Plan.

3.  Tenant will prepare and deliver to Landlord working drawings for the Leased Premises consisting of complete sets of detailed architectural, structural, mechanical, electrical and plumbing plans and specifications consistent with the requirements of Article V below ("Tenant Working Drawings").

4.  On or before the Initial Working Drawings Review Date, Landlord will review the Tenant Working Drawings as they relate to coordination with the Building Standard Shell Condition

Exhibit D

Improvements constructed by Landlord. Landlord's review shall not assess the accuracy or constructability of the Tenant Working Drawings. Tenant shall promptly reimburse Tenant for Landlord's reasonable out-of-pocket expenses in reviewing the Tenant Working Drawings.

5.    Upon receipt of Landlord's review of the Tenant Working Drawings, Tenant will revise the Working Drawings to incorporate such revisions into the final Working Drawings. The final Working Drawings shall be submitted to Landlord. Landlord's approval of the Tenant Working Drawings shall acknowledge that the Tenant Working Drawings correctly depict the proper layout of all improvements desired by Tenant for the Leased Premises.

III.    CERTAIN PROVISIONS RELATING TO CONSTRUCTION

1.    Tenant acknowledges that (i) the structure of the Building is complete with windows installed, (ii) vertical transportation for freight and passengers for construction purposes is available to the applicable floor upon a reasonable schedule and upon similar terms and conditions to which such facilities are made available to subcontractors of the Building's general contractor, (iii) electricity to the extent necessary for construction purposes is available to the same extent and upon terms and conditions to which such facilities are made available to subcontractors of the Building's general contractor, and (iv) the Building Shell is completed on the applicable floor so as to permit Tenant to carry out the leasehold improvements work on such floor with necessary continuity.

2.    The following provisions shall apply to all work necessary or desirable to prepare the Leased Premises for initial occupancy by Tenant (the "Tenant's Work"):

(a)    Tenant's Work shall be completed by Tenant. Tenant appoints Cushman & Wakefield of Florida, Inc. as Tenant's construction manager who will supervise the construction of Tenant's Work. Landlord shall have no responsibility for construction of any Tenant's Work. Landlord shall, however, provide the following in connection with Tenant's Work at no cost to Tenant: access to and use of the loading dock, elevators, parking garage, hoisting, temporary water, electrical systems, air conditioning, toilet facilities and related facilities.

(b)    The architects, engineers and contractors selected by Tenant to perform Tenant's Work shall be subject to the reasonable approval of Landlord. Tenant's Contractor shall perform Tenant's Work in a first-class, workmanlike manner, using only good commercial grades of materials, in accordance with this Lease and the plans and specifications approved hereunder, Landlord's insurance requirements and with all applicable governmental laws, ordinances, codes, rules and regulations, and Tenant's Work shall be subject to Landlord's reasonable administrative supervision. Tenant's Work shall not commence until the Tenant's Contractor has delivered to Landlord a copy of the building permit issued for the Tenant's Work and evidence of insurance, both of which are reasonably satisfactory to Landlord in all respects. Upon completion of Tenant's Work, Tenant shall deliver to Landlord evidence of payment, contractors' affidavits and sworn statements, full and final waivers of lien from contractors and subcontractors for labor, services and materials and all other documents reasonably required by Landlord, together with record drawings, in both electronic and paper form, reflecting as built conditions of the Leased Premises.

(c)    Tenant shall indemnify, defend by counsel reasonably acceptable to Landlord and hold harmless Landlord, Landlord's beneficiaries, the managing agent of the Project and their respective agents, partners, members and employees and the Project of, from and against any and all liabilities, losses, costs, charges, claims, damages, liens, fees and expenses, including, without limitation, reasonable attorneys' fees and expenses, relating to the Tenant's Work. Landlord shall permit Tenant and Tenant's Contractor to have reasonable access to the Leased Premises immediately upon execution of the Lease by Landlord and Tenant for purposes of constructing Tenant's Work, provided that Tenant

Exhibit D

and Tenant's Contractor shall abide by the rules of the site applicable to all contractors, shall coordinate and schedule their access to the Leased Premises for labor and materials delivery through the managing agent of the Project and shall not interfere with or delay, to any material extent, the work of any other contractor working in connection with the Project.

(d)     Any entry to the Project, the Building or the Leased Premises by or on behalf of Tenant or Tenant's Contractor shall be under and subject to all of the terms and provisions of this Lease, the same as if the Commencement Date had occurred, except that Tenant shall not be obligated to pay any Base Rental or Tenant's Additional Rental prior to the Rent Commencement Date. To the extent not prohibited by law, all entry to the Project, the Building or the Leased Premises by or on behalf of Tenant or Tenant's Contractor from and after the Landlord Premises Delivery Date shall be solely at the risk of Tenant and Tenant's Contractor, and Landlord, Landlord's beneficiaries, the managing agent of the Project and their respective agents, partners and employees shall not be liable in any way, and Tenant hereby waives and releases them from any liability, for any injury or damage to or theft, robbery, pilferage, loss or loss of the use of any property of Tenant, Tenant's Contractor or any other person or entity or any of the Tenant's Work in or about the Leased Premises or the Project which occurs during such period; provided, however, Landlord, Landlord's beneficiaries, the managing agent of the Project and their respective agents, partners, members and employees shall be liable, and Tenant does not waive or release them from liability, for their respective gross negligence or willful misconduct which occurs during such period and causes any injury to or death of any person. The foregoing waiver and release of claim shall be in addition to and shall not limit or be limited by any other releases or waivers of claims in this Lease.

(e)     The Commencement Date shall not be subject to any type of delays except for delays due to hurricanes which cause outages or closures of the Building that hampers Tenant's Contractor's ability to access the Building to perform Tenant's Work in or about the Leased Premises or the Project, or for the other delays set forth in Section 1.2(b) of this Lease.

3.     Except as provided in Paragraph 4, below, Tenant shall pay the cost of all the Tenant's Work, including, without limitation, the cost of all items necessary or desirable to complete the Tenant's Work, such as the fees and expenses arising out of the preparation of Tenant's Plans and Specifications, the fees and expenses of Tenant's Contractor, and the cost of the items described in the second sentence of Paragraph 2(a), above.

4.     Landlord shall pay the Tenant Improvement Allowance to Tenant as follows:  Installments of Tenant Improvement Allowance shall be paid by Landlord pro rata on the basis of the total estimated cost for Tenant's Work as such costs are incurred by Tenant; provided, however, it shall be a condition to the obligation of Landlord to pay amounts pursuant to this Paragraph 7 that Tenant shall have provided Landlord with appropriate requests for payment, invoices, contractors' affidavits and sworn statements, contractors' and subcontractors' lien waivers, and other documents as may be reasonably required (i) by Landlord to demonstrate the correctness of the amount requested by Tenant, (ii) to induce the issuer of the policy of title insurance insuring Landlord's interest in the Development to issue an endorsement to the policy of title insurance insuring Landlord's interest in the Development to be subject to no mechanics' liens or claims therefor resulting from the Tenant's Work and (iii) to satisfy any other conditions (including that Tenant demonstrates that it has sufficient funds in addition to Tenant Improvement Allowance to complete the Tenant's Work) as may be reasonably imposed by Landlord or any Mortgagee. Upon completion of Tenant's Work, and provided that Tenant has reasonably satisfied all of the conditions for payment of the Tenant Improvement Allowance described in this Paragraph 7 and has taken possession of all of the Leased Premises for purposes of conducting its business, Tenant may elect, upon written notice thereof to Landlord delivered within three (3) months after the Commencement Date, to apply any portion of the Tenant Improvement Allowance not needed for

Exhibit D

the payment in full of the cost of Tenant's Work (such amount being hereafter referred to as the "Balance") towards the cost of moving, plans and specifications and professional services, to the extent the same are related to this lease or Tenant's moving into the Leased Premises. If Tenant has not fully utilized the Tenant Improvement Allowance within twelve (12) months after the Commencement Date, any remaining balance of the Tenant Improvement Allowance will be forfeited by Tenant and retained by Landlord. Notwithstanding the foregoing, in the event that the costs incurred by Tenant for Tenant's Work exceed the Tenant Improvement Allowance, Landlord shall provide to Tenant an additional allowance (the "Additional Tenant Improvement Allowance") of up to $5.00 per Rentable Square Foot of the Leased Premises to be used for the excess construction costs. The Additional Tenant Improvement Allowance shall be disbursed by Landlord to Tenant in the same manner as the Tenant Improvement Allowance. Tenant shall repay such Additional Tenant Improvement Allowance together with an additional amount computed like interest thereon at the rate of ten percent (10%) per annum amortized over the initial Lease Term of the Lease to Landlord on a monthly basis as additional rent under this Lease in accordance with the other terms of this Lease. In the event that the excess construction costs exceed $5.00 per Rentable Square Foot then Tenant shall be solely responsible for such costs. Notwithstanding anything to the contrary in the foregoing, Tenant shall have the right to utilize up to $2.00 per rentable square foot of the Tenant Improvement Allowance towards moving costs to the Building, which funds shall be disbursed by Landlord to Tenant on the same basis as the balance of the Tenant Improvement Allowance.

IV.   MINIMUM INFORMATION REQUIRED FOR SPACE PLAN

The Space Plan shall include drawings, plans and specifications prepared by Tenant's architect showing the intended design, character and finishes of the Leased Premises, including partitions and door locations, all in sufficient detail to enable the Tenant Working Drawings to be prepared.

V.   MINIMUM INFORMATION REQUIRED OF INITIAL WORKING DRAWINGS

Floor Plans Indicating:

1. Location and type of all partitions.

2. Location and types of all doors - indicate hardware and provide keying schedule.

3. Location and type of glass partitions, windows and doors - indicate framing if not part of Building Standard Shell Condition.

4. Location of telephone equipment room accompanied by an approval of the telephone company if required.

5. Indicate critical dimensions necessary for construction, such as millwork, special partitions, etc..

6. Location of all electrical items - outlets, switches, telephone outlets.

7. Location and type of all non-building electrical items, including lighting.

8. Location and type of equipment that will require special electrical requirements. Provide manufacturers' specifications for use and operation.

9. Location, weight per square foot and description of any exceptionally heavy equipment or filing system exceeding 50 psf live load except in areas designed specifically for special Tenant loads.

10. Requirement for special air conditioning or ventilation.

Exhibit D

11. Type and locations of all finishes.

12. Location and type of plumbing equipment and services.

13. Location and type of kitchen equipment and services.

14. Location of all HVAC controls, fire alarm, security and life safety equipment.

15. Location and type of all graphics and signage.

16. Location of all Tenant fixtures, furniture and equipment ("FF&E").

17. Location and size of any floor openings required. Also include structural loading data for vaults, vault walls, slab depressions, special stairs, file rooms, elevators, libraries, etc.

Details Showing:

1. All millwork with dimensions and dimensions of all equipment to be built-in.

2. Corridor entrance.

3. Bracing or support of special walls, glass partitions, etc., if desired. If not included with the Tenant Space Plan, the Building architect will design, at Tenant's expense, all support or bracing required.

VI. **DEFINITIONS**

1. "Initial Space Plan Delivery Date" shall mean the date Tenant delivers to Landlord a copy for its review and comment an initial Space Plan as defined for all of Tenant's Leased Premises ("Tenant's Space Plans").

2. "Initial Space Plan Review Date" shall mean the date Landlord provides Tenant comments on the Tenant's initial Space Plan consistent with Section IV, above.

3. "Initial Working Drawing Delivery Date" shall mean the date Tenant delivers to Landlord a fully coordinated and complete set of detailed architectural, structural, mechanical, electrical and plumbing plans and specifications based upon the Tenant's Final Space Plan.

4. "Initial Working Drawing Review Date" shall mean the date Landlord provides Tenant comments on Tenant's initial Working Drawings.

Exhibit D

**EXHIBIT B**

**AIR CONDITIONING AND HEATING SERVICES**

     Subject to the provisions of Section 3.1, Landlord will furnish Building Standard air conditioning and heating between 7:30 a.m. and 6:00 p.m. on weekdays (from Monday through Friday, inclusive), and between 8 a.m. and 1:00 p.m. on Saturdays, all exclusive of Holidays as defined below (the "Building Operating Hours"). Upon request of Tenant made in accordance with the rules and regulations for the Building, Landlord will furnish air conditioning and heating at other times (that is, at times other than the times specified above), in which event Tenant shall reimburse Landlord for Landlord's actual cost of furnishing such services, which as of the date hereof, is $35.00 per hour, per floor, and which is subject to change from time to time.

     The following dates shall constitute "Holidays" as said term is used in this lease:

| | |
|---|---|
| (a) | New Year's Day |
| (b) | Memorial Day |
| (c) | Independence Day |
| (d) | Labor Day |
| (e) | Thanksgiving Day |
| (f) | Friday following Thanksgiving Day |
| (g) | Christmas |
| (h) | Any other holiday generally recognized as such by landlords of office space in the Miami office market, as determined by Landlord in good faith. |

If in the case of any holiday described in (a) through (g) above, a different day shall be observed than the respective day above described, then that day which constitutes the day observed by national banks in Miami, Florida, on account of such holiday shall constitute the holiday under this lease.

EXHIBIT F

BUILDING RULES AND REGULATIONS

PURPOSE:    The purpose of these Rules and Regulations is to provide each business within the Project with a quality of environment and visual appeal consistent with the high standards of office buildings in the Airport / West Dade submarket of Miami.

A.    PARKING:

Parking of automotive trucks and other vehicles shall be restricted to areas designated for such purpose by Landlord.

Landlord reserves the right to remove by towing any vehicle which may be obstructing any door or driveway, is improperly parked, obstructing other parked vehicles or is parked in a restricted area. All towing expenses shall be paid by the vehicle owner.

Each vehicle owner shall be responsible for any damage caused by the operation or parking of such vehicle which causes damages to Landlord's property.

Parking after normal business hours shall conform and comply with all laws, ordinances and regulations of any agency or any regulatory authority.

Tenant shall not make any repairs to nor maintain its vehicles, including, without limitation, washing and waxing, within the Project;

B.    OUTDOOR STORAGE:

Tenant shall not store any materials, supplies, equipment, etc., outside the Leased Premises.

Storage in trailers, whether attached to or detached from a driving unit is prohibited (except as is usual and customary for loading and unloading such trailers). Parking of any vehicle within the Project for more than five continuous days is prohibited.

C.    WASTE REMOVAL:

With respect to waste other than customary office waste generated by Tenant, Tenant shall furnish its own sealable waste and refuse containers which must be located at all times within the area designated by Landlord. No other containers are permitted on site. Enclosures provided by Landlord and container lids shall remain closed at all times when not actively in use. Tenant is responsible for maintaining the assigned waste and refuse areas free and clean of all litter, obnoxious odors, insects, rodents, etc. Any medical waste produced by Tenant or its employees, licensees, invitees, etc. shall be disposed of in accordance with all applicable guidelines. Any activity or expense incurred by Landlord in cleaning, maintaining, or otherwise preserving the concept of a clean environment shall be reimbursed to Landlord by Tenant plus fifteen percent (15%) for Landlord's overhead and expenses. Failure by Tenant to timely reimburse Landlord therefor shall be deemed a default of and cause for cancellation of the Lease.

Tenant shall comply with Landlord's recycling program for the Building, or in the absence thereof, Tenant shall institute and maintain a recycling program for its waste in compliance with all applicable laws and requirements of any governmental agency or department having jurisdiction over the Leased Premises.

D.   · SIGN CONTROLS:

Painting or affixing signs on any part of the outside of the Leased Premises, the Building, the Parking Areas, windows or doors is prohibited. Free standing signs are not permitted outside of the Leased Premises. No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by Tenant on the inside of the Leased Premises If the same can be seen from outside of the Leased Premises without the prior written consent of Landlord (which consent may be withheld by Landlord in its sole discretion), and then only of such color, size, character, style and material and in such places as shall be approved and designated by Landlord. In the event of a violation of the foregoing by Tenant, Landlord may remove same without any liability and may charge the expense incurred by such removal to Tenant. Signs at entrance to the Leased Premises shall be placed thereon by a contractor designated by Landlord and shall be paid for by Tenant.

E.   TRADE FIXTURES AND SECURITY SYSTEMS: Please refer to the terms and requirements of the Lease.

F.   ON-SITE IMPROVEMENTS:

Tenant shall not be permitted to alter, move, maintain or disturb any part of the landscaping or other improvements located on or adjacent to the Building, the common areas or the Project.

G.   MISCELLANEOUS:

In addition to the Rules and Regulations hereinabove set forth, Tenant shall comply with the following:

1.   Tenant, its officers, agents, servants and employees shall not block or obstruct any of the entries, passages, doors, hallways or stairways of the Building or the Parking Areas, or place, empty or throw any rubbish, litter, trash or material of any nature into such areas, or permit such areas to be used at any time except for the ingress or egress of Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees.

2.   The movement of furniture, equipment, machines, merchandise or materials within, into or out of the Leased Premises, the Building or the Parking Areas shall be restricted to time, method and routing of movement as determined by Landlord upon request from Tenant and Tenant shall assume all liability and risk to property, the Leased Premises, the Building and the Project in such movement. Tenant shall not move furniture, machines, equipment, merchandise or materials within, into or out of the Building, the Leased Premises or the Parking Areas without having first obtained a written permit from Landlord at least twenty-four (24) hours in advance. Safes, large files, electronic data processing equipment and other heavy equipment or machines shall be moved into the Leased Premises, the Building, or the Parking Areas only with Landlord's prior written consent and shall be placed where directed by Landlord.

3.   Landlord will not be responsible for lost or stolen personal property, equipment, money or any article taken from the Leased Premises, the Building or the Parking Areas regardless of how or when such loss occurs.

4.   Tenant, its officers, agents, servants and employees shall not install or operate any refrigerating, heating or air conditioning apparatus, or carry on any mechanical operation, or bring into the Leased Premises, the Building or the Parking Areas any inflammable fluids or explosives without written permission of Landlord.

5.   Tenant, its officers, agents, servants or employees shall not use the Leased Premises, the Building or the Parking Areas for housing, lodging or sleeping purposes or for the cooking or preparation of food without the prior written consent of Landlord.

6.   Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees shall not bring into the Parking Areas, the Building or the Leased Premises, or keep on the Leased Premises any fish, fowl, reptile, insect or animal, or any bicycle or other vehicle without the prior written consent of Landlord, wheelchairs and baby carriages excepted.

Exhibit F

7.     No additional locks shall be placed on any door in the Building without the prior written consent of Landlord. Landlord may at all times keep a pass key to the Leased Premises. All keys shall be returned to Landlord promptly upon the expiration or earlier termination of the Lease.

8.     Other than as set forth in Section 5.1(c) of this Lease, Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees shall do no painting or decorating in the Leased Premises, or mark, paint or cut into, drive nails or screw into, nor in any way deface any part of the Leased Premises or the Building without the prior written consent of Landlord. If Tenant desires signal, communication, alarm or other utility or service connections installed or changed, such work shall be done at the expense of Tenant, with the prior written approval and under the direction of Landlord.

9.     Landlord reserves the right to close the Building at 6:00 p.m. on weekdays (except for holidays generally recognized by state and federal governments), and at 1:00 p.m. on Saturdays, subject however to Tenant's right to admittance under regulations prescribed by Landlord, and to require that all persons entering the Building identify themselves and establish their right to enter or to leave the Building.

10.    Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees shall not permit the operation of any musical or sound-producing instruments or device which may be heard outside the Leased Premises, the Building or the Parking Areas, or which emanate electrical waves which will impair radio or television broadcasting, or reception from or in the Building.

11.    Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees shall, before leaving the Leased Premises unattended, close and lock all doors and shut off all utilities; damage resulting from failure to do so shall be paid for by Tenant. Tenant, before the closing of the day and leaving the Leased Premises, shall see that all blinds and/or draperies are pulled and drawn, and shall see that all doors are locked.

12.    All plate and other glass now in the Leased Premises which is broken by Tenant, its employees, agents, contractors, guests, and invitees shall be replaced by Landlord at the expense of Tenant.

13.    Tenant shall give Landlord prompt notice of all accidents to, or defects in air conditioning equipment, plumbing, electric facilities, or any part or appurtenance of the Leased Premises or the Building.

14.    The plumbing facilities shall not be used for any purpose other than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage or damage resulting from a violation of this provision shall be borne by Tenant.

15.    All contractors and/or technicians performing work for Tenant within the Leased Premises, the Building or Parking Areas shall be referred to Landlord for approval before performing such work. This shall apply to all work including, without limitation, installation of telephones, telegraph equipment, electrical devices and attachments, and all installations affecting floors, walls, windows, doors, ceilings, equipment, or any other physical feature of the Building, the Leased Premises or Parking Areas. None of this work shall be done or caused to be done by Tenant without Landlord's prior written approval.

16.    No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Building, nor placed in the halls, corridors or vestibules without the prior written consent of Landlord.

17.    Glass panel doors that reflect or admit light into the passageways or into any place in the Building shall not be covered or obstructed by Tenant, and Tenant shall not permit, erect and/or place drapes, furniture, fixtures, shelving, display cases or tables, lights or signs and advertising devices in front of or in proximity of interior and exterior windows, glass panels or glass doors providing a view into the interior of the Leased Premises, unless same shall have first been approved in writing by Landlord.

18.    No space in the Building or the Parking Areas shall, without the prior written consent of Landlord, be used for manufacturing, public sales, or for the storage of merchandise, or for the sale of merchandise, goods or property of any kind, or auction.

Exhibit F

19.   Canvassing, soliciting and peddling in the Building or the Parking Areas is prohibited and Tenant shall cooperate to prevent the same.  In this respect, Tenant shall promptly report any such activities to Landlord's property management office.

20.   There shall not be used in any space, or in the public halls of the Building, either by Tenant or by jobbers or others, in the delivery or the receipt of merchandise, any hand trucks except for those which are equipped with rubber tires and side guards.

21.   Neither Tenant nor any officer, agent, employee, servant, patron, customer, visitor, licensee or invitee of Tenant shall go upon the roof of the Building without the prior written consent of Landlord or Landlord's designated representative.

22.   In the event Tenant must dispose of crates, boxes, etc., which will not fit into office wastepaper baskets, it will be the responsibility of Tenant to dispose of same in a manner consistent with the Lease and these Rules and Regulations.  In no event shall Tenant set such items in the public hallways or other areas of the Building, Parking Areas or the Project, excepting Tenant's own Premises for disposal.

23.   Tenant is cautioned in purchasing furniture and equipment in that the size of same should be limited to such as will pass through the doors of the Leased Premises.  Large pieces should be made in parts and set up in the Leased Premises.  Landlord reserves the right to refuse to allow any furniture or equipment of any description not complying with the above conditions to be placed in the Building.

24.   Tenant will be responsible for any damage to the Leased Premises, including, without limitation, carpeting and flooring, as a result of rust or corrosion of file cabinets, roller chairs, metal objects, or spills of any type of liquid.

25.   Tenants employing laborers or others outside of the Building shall not have their employees paid in the Building or in the Project, but shall arrange to pay their payrolls elsewhere.

26.   If the Leased Premises should become infested with vermin, Landlord, at Tenant's sole cost and expense, shall cause the Leased Premises to be exterminated at such time and from time to time, to the satisfaction of Landlord.

27.   Tenant shall not install any antenna, aerial wires, satellite dishes, radio or television equipment, inside or outside of the Building without Landlord's prior written approval and upon such terms and conditions as may be specified by Landlord in each and every instance.

28.   Tenant shall not make or permit any use of the Leased Premises, the Building or the Parking Areas which, directly or indirectly, is forbidden by law, ordinance or governmental or municipal regulation, code or order, or which may be disreputable or dangerous to life, limb or property.

29.   Tenant shall not advertise the business, profession or activities of Tenant in any manner which violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining thereto, nor shall Tenant use the name of the Building or the Project for any purpose other than that of the business address of Tenant, or use any picture or likeness of the Building or the Project, or the name of the Building or the Project on any letterhead, envelope, circular, notice, advertisement, container or wrapping material, without Landlord's prior written consent thereto.

30.   Tenant, its officers, agents, employees, servants, patrons, customers, licensees, invitees and visitors shall not solicit business in the Building, the Parking Areas, or the Project, nor shall Tenant distribute any handbills or other advertising matter in automobiles parked in the Parking Areas.

31.   Tenant shall not conduct its business and/or control its officers, agents, employees, servants, patrons, customers, licensees and visitors in such a manner as to create any nuisance, or interfere with, annoy or disturb any other tenant or Landlord in its operation of the Building, or commit waste, or suffer or permit waste to be committed in the Leased Premises, the Building, or the Project.

Exhibit F

32.     Tenant shall permit Landlord or its agent to enter upon the Leased Premises during normal office hours to make inspections, repairs, alterations or additions in or to the Leased Premises or the Building, and at any time in the event of an emergency, and shall permit Landlord to perform any acts related to the safety, protection, preservation, reletting or improvement of the Leased Premises or the Building.

33.     Tenant, without the prior written consent of Landlord, shall not install any linoleum or similar floor covering.

34.     Access to the Building, or to the halls, corridors, elevators or stairways to the Leased Premises may be refused from 1:00 p.m. Saturday until 7:30 a.m. Monday, on holidays generally recognized by state and federal governments, and during the rest of the week between the hours of 6:00 p.m. and 7:30 a.m., unless the person seeking access has a pass or is properly identified. Landlord shall in no event be liable for damages for the admission to, or exclusion from, the Building of any person whom Landlord has the right to exclude hereunder. Tenant's employees, agents and visitors shall be permitted to enter and leave the Building whenever appropriate arrangements have been previously made between Landlord and Tenant with respect thereto. Tenant shall be responsible for all persons for whom Tenant requests such permission, and Tenant shall be liable to Landlord for all acts of such persons. Any person whose presence in the Building at any time shall, in the judgment of Landlord, be prejudicial to the safety, character, reputation and interest of the Building, or its tenants, may be denied access to the Building, or may be ejected therefrom. In case of invasion, riot, public excitement or other commotion, Landlord may prevent all access to the Building during the continuance of same, by closing the doors or otherwise, for the safety of the tenants of the Building, and for the protection of property in the Building. Landlord may require any person leaving the Building with any package or other object to exhibit a pass from Tenant.

35.     Tenant acknowledges that Landlord has designated the Building as a "non-smoking" building, and Tenant, its officers, agents, employees, servants, patrons, customers, licensees and visitors shall at all times refrain from smoking in the Building except for those areas of the Building, if any, specifically designated by Landlord as "smoking" areas.

36.     Tenant shall comply with all indoor air quality standards and requirements pertaining to the Building and the Leased Premises, including those regulations promulgated by OSHA, as same may be amended from time to time.

Exhibit F

EXHIBIT G

DECLARATION OF COMMENCEMENT DATE AND RENTABLE AREA

This Declaration is made as of _____, 200__, by and between HINES VAF II DORAL, L.P. ("Landlord") and MARTINAIR HOLLAND NV ("Tenant").

Landlord and Tenant are parties to that certain Office Lease (the "Lease") dated as of _____, 2007.

In accordance with the Lease, Landlord and Tenant hereby memorialize that:

1.   The Commencement Date is _____, ____.

2.   The expiration date of the initial term is _____, ____.

3.   The Rentable Square Feet of the Leased Premises is _____ square feet.

4.   The Rentable Area of the Project as of the date hereof is approximately _____ square feet.

TENANT:

MARTINAIR HOLLAND NV,

By: _____
Name: _____
Title: _____

LANDLORD:

HINES VAF II DORAL, L.P.,
a Delaware limited partnership

By    Hines VAF II Doral GP LLC,
      a Delaware limited liability company

      By:   Hines U.S. Office Value Added Fund II, L.P., its sole
            member

            By:   Hines U.S. Office Value Added Fund II,
                  LLC, its general partner

                  By:   Hines Interests Limited
                        Partnership, its managing member

                        By:   Hines Holdings, Inc., its
                              general partner

                              By: _____
                              Name: _____
                              Title: _____

Exhibit G

EXHIBIT H

SPECIAL STIPULATIONS

These Special Stipulations are hereby incorporated into this lease and in the event that they conflict with any provisions of this Lease, these Special Stipulations shall control.

1.   **Base Rental.**

(a)   Base Rental for the Leased Premises shall be as follows:

| Year | Commencing | Base Rent (Per Annum Rate per RSF) | Rentable Square Feet | Monthly Base Rental |
|------|-----------|-----------------------------------|---------------------|--------------------|
| 1 Months 1 – 12 | | $14.20 | 14,569 | $17,239.98 |
| 2 Months 13 – 24 | | $15.20 | 14,569 | $18,454.07 |
| 3 Months 25 – 36 | | $16.20 | 14,569 | $19,668.15 |
| 4 Months 37 – 48 | | $17.20 | 14,569 | $20,882.23 |
| 5 Months 49 – 60 | | $18.20 | 14,569 | $22,096.32 |
| 6 Months 61 – 72 | | $19.45 | 14,569 | $23,613.92 |
| 7 Months 73 – 84 | | $20.70 | 14,569 | $25,131.53 |
| 8 Months 85 – 96 | | $21.95 | 14,569 | $26,649.13 |
| 9 Months 97 – 108 | | $23.20 | 14,569 | $28,166.73 |
| 10 Months 109 – 120 | | $24.45 | 14,569 | $29,684.34 |
| 11 Months 121 – 126 | | $25.70 | 14,569 | $31,201.94 |

Notes:   (x)   Each "Year" is a calendar year of 365/6 days.

(y)   In addition to Base Rental, Tenant shall also be obligated to pay Tenant's Additional Rental, including, without limitation, Tenant's Percentage Share of the Operating Expenses.

(b)   Notwithstanding the foregoing Base Rental schedule, Landlord agrees to provide Tenant an abatement of Base Rental and Additional Rental (the "Abatement"), during the first six (6) months of the Lease Term (the "Abatement Period"). The day following the expiration of the Abatement Period is referred to in the Lease as the "Rent Commencement Date". In the event of a monetary default by Tenant under this Lease during the Lease Term beyond any applicable notice and cure periods, if Landlord elects to exercise its remedies under this Lease, the Abatement shall be amortized on a straight-line basis and any unamortized amounts of the Abatement at the time of default shall become immediately due and payable to Landlord.

2.   **Satellite Antenna Dish.**

Landlord hereby grants to Tenant the non-exclusive right, at its sole cost and expense, to install, maintain and operate one (1) satellite antenna dish no larger than one (1) meter in diameter and related equipment (the "Equipment") on the roof of the Building at no additional charge, subject to the following terms and conditions:

Exhibit H

(a)     The location, size and all other aspects of the Equipment shall be approved by Landlord prior to Tenant's installation of the Equipment. Such Landlord approval will not be unreasonably withheld, conditioned or delayed. Such Equipment, and the installation and operation of same, shall be subject to all applicable governmental approvals, rules and regulations. Tenant shall deliver to Landlord Tenant's plans and specifications for the installation of the Equipment and the surrounding screening for review and approval not to be unreasonably withheld, conditioned or delayed by Landlord's engineer not less than ten (10) days prior to commencing installation of the Equipment. Tenant shall reimburse Landlord for actual and commercially reasonable third party costs and expenses incurred by Landlord in connection with Landlord or its designated agent's review and approval of such plans and specifications as well as ensuring Tenant's compliance with this provision.

(b)     Tenant shall install the Equipment in an aesthetically pleasing manner and exercise all reasonable steps to shield or screen the Equipment from public view. Tenant shall fence or screen the Equipment so as to minimize any risks to ensure that the Equipment does not create a nuisance.

(c)     Tenant shall operate the Equipment in compliance with all applicable laws, rules, regulations and ordinances.

(d)     Landlord shall perform all roof penetrations and modifications necessary for the installation, maintenance or removal of Tenant's Equipment. Tenant will reimburse Landlord for all actual and commercially reasonable associated costs and expenses incurred by Landlord in connection with such roof penetrations and modifications.

(e)     Tenant hereby agrees to indemnify and hold Landlord, its agents, employees, contractors and representatives, harmless from and against any and all cost, claims, damages (including, but not limited to, any damage to the Building, the roof or Landlord's property), causes of action and liability which may arise by reason of any occurrence attributable to or arising out of Tenant's installation, maintenance, repair, operation or removal of any of the Equipment, including, without limitation, any claim or cause of action for injury to or death of any person or damage to any property arising therefrom and Tenant agrees to defend any claim or demand against Landlord, its agents or employees arising out of any such occurrence. Tenant shall, upon thirty (30) days prior written notice from Landlord, reimburse Landlord for all actual and commercially reasonable third party costs and expenses incurred by Landlord as a result of Tenant's operation of the Equipment, including damages to the Building and the furnishing of electric power for the operation of the Equipment.

(f)     Upon the expiration or earlier termination of this Lease or if Tenant vacates or abandons the Leased Premises, Tenant shall promptly remove the Equipment and repair all damage to the Building caused thereby at its sole expense or Landlord may do so at Tenant's sole expense.

(g)     Tenant's Equipment shall not hinder or unreasonably interfere with any other tenants' or licensees' installation, operation and maintenance or repair of antenna or satellite equipment.

(h)     Landlord reserves the right to enter into a contract with a third-party manager for the leasing and management of the roof of the Building. Tenant shall be responsible for complying with all reasonable rules and regulations established by such manager for any equipment placed after a third party manager is hired.

3.     **Monument Signage.**

So long as this Lease is in full force and effect, Tenant is not in monetary default hereunder beyond any applicable notice and cure periods, and Tenant is leasing and occupying the entirety of the Leased Premises, Tenant shall have the non-exclusive right, at its sole cost and expense, to have its identification signage on the monument sign located adjacent to 8750 NW 36th Street such signage right being subject to the following terms and conditions:

(a)     The location shall be designated by Landlord and the, design, construction, size, and all other aspects of such signage shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld, and shall be subject to the approval (if approval is required for such panel) of all governmental agencies or authorities having jurisdiction over the Building, and shall be subject to all applicable rules, regulations, ordinances and laws, including, without limitation, zoning ordinances, and any declarations, covenants or instruments enumbering the Land,

Exhibit H

(b)    The expense of installing, constructing, maintaining and removing the Tenant's identification panel on such monument signage shall be the sole cost and expense of Tenant and shall be paid directly to Landlord by Tenant. Tenant shall be responsible for all costs and expenses associated with such identification panel.  Upon the removal of such identification signage, Tenant shall pay all costs associated with restoring the existing monument sign to substantially the same condition that existed prior to the installation of such identification signage, reasonable wear and tear and damage by casualty excepted.

(c)    If Tenant requests any assignment of this Lease or subletting of the entire Leased Premises, Tenant's rights with respect to the identification signage as contained in this Stipulation No. 3 shall not be transferable or assignable to an assignee or subtenant without the express prior written consent of Landlord, which consent may not be unreasonably withheld, conditioned or delayed.

4.    Right of First Offer.

Subject to the rights of existing tenants in the Building, prior to execution of a lease for all or any portion of the First Offer Space, as hereinafter defined, and so long as Tenant is not then in default under this Lease beyond any applicable notice and cure periods, Landlord will notify Tenant ("Landlord's Notice") in writing of the terms and conditions upon which it would be willing to lease the First Offer Space to Tenant.

The "First Offer Space" shall mean any space on the third (3rd) floor in the Building that becomes available for lease.  The First Offer Space shall be "available for lease" if (i) the space is not then leased to a third party or (ii) the space will become vacant because the current tenant's lease has or will expire.

Tenant shall have ten (10) business days after receipt of Landlord's Notice, to notify Landlord in writing whether Tenant will lease the entire First Offer Space upon such terms and conditions set forth in Landlord's Notice. If Tenant elects to lease the First Offer Space, Landlord and Tenant will execute an amendment to this Lease adding the First Offer Space to the Leased Premises within ten (10) business days after Landlord's receipt of Tenant's notice of intent to lease upon all the same terms as this Lease except as modified by the terms in Landlord's Notice and the Base Rental for the First Offer Space shall be at the then current Prevailing Market Rate as defined in Exhibit H-1. If Tenant does not deliver its notice of intent to lease the First Offer Space or elects not to lease the First Offer Space within such ten (10) business day period, then this right of first offer to lease the First Offer Space will lapse and be of no further effect and Landlord will have the right to lease the First Offer Space to any third party on the same or any other terms and conditions, whether or not such terms and conditions are more or less favorable than those offered to Tenant; provided, however, (i) if Landlord has not leased the First Offer Space to a third party within one (1) year after Tenant has elected not to, or has been deemed to have elected not to, lease the First Offer Space, or (ii) after all or any portion of the First Offer Space is again "available for lease", then this right to first offer will once again apply to the First Offer Space or such applicable portion of the First Offer Space.  The right granted to Tenant under this Special Stipulation No. 4 is personal to Tenant, and in the event of any assignment of this Lease or sublease by Tenant requiring Landlord's consent under the terms of the Lease, this right of first offer to lease the First Offer Space shall thenceforth be void and of no further force and effect.

5.    Renewal Option.

So long as this Lease is in full force and effect and Tenant is not in default beyond applicable notice and cure periods in the performance of any of the covenants or terms and conditions of this Lease at the time of notification to Landlord or at the time of commencement of the Extension Term, as that term is hereinafter defined, Tenant shall have the option (the "Extension Option") to extend the Term for the entire Leased Premises for one (1) additional period of five (5) years (the "Extension Term"), at the Prevailing Market Rate, as defined in Exhibit H-1, subject to terms and conditions set forth in this Special Stipulation No. 5.  Tenant shall provide Landlord with written notice nine (9) months prior to the expiration of the Lease Term of its desire to extend the Lease Term.  Landlord shall provide Tenant with a written proposal setting forth its determination of the Prevailing Market Rate to extend the Lease Term within thirty (30) days of receipt of such notice or, if Landlord and Tenant do not agree upon such proposal within thirty (30) days following Landlord's tender thereof, then fair market rental value shall be determined in the manner set forth in Exhibit H-1.

Exhibit H

EXHIBIT H-1

PREVAILING MARKET RATE

The term "fair market rental value" as of any date, with respect to any space, and with respect to any period shall mean the fixed base rent per annum which, on such date, a willing landlord under no compulsion would agree to accept from a non-renewal non-expansion tenant having the creditworthiness of Tenant, and such a willing non-renewal non-expansion tenant under no compulsion would agree to pay, for a lease of comparable space for such comparable period of time in the Building or Project on all of the terms and conditions of this Lease to be applicable thereto (including (i) any construction allowance and/or free rent period to which Tenant will be entitled with respect thereto, or the absence thereof if such be the case, and (ii) Tenant's obligation to pay additional rent based upon operating expenses and taxes, and the base year or amount to be applicable to such obligation). With respect to any renewal, Tenant shall have the right to a market allowance, or to waive the same and have that waiver taken into account in the determination of the fair market rental value.

When determining the aforesaid fair market rent by reference to comparable transactions, the base rents provided for in such comparable transactions shall be adjusted to reflect the differences between the other terms of such comparable transactions and the other terms of the renewal or expansion to which the aforesaid fair market rent is to be applicable. For example: (a) if such comparable transactions provided for any allowance and/or free rent, then in determining the aforesaid fair market rent to be applicable to any renewal or expansion with respect to which Tenant does not receive any allowance and/or free rent (or a smaller allowance and/or free rent) the base rents provided for in such comparable transactions shall be adjusted downward, or (c) if such comparable transactions provided for the tenant there under to pay its pro-rata share of increases in operating expenses and/or taxes over a base year different from the base year to be applicable to any renewal or expansion, then in determining the aforesaid fair market rent to be applicable to any renewal or expansion the base rents provided for in such comparable transactions shall be adjusted upward or downward, as appropriate.

In the event of a renewal, if Landlord and Tenant cannot agree on base rental terms within thirty (30) days following Tenant's exercise of its renewal option then each will appoint a bona fide real estate appraiser whose instructions shall be to agree to a market base rental on the above outlined formula no later than ten (10) months prior to the expiration date of the Lease. If these two appraisers are not able to agree on a fair market base rental by utilizing the above outlined formula (if their appraised terms are within 5% of each other, they will be averaged and the average shall be deemed to be the fair market base rental) then they will jointly appoint a third appraiser. The third appraiser shall determine which of the appraisals provided by the Landlord's and Tenant's appraisers respectively, is closest to the fair market base rental, and that appraisal shall be used for determining the renewal terms no later than nine (9) months prior to the expiration date of the Lease. Tenant shall then have five (5) days within which to either accept the designated fair market base rental and final documentation shall be prepared and executed between Landlord and Tenant accordingly or reject the designated fair market base rental and vacate the Leased Premises at the expiration of the Lease Term.

EXHIBIT I

JANITORIAL SPECIFICATIONS

## LOBBIES AND CORRIDORS – Daily Service

- Sweep and clean building entrances.
- Clean and sanitize all public telephones and enclosures. Neatly arrange and replace as needed all phone books.
- Clean and remove smudges from entry door glass.
- Polish all entry handles, door plates and metal trim.
- Wipe clean all glass, wood, or metal doors and doorjambs.
- Empty all ashtrays, wipe clean, and polish.
- Screen all sand urns of cigarette butts and debris. Clean container and add sand as needed.
- Empty all trash receptacles, clean container with clean, damp cloth, and replace plastic liner.
- Remove all debris from landscaped pots and planters. Report any thefts, broken pots or missing plants.
- Vacuum all carpet areas completely and remove spots.
- Dust mop and damp mop entry floors.
- Clean and remove smudges and marks on walls, wall coverings, and artwork.
- Wipe clean all directory boards (exterior) with clean, soft cloth using glass cleaner that is considered safe and not labeled as hazardous waste.
- Wipe clean all fire extinguisher cabinets and glass. Report broken glass or missing extinguishers.
- Clean and polish all elevator doors, jambs, pull plates, and hall lanterns.
- Dust and clean all lobby and corridor signage.
- Report any lights burned out.
- Secure all doors and turn off appropriate lights upon completion of work assignments.
- Dust and clean all horizontal surfaces less than seven feet in height.
- Clean, polish and straighten all furniture as needed.

## LOBBIES AND CORRIDORS – Weekly Service

- Clean and polish all entry metal and sills.
- Dust and clean or polish all baseboards.
- Spot clean all carpeted areas.
- Dust all ledges and exit signs.
- Dust all walls above seven feet

## LOBBIES AND CORRIDORS – Monthly Service

- Clean all ceiling vents and grills.
- Dust high ceiling corners and entryways.
- Dust and clean light fixtures and covers (interior and exterior).
- Clean and treat all wood paneling and furniture as requested.
- Strip, reseal or re-wax common area floors as necessary.
- Shampoo carpet areas as necessary.
- Dust and clean all fire lobby doors inside and out.
- Polish door floor plates.

Exhibit I

**OFFICES - Daily Service**

- Remove hand spots or smudges from entry doors.
- Using a dustless mop, damp mop all non-carpeted areas.
- Vacuum and spot clean carpets in all traffic areas, removing staples and other debris.
- Properly position furniture, books and magazines in reception areas.
- Properly position furniture in offices and conference rooms.
- Before leaving any suite, shut off lights, electrical appliances, close drapes and blinds and lock all entrance doors and only interior doors as requested.
- Blackboards will be erased/chalk boards cleaned upon request only.
- Remove fingerprints and smudges from all walls.
- Spot clean all partition glass and mirrors.
- Remove all fingerprints and smudges from light switch covers, electrical outlet cover plates and doorknob handles.
- Dust windows sills and ledges.
- Dust all horizontal surfaces less than seven feet, furniture, and equipment. DO NOT dust desks, conference tables or counters, which are cluttered with paperwork.
- Dust and replace all desk ornaments, phones and machines in their original position.
- Clean furniture fabric with a whiskbroom to sweep off any dust, paper bits, and erasures as needed. Remove all staples.
- Empty all ashtrays and wipe clean.
- Empty all wastebaskets and carry trash to designated areas for removal; replace plastic liners as needed.
- Empty large recycling bins from offices into separate container to be disposed of into specially designated recycling dumpsters.
- Clean and wash all lunchroom tabletops, counters, sinks, cabinets, refrigerator, and stove (exterior only) surfaces. Report any insect problems.
- Report all burned out lights.
- Perform additional services requested by tenant and bill tenant directly.

**OFFICES - Weekly Service**

- Damp wipe all interior doors with a treated cloth.
- Detail vacuum entire carpet areas; remove staples and other debris.
- Polish all desktops that are cleared of paperwork.
- Dust all ledges, files, baseboards, and sills under seven feet.
- Vacuum all furniture or wipe vinyl furniture clean.
- Dust all lower parts of furniture.
- Detail and clean all kitchen or wet bar areas.

**OFFICES - Monthly Service**

- Completely clean all partitions and doors, doorjambs, door floor plates, glass and mirrors from floor to ceiling.
- Dust all ledges, wall moldings, pictures, shelves, etc. over seven feet.
- Brush down and clean all vents and grills.
- Scrub and wax all tile floors.
- Detail all desks and office furniture.

Exhibit I

- ⚹ Detail and clean all kitchen, wet bars or lunch room areas.
- • Clean all baseboards.
- • Dust all light fixtures and covers.

## OFFICES – Quarterly Service

- ⚹ Dust and clean or vacuum all drapes and blinds.
- ⚹ Detail and vacuum chairs and upholstered furniture.
- ⚹ Strip, clean and apply floor dressing to all composition, hardwood and parquet floors.
- ⚹ Dust and clean all light fixtures and covers.

## RESTROOMS – Daily Service

- • Dust and clean restroom signage and doors.
- • Vacuum all restrooms vestibules and remove spots.
- • Wet mop and disinfect tile floor, paying particular attention to areas under urinals and toilet bowls.
- • Clean alkaline deposits and soap spills from floor tile grout.
- • Wash and disinfect all basins, urinals, and toilet bowls.
- • Clean underside rims of urinals and toilet bowls.
- • Wash both sides of toilet seats with soap and water and disinfect.
- • Empty, clean, sanitize, and polish all paper dispensers, replacing liners as necessary.
- • Clean and polish all mirrors.
- • Dust ledges and base boards.
- • Damp wipe, polish, and shine all chrome, metal fixtures, hand plates, kick plates, utility covers, plumbing, clean-out covers, and doorknobs.
- • Spot clean with disinfectant all partitions and tile walls. Report any graffiti and remove if possible.
- • Fill all toilet latrines, soap, sanitary napkin and towel dispensers as necessary.
- • Report all burned out lights, leaking faucets, running plumbing, or other maintenance needs.
- • Janitor carts will not be brought into restroom areas or used to prop open doors.
- • Restroom doors will be propped open with a rubber stop, and a sign indicating "restroom closed for cleaning" will be placed outside.
- • Pour clean water down floor drains to prevent sewer gas from escaping.

## RESTROOMS – Weekly Service

- • Wash down all walls.
- ⚹ Wash all waste containers and disinfect.
- • Clean and polish all doors, doorplates, and hardware.

## RESTROOMS – Monthly Service

Wipe clean all ceilings, lights, and fixtures. Shampoo, as needed, and clean vestibule carpet

Exhibit I

- Detail all toilet compartments and fixtures.
- Brush and clean all grills and vents.
- Strip wax and apply new wax to tile floors as needed/ requested.
- Spray Buffing will be required on a monthly basis.

**ELEVATORS – Daily Service**

- Vacuum and clean all spots and stains from carpet.
- Dust and clean baseboards.
- Dust and polish all metal with approved polish (no abrasives).
- Damp wipe and remove all spots and fingerprints from doors and walls (interior and exterior).
- Dust and clean elevator ceilings and lights.
- Remove gum, stains or debris from ceilings, handrails and elevator tracks.
- Dust, disinfect and clean emergency phone and security compartments.
- Clean all call buttons, call plates, and signage.
- Report any burned out lights or malfunctions of elevator.
- Clean and polish elevator tracks.

**STAIRWELLS – Daily Service**

- Remove all trash, cigarette butts, etc.
- Report any exit signs that are burned out
- Report any lights burned out.

**STAIRWELLS – Weekly Service**

- Sweep down all stairs and landings.
- Dust all handrails, banisters, and ledges.
- Clean all walls of fingerprints and smudge marks, etc.
- Dust and clean all stairwell signage.
- Dust and clean all emergency phones.

**STAIRWELLS – Monthly Service**

- Wipe clean all stairwell doors and door jambs.
- Wet mop all stairs and staff landing. Clean base boards if necessary.
- Dust and clean all lights and fixtures.
- Dust and clean all emergency fire equipment and plumbing.

**Vacant Spaces – Monthly Service**

- Sweep and damp mop all non-carpeted areas.
- Dust all horizontal surfaces.
- Vacuum all carpeted areas.

Exhibit I

MSDS (Material Safety Data Sheets)

. It will be the responsibility of the Contractor to properly maintain all MSDS records relating to chemicals, cleaning agents, etc. used for the performance of this Contract. This documentation must be maintained in an on-going basis as new cleaning chemicals are added.

An MSDS guide will be maintained in both the Janitorial office as well as in the property Management Office.

Note: Janitorial specifications are subject to reasonable modifications from time to time but shall at all times maintain the Building as a Class A office building in the Doral/west airport submarket of Miami-Dade County, Florida.

Exhibit I

## Exhibit B

"Furniture"

| | North End |
|---|---|
| Rm 315 | 1 exec desk, 4 drawer cabinet, 1 ergo chair, 2 guest chairs, 1 rolling filer |
| Rm 316 | 1 exec desk, 4 drawer cabinet, 1 ergo chair, 2 guest chairs, 1 rolling filer |
| Rm 317 | 2 Reg desks, 2 drawer cabinet, 1 guest chair, 1 ergo chair, 1 small shelving unit |
| Rm 318 | 2 reg desks, 4 door cabinet (glass doors), 1 ergo chair |
| Rm 319 | 1 exec desk, 4 drawer cabinet, long cabinet 2/4, 1 ergo chair, 2 guest chairs, 1 rolling filer |
| Rm 320 | End of exec desk, 1 ergo chair, 1 guest chair |
| Cubicles Large (15) | L-shape desk, 1 gray metal cabinet, 1 ergo chair |
| Cubicles Small (4) | Reg desk, 1 small grey filing drawer, 1 ergo chair |
| Kitchen | 3 square tables, 12 chairs, 1 fridge, 1 microwave, 2 small kidney shaped rolling tables |
| Conference Room | 8 reg tables, 16 red conference chairs, 2 small kidney shaped rolling tables |
| Meeting Room | 1 round table, 4 red conference chairs, 1 small 2 door cabinet |
| Lobby | 1 cream sofa, 2 cream waiting room chairs, 1 square coffee table, 2 round end tables |
| Reception area | 1 long reception desk, large reception cabinet (4 drawers + 4 doors), 2 ergo chairs, 1 rolling filer |
| Mailroom | Fixed grey cabinets and shelving units |
| | South End |
| Rm 301 | 1 Exec Desk, 4 drawer cabinet, 2 guest chairs, 1 ergo chair, 1 rolling filer |
| Rm 303 | 1 Exec Desk, Long cabinet 2/4, 1 guest chair, 1 ergo chair, 1 rolling filer |
| Rm 304 | 1 Exec Desk, 4 drawer cabinet, long cabinet 2/4, 2 guest chairs, 1 ergo chair, 1 rolling filer |
| Rm 305 | 1 Reg desk, long cabinet 2/4, 1 ergo chair, 1 guest chair |
| Rm 306 | 1 Reg desk, long cabinet 2/4, 1 ergo chair, 1 guest chair |
| Rm 307 | 2 Reg desks, long cabinet 2/4, 2 ergo chairs, 2 guest chairs |
| Rm 308 | 1 Reg desk, long cabinet 2/4, 2 ergo chairs, 2 guest chairs, 1 rolling filer |
| Rm 309 | 1 Exec desk, long cabinet 2/4, 1 ergo chair, 2 guest chairs, 1 rolling filer |
| Rm 310 | 1 reg desk, long cabinet 2/4, 1 small shelving unit, 1 ergo chair, 2 guest chairs, 1 rolling filer |
| Rm 311 | 1 reg desk, long cabinet 2/4, 1 small shelving unit, 1 ergo chair, 1 guest chair, 1 rolling filer |
| Rm 312 | 1 exec desk, 4 drawer cabinet, long cabinet 2/4, 2 guest chairs, 1 ergo chair, 1 rolling filer, |
| Rm 313 | 1 reg desk, 2 drawer cabinet, long cabinet 2/4, 1 ergo chair, 1 guest chair, 1 rolling filer |
| Rm 314 | 1 reg desk, long cabinet 2/4, 1 ergo chair, 1 guest chair, 1 rolling filer |
| Cubicles Large (20) | L-shape desk, 1 gray metal cabinet, 1 ergo chair |
| | Miscellaneous |
| GM Office (Rm 302) | 1 conference table, 8 guest chairs, 1 leather office chair, 1 large U-shaped desk, 1 large shelving and cabinet unit |
| Secretary and Waiting room | 1 U-shaped desk (includes drawers), 2 drawer cabinet, 1 ergo chair, 2 guest chairs, 1 round waiting room table |
| Small kidney shaped rolling tables | |

25

<u>EXHIBIT C</u>

Building Security

## INTENTIONALLY OMITTED



March 14, 2014

**VIA UPS OVERNIGHT DELIVERY**

Martinair Holland N.V.
6640 NW 22nd Street
Bldg. 707, Suite 204
Miami, FL 33122
Attn: Ron Vandegeer, Director of Finance

Re:       Benihana Inc. Sublease Termination Notice

Dear Mr. Vandegeer,

Pursuant to Section 17 "Cancellation" of the Sublease, dated December 16, 2011, between Martinair Holland, N.V. and Benihana Inc., this letter shall serve as formal written notice of Subtenant's desire to exercise its right to terminate the Sublease.

Please contact me at your earliest convenience to discuss the terms of the termination in further detail. I can be reached at 305.702.2819 or ahlavaty@benihana.com .

Sincerely,

Adam Hlavaty
Senior Director of Real Estate
Benihana Inc.

Cc:       Cristina Mendoza, General Counsel, Benihana Inc.
          Hines Interests Limited Partnership, 3750 NW 87th Avenue, Suite 210, Doral, FL 33178,
          Attn: Property Manager
          Hines Interests Limited Partnership, 7300 Corporate Center Drive, Suite 100, Miami, FL 33128,
          Attn: Mr. Cortabarria
          Hines GS Properties, Inc., One South Dearborn, Chicago, IL 60603, Attn: Mr. Shannahan
          Hines Value Added Funds, 499 Park Avenue, 12th Floor, New York, 10022, Attn: Mr. Congdon

Exhibit B

8750 NW 36th Street, Suite 300, Doral, Florida 33178  phone: 305.593.0770  web: www.benihana.com  fax: 305.592.6371

